# EXHIBIT 1

## RIV CAPITAL INC.

## CONVERTIBLE PROMISSORY NOTE PURCHASE AGREEMENT

THIS CONVERTIBLE PROMISSORY NOTE PURCHASE AGREEMENT (this "*Agreement*") is made as of the 9th day of August, 2021 by and among RIV Capital Inc., a corporation existing under the laws of the Province of Ontario (the "*Company*") and The Hawthorne Collective, Inc., a corporation existing under the laws of the State of Ohio (the "*Purchaser*").

### RECITAL

**WHEREAS** the Purchaser and the Company wish to create a long-term strategic business relationship in order to cooperatively source, invest in and develop certain business opportunities that the parties have a shared interest in pursuing, as is further detailed in the investor rights and strategic opportunities agreement substantially in the form attached hereto as <u>Exhibit A</u> (the "*Investor Rights Agreement*");

**AND WHEREAS**, pursuant to the terms hereof, the Company has agreed to sell and issue to the Purchaser, and the Purchaser has agreed to purchase, an unsecured convertible promissory note substantially in the form attached hereto as <u>Exhibit B</u> (the "*Note*"); and

**AND WHEREAS** the Note is convertible in accordance with its terms into Class A common shares in the capital of the Company (the "*Common Shares*") which, if the Note were issued and subsequently converted on the date hereof, would represent approximately 41% of the issued and outstanding Common Shares as of the date hereof.

### AGREEMENT

**NOW, THEREFORE**, in consideration of the foregoing, and the mutual representations, warranties, covenants and conditions set forth below, the Company and the Purchaser, intending to be legally bound, hereby agree as follows:

1.   <u>**Interpretation**</u>.

1.1   <u>Rules of Construction</u>. Except as may be otherwise specifically provided in this Agreement and unless the context otherwise requires, in this Agreement:

(a)   the terms "Agreement", "this Agreement", "the Agreement", "hereto", "hereof", "herein", "hereby", "hereunder" and similar expressions refer to this Agreement in its entirety and not to any particular provision hereof and include any schedules or exhibits thereto;

(b)   references to an "Article" or "Section" followed by a number or letter refer to the specified Article or Section to this Agreement;

(c)      the division of this Agreement into articles and sections and the insertion of headings are for convenience of reference only and shall not affect the construction or interpretation of this Agreement;

(d)      words importing the singular number only shall include the plural and vice versa and words importing the use of any gender shall include all genders;

(e)      the word "including" is deemed to mean "including without limitation" and the word "includes" is deemed to mean "includes without limitation";

(f)      the terms "party" and "the parties" refer to a party or the parties to this Agreement;

(g)      all terms defined in this Agreement have the defined meanings when used in any certificate or other document made or delivered pursuant hereto, unless otherwise defined therein;

(h)      any reference to any agreement, plan, contract or any other written instrument or document (including this Agreement) means such agreement, plan, contract, or written instrument or document as amended, modified, replaced or supplemented from time to time;

(i)      any reference to a statute, regulation or rule shall be construed to be a reference thereto as the same may from time to time be amended, re-enacted or replaced, and any reference to a statute shall include any regulations or rules made thereunder;

(j)      unless otherwise stated, all dollar amounts refer to United States dollars;

(k)      the word "day" means calendar day unless Business Day is expressly specified; for the purposes of this Agreement, "***Business Day***" means any day, other than (i) a Saturday, Sunday or statutory holiday in the Province of Ontario or the State of Ohio, or (ii) a day on which banks are generally closed in the Province of Ontario or the State of Ohio;

(l)      any time period within which a payment is to be made or any other action is to be taken hereunder shall be calculated excluding the day on which the period commences and including the day on which the period ends;

(m)      the parties agree that they have been represented by counsel during the negotiation and execution of this Agreement and, therefore, waive the application of any law, regulation, holding or rule of construction providing that ambiguities in any agreement or other document will be construed against the party drafting such agreement or document; and

(n)      whenever any payment is required to be made, action is required to be taken or period of time is to expire on a day other than a Business Day, such payment shall be made, action shall be taken or period shall expire on the next following Business Day.

1.2     <u>Governing Law and Submission to Jurisdiction</u>.

(a)     This Agreement and all matters, claims or actions (whether at law, in equity, in contract, in tort or otherwise) based upon, arising out of or relating to this Agreement or the negotiation, execution or performance of this Agreement, shall be interpreted and enforced in accordance with, and the respective rights and obligations of the parties shall be governed by, the laws of the Province of Ontario and the federal laws of Canada applicable in that province, regardless of the laws that might otherwise govern under any applicable conflict of laws principles.

(b)     Each of the parties irrevocably and unconditionally (i) submits to the exclusive jurisdiction of the courts of the Province of Ontario over any action or proceeding arising out of or relating to this Agreement, (ii) agrees to commence such an action or proceeding in Toronto, Ontario, and to cooperate and use its commercially reasonable efforts to bring the action or proceeding before the Ontario Superior Court of Justice (Commercial List), (iii) waives any objection that it might otherwise be entitled to assert to the jurisdiction of such courts and (iv) agrees not to assert that such courts are not a convenient forum for the determination of any such action or proceeding.

(c)     The Purchaser, being organized under the laws of a foreign jurisdiction and residing outside of Canada, hereby appoints Blake, Cassels & Graydon LLP, 199 Bay St, Suite 4000, Toronto, Ontario, M5L 1A9, as their agent for service of process in the Province of Ontario.

1.3     <u>Severability</u>. If any provision of this Agreement is determined by a court of competent jurisdiction to be invalid, illegal or unenforceable in any respect, all other provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party hereto. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties hereto as closely as possible in an acceptable manner to the end that transactions contemplated hereby are fulfilled to the extent possible.

1.4     <u>Exhibits</u>. The following Exhibits are attached to and form an integral part of this Agreement:

Exhibit A                    Investor Rights Agreement

Exhibit B                    Note

**2.      Amount and Terms of the Loan.**  Subject to the terms and conditions of this Agreement, the Company shall sell and issue to the Purchaser, and the Purchaser shall purchase, the Note (together with this Agreement, the Investor Rights Agreement and any Additional Notes (as defined herein), the "***Loan Documents***") for a purchase price of the Canadian dollar equivalent of $150,000,000 (based on the daily average rate of exchange for USD:CAD published by the Bank of Canada on the date hereof) (the "***Loan***").  The Note, subject to the terms and conditions provided therein, shall be convertible into Common Shares (such Common Shares so issued on

conversion, the "***Conversion Shares***") or repayable on its terms.  The obligations of the Company to the Purchaser under the Note shall be unsecured.  The Loan shall be deemed to include any additional principal amount evidenced by Additional Notes sold pursuant to the terms hereof.

**3.**      **Closing.**

3.1      Closing Date.  The closing of the sale and purchase of the Note shall be held on the Business Day following satisfaction of all conditions of Closing, other than those conditions that by their terms can only be satisfied on closing (the "***Closing***" and such date, the "***Closing Date***").

3.2      Closing Deliverables.  Subject to the satisfaction and/or waiver of conditions set forth in Section 3.3, at the Closing (a) the Purchaser shall deliver to the Company the full amount of the Loan by wire transfer of immediately available funds to the bank account designated by the Company in Section 3.2 of the Disclosure Schedule; and (b) the Company shall issue and deliver to the Purchaser the Note in favour of the Purchaser, duly executed by the Company (which shall also be executed by the Purchaser on Closing).

3.3      Closing Conditions.

(a)      Conditions to the Purchaser's Obligations at Closing.      The obligation of the Purchaser to purchase the Note at the Closing is subject to the fulfillment, on or before the Closing, of each of the following conditions unless otherwise waived by the Purchaser, in its sole discretion:

(i)      the representations and warranties of the Company in Article 4, other than the Company Fundamental Representations (as defined herein), shall be true and correct in all material respects as of the Closing; and the Company Fundamental Representations shall be true and correct as of the Closing;

(ii)      the Company shall have complied with, and performed, in all material respects, all obligations, covenants, conditions and agreements herein required to be performed or observed by it on or prior to the Closing;

(iii)      the Company shall have delivered to the Purchaser evidence satisfactory to the Purchaser, acting reasonably, showing that (A) the number of directors comprising the Company's board of directors (the "***Board***") shall have been increased to seven (7) members, (B) that Christopher Hagedorn, Mark Sims and Gary Vaynerchuk have been appointed to the Board as contemplated in the Investor Rights Agreement, effective immediately upon Closing; and (C) the directors' and officers' insurance policy of the Company remains in full force and effect and the persons listed in (B) are covered thereby;

(iv)      the Company shall have executed and delivered the Investor Rights Agreement;

(v)      the Common Shares shall have been delisted from the Toronto Stock Exchange (the "***TSX***") and shall have been listed on the Canadian Securities Exchange (the "***CSE***");

(vi)     except for any notices required or permitted to be filed after Closing, all Company Required Approvals (as defined below) required to be obtained prior to Closing, shall have been obtained;

(vii)     the Company shall have delivered to the Purchaser a certificate of status of the Company under the *Business Corporations Act* (Ontario);

(viii)     there shall be no Order (as defined below) that would, or would be reasonably expected to, (a) cease trade, enjoin, prohibit or impose materially adverse limitations or conditions on the Purchaser's ability to acquire, hold or exercise full rights of ownership over the Note and/or the Conversion Shares (as defined in the Note), as and when issued in accordance with the terms of the Loan Documents, including the right to vote the Conversion Shares; (b) impose materially adverse terms or conditions on completion of the transactions contemplated hereby or on the ownership by the Purchaser of the Note or the Conversion Shares, as and when issued in accordance with the terms of the Loan Documents, or compel the Purchaser to dispose of or hold separate any material portion of the business or assets of the Purchaser, any of its Affiliates (as defined below) or the Company or any of its subsidiaries (taken on a consolidated basis) as a result of the transactions contemplated hereby; or (c) prevent the consummation of the transactions contemplated hereby, or if the transaction is consummated, have a Material Adverse Effect; and

(ix)     the Company shall have delivered to the Purchaser a certificate signed by a duly appointed officer of the Company, in form and substance satisfactory to the Purchaser, acting reasonably, certifying (a) the articles of incorporation (the "***Articles***") and by-laws (the "***By-laws***") of the Company in effect as of the date hereof, (b) resolutions of the Board approving the Loan Documents, and the transactions contemplated thereby, and (c) that each of the conditions stated in Section 3.3(a)(i) and Section 3.3(a)(ii) have been satisfied as of the Closing.

(b)     <u>Conditions of the Company's Obligations at Closing</u>.     The obligation of the Company to issue and sell the Note to the Purchaser at the Closing is subject to the fulfillment, on or before the Closing, of each of the following conditions, unless otherwise waived by the Company, in its sole discretion:

(i)     the representations and warranties of the Purchaser in <u>Article 5</u>, other than the Purchaser Fundamental Representations (as defined herein), shall be true and correct in all material respects as of the Closing; and the Purchaser Fundamental Representations shall be true and correct as of the Closing;

(ii)     the Purchaser shall have complied with, and performed, in all material respects, all obligations, covenants, conditions and agreements herein required to be performed or complied with by the Purchaser on or before such Closing;

(iii)     the Purchaser shall have delivered the full amount of the Loan in accordance with Section 3.2;

(iv)     the Common Shares shall have been delisted from the TSX and shall have been listed on the CSE;

(v)      the Purchaser shall have executed and delivered the Investor Rights Agreement; and

(vi)      except for any notices required or permitted to be filed after Closing, all Company Required Approvals required to be obtained prior to Closing shall have been obtained.

**4.**      **Representations and Warranties of the Company.**   The Company hereby represents and warrants to the Purchaser that the following representations, subject to the disclosures and qualifications set forth in the Disclosure Schedule of the Company provided to the Purchaser on the date hereof (the "***Disclosure Schedule***"), are true and complete as of the date of this Agreement (except for representations and warranties that speak as of a specific date which shall be true and correct as of such specified date).  As used in this Article 4, the term "***knowledge***" (including the phrase "***to the Company's knowledge***") shall mean the actual knowledge, after reasonable investigation of such Person's direct reports, of Narbé Alexandrian, Eddie Lucarelli and Matthew Mundy.

4.1      Organization, Good Standing, Corporate Power and Qualification.   The Company is a corporation duly organized, validly existing and in good standing under the laws of its jurisdiction of incorporation and has all requisite corporate power and authority to carry on its business as now conducted, and to create, issue and sell the Note and reserve, authorize and issue the Conversion Shares, in accordance with the terms of the Note, and to enter into the Loan Documents and to carry out its obligations hereunder and thereunder.  Neither the Company nor, to the knowledge of the Company, any other Person, has taken any steps or proceedings, voluntary or otherwise, requiring or authorizing the Company's dissolution or winding-up.  The Company is duly qualified to carry on business and is in good standing in each jurisdiction in which it currently carries on business except where the failure to so qualify would not have a Material Adverse Effect.  For purposes of this Agreement, a "***Material Adverse Effect***" shall mean a material adverse effect on the business, assets (including intangible assets), liabilities, financial condition, property or results of operations of the Company and its Subsidiaries (as defined below), taken as a whole.

4.2      Capitalization.

(a)      The authorized capital of the Company consists of an unlimited number of Common Shares of which 142,468,471 Common Shares are issued and outstanding as at the date of this Agreement.  All of the outstanding Common Shares have been duly authorized and are validly issued shares in the capital of the Company, and were issued in compliance with all applicable securities laws.

(b)      As at the date of this Agreement, the Company had (i) 8,589,667 Common Shares allotted, reserved and set aside for issuance against the exercise of outstanding options issued pursuant to the Company's Stock Option Plan (the "***Option Plan***"), (ii) 353,030 Common Shares allotted, reserved and set aside for issuance against the settlement of outstanding restricted share units issued pursuant to the Company's Restricted Share Unit Plan (the "***RSU Plan***") and (iii) 1,506,658 Common Shares allotted, reserved and set aside for issuance against the settlement of outstanding options, performance share units and restricted share units issued pursuant to the Company's Long Term Incentive Plan (collectively with the Option Plan and the RSU Plan, the

6

"***Equity Incentive Plans***"). The Company has furnished to the Purchaser complete and accurate copies of the Equity Incentive Plans duly adopted by the Company and forms of share award agreements or award documentation used thereunder. Except as disclosed in Section 4.2(b) of the Disclosure Schedule, none of the Company's share award agreements or option, restricted share unit and performance share unit documents contain provisions for the acceleration of vesting (or lapse of a repurchase right) or other changes in the vesting provisions that are triggered upon the completion of the transactions contemplated herein.

(c)     Except (A) as provided in the Loan Documents and (B) for securities described in Section 4.2(b), there are no outstanding options, warrants, rights (including conversion or preemptive rights and rights of first refusal or similar rights) or agreements, orally or in writing, to purchase or acquire from the Company any Common Shares, or any securities convertible into or exchangeable for Common Shares.

(d)     Except as contemplated under the terms Equity Incentive Plans and the Note, the Company has no obligation (contingent or otherwise) to purchase or redeem any of its securities.

(e)     The Company has obtained valid waivers of any rights by other parties to purchase any of the equity securities covered by this Agreement.

4.3     Subsidiaries & Other Interests.  Section 4.3 of the Disclosure Schedule sets forth all registered or beneficial interests owned or controlled by the Company, directly or indirectly, in any other corporation, partnership, trust, joint venture, limited liability company, association, or other business entity (including the approximate percentage interest held in each such entity). Other than as disclosed in Section 4.3 of the Disclosure Schedule, the Company is not a participant in any joint venture, partnership or similar arrangement. "***Subsidiary***" or "***Subsidiaries***" means, as to any Person (in this definition, the "first Person"), any other Person (in this definition, the "second Person"): (a) in respect of which the first Person or a Subsidiary of the first Person is a general partner or, in the case of a limited liability company, the managing member or manager thereof; (b) of which at least a majority of the outstanding equity interests having by the terms thereof ordinary voting power to elect a majority of the board of directors or similar governing body of the second Person (irrespective of whether or not at the time any equity interests of any other class or classes of the second Person shall have or might have voting power by reason of the happening of any contingency) is at the time directly or indirectly owned or controlled by the first Person or one or more of its Subsidiaries; or (c) as to which the first Person consolidates for accounting purposes.  Each Subsidiary is duly organized, validly existing and in good standing under the laws of its jurisdiction of formation and has all requisite power and authority to carry on its business as presently conducted.  Each Subsidiary is duly qualified to carry on business and is in good standing in each jurisdiction in which it currently carries on business except where the failure to so would have a Material Adverse Effect. There are no outstanding options, warrants, rights (including conversion or preemptive rights and rights of first refusal or offer or similar rights) or agreements, orally or in writing, to purchase or acquire any equity interests held by the Company, directly or indirectly, in any Subsidiary.

4.4     Authorization.  All corporate action required to be taken by the Company to enter into the Loan Documents, to issue the Note at the Closing, and to reserve, allot, set-aside for

issuance, and to issue the Conversion Shares issuable upon exercise of the Note, has been taken or will be taken prior to the Closing. All corporate action of the Company necessary for the execution and delivery of the Loan Documents, the performance of all obligations of the Company under the Loan Documents to be performed as of the Closing, and the issuance and delivery of the Note has been taken or will be taken prior to the Closing. The Loan Documents, when executed and delivered by the Company, shall constitute valid and legally binding obligations of the Company, enforceable against the Company in accordance with their respective terms except (i) as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, or other laws of general application relating to or affecting the enforcement of creditors' rights generally or (ii) as limited by laws relating to the availability of specific performance, injunctive relief, or other equitable remedies.

4.5    <u>Valid Issuance</u>.  The Note, when issued, sold and delivered in accordance with the terms and for the consideration set forth in this Agreement, will be validly issued and free of restrictions on transfer other than restrictions on transfer under the Loan Documents, applicable securities laws and liens or encumbrances created by or imposed by the Purchaser.  Assuming the accuracy of the representations of the Purchaser in <u>Article 5</u> of this Agreement, the Note will be issued in compliance with all applicable securities laws.  The Conversion Shares issuable upon exercise of the Note have been or will be prior to Closing duly allotted, reserved and set-aside for issuance, and upon such issuance in accordance with the terms of the Note, will be validly issued, fully paid and non-assessable Common Shares, free of restrictions on transfer other than restrictions on transfer under the Loan Documents, applicable securities laws and liens or encumbrances created by or imposed by the Purchaser.  Assuming the accuracy of the representations of the Purchaser in <u>Article 5</u> of this Agreement, the Conversion Shares will be issued in compliance with all applicable securities laws.

4.6    <u>Consents and Filings</u>.  To the Company's knowledge, Section 4.6 of the Disclosure Schedule sets forth a complete list of all consents, approvals, Orders or authorizations of, or registrations, declarations or filings with, or notices to, any Governmental Authority or other Person required to be made or obtained by the Company in connection with the authorization, execution, delivery and performance of this Agreement and the other Loan Documents, or the consummation of the transactions contemplated hereby and thereby (the "***Company Required Approvals***"). Other than the Company Required Approvals, and as required by the terms and conditions of the Note, assuming the accuracy of the representations made by the Purchaser in <u>Section 5</u> of this Agreement, no consent, approval, Order or authorization of, or registration, qualification, designation, declaration or filing with, any Governmental Authority is required on the part of the Company in connection with the consummation of the transactions contemplated by this Agreement, except for filings pursuant to applicable securities laws, which have been made or will be made in a timely manner.  For purposes of this Agreement (i) "***Order***" shall mean any order, decision, charge, subpoena, judgment, ruling, injunction, award, stipulation, assessment, verdict, decree or writ, whether preliminary or final, of any Governmental Authority, (ii) "***Governmental Authority***" shall mean any court, tribunal, arbitrator, authority, agency, commission, bureau, board, department, official, body or other instrumentality of the United States, Canada, any other foreign country, or any domestic or foreign state, province, county, city, other political subdivision or any other similar body or organization exercising governmental or quasi-governmental power or authority having jurisdiction over the Company or Purchaser or the transactions contemplated by this Agreement or the Loan Documents, as applicable and (iii)

"***Person***" shall mean an individual, corporation, company, partnership, joint venture, limited liability company, governmental authority, unincorporated organization, trust, estate, association or other entity, whether domestic or foreign, or the United States of America, Canada or any other nation, state or Governmental Authority or political subdivision thereof.

4.7     Litigation.  Other than as set forth on Section 4.7 of the Disclosure Schedule, there is no claim, action, suit, proceeding, arbitration, complaint, charge or investigation pending or, to the Company's knowledge, currently threatened (i) against the Company, or to the Company's knowledge, any director, officer or employee of the Company arising out of their relationship with the Company; (ii) to the Company's knowledge, that questions the validity of the Loan Documents or the right of the Company to enter into them, or to consummate the transactions contemplated by the Loan Documents; or (iii) to the Company's knowledge, that would reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect. Neither the Company nor, to the Company's knowledge, any of its directors or officers is a party or is named as subject to the provisions of any Order (in the case of directors or officers, such as would materially adversely affect the Company).  There is no material action, suit, proceeding or investigation initiated by the Company pending or which the Company intends to initiate.

4.8     Intellectual Property. Except as would not have a Material Adverse Effect, the Company owns or possesses or can acquire on commercially reasonable terms sufficient legal and enforceable rights to all Company Intellectual Property without any payment to a third-party, or without any known conflict with, or infringement of, the rights of other Persons. There are no outstanding options, licenses, agreements, claims, encumbrances or shared ownership interests of any kind relating to the Company Intellectual Property, nor is the Company bound by or a party to any options, licenses or agreements of any kind with respect to the patents, trademarks, service marks, trade names, copyrights, trade secrets, licenses, information, proprietary rights and processes of any other Person, in each case other than those options, licenses or agreements entered into in the ordinary course of business.  The Company has not received any communications alleging that the Company has violated, or by conducting its business, would violate any of the patents, trademarks, service marks, tradenames, copyrights, trade secrets or other proprietary rights or processes of any other Person. For the purposes of this Section 4.8, "***Company Intellectual Property***" shall mean all patents, patent applications, registered and unregistered trademarks, trademark applications, registered and unregistered service marks, service mark applications, tradenames, copyrights, trade secrets, domain names, information and proprietary rights and processes, similar or other intellectual property rights, subject matter of any of the foregoing, tangible embodiments of any of the foregoing, licenses in, to and under any of the foregoing, and any and all such cases that are owned or used by the Company in the conduct of the Company's business as now conducted.

4.9     Compliance with Other Instruments.  The Company is not in violation or default (i) of any provisions of its Articles or By-laws, (ii) of any Order to which the Company is subject, (iii) under any note, indenture or mortgage to which the Company is party, or (iv) under any lease, agreement or contract to which it is a party or by which it is bound that is required to be listed on the Disclosure Schedule, or (v) other than United States federal laws applicable to "marijuana" (as defined in 21 U.S.C. § 802, "***Marijuana***") or the operation of a Marijuana related business, including without limitation the Controlled Substances Act (21 U.S.C. § 801, et seq.) (collectively, "***U.S. Cannabis Laws***"), of any provision of federal, provincial or state statute, rule or regulation

applicable to the Company, the violation or default of which would have a Material Adverse Effect. The execution, delivery and performance of the Loan Documents and the consummation of the transactions contemplated by the Loan Documents will not result in any such violation or be in conflict with or constitute, with or without the passage of time and giving of notice, either (y) a default under any such Order to which the Company is subject, or any material contract or agreement to which the Company is party; or (z) an event which results in the creation of any lien, charge or encumbrance upon any material assets of the Company or the suspension, revocation, forfeiture, or nonrenewal of any material permit or license applicable to the Company.

4.10    Agreements; Actions.

(a)    Except for (i) the Loan Documents and (ii) except as disclosed in Section 4.10(a) of the Disclosure Schedule, there are no agreements, understandings, instruments, contracts or proposed transactions to which the Company is a party or by which it is bound that involve obligations (contingent or otherwise) of, or payments to, the Company in excess of $100,000.

(b)    Except for (i) as disclosed in the Continuous Disclosure Documents, (ii) the Professional Services Contracts, and (iii) as disclosed in Section 4.10(b) of the Disclosure Schedule, the Company has not (A) declared or paid any dividends, or authorized or made any distribution upon or with respect to any class or series of its capital stock, (B) incurred any indebtedness for money borrowed or incurred any obligation or other liabilities, directly or indirectly, individually in excess of $250,000 or in excess of $500,000 in the aggregate, (C) made any loans or advances to any Person, other than ordinary advances for travel expenses and other advances made in the ordinary course of its business, or (D) sold, exchanged or otherwise disposed of any of its material assets or rights.  For the purposes of (a) and (b) of this Section 4.10, all indebtedness, liabilities, agreements, understandings, instruments, contracts and proposed transactions involving the same Person (including Persons the Company has reason to believe are affiliated with each other) shall be aggregated for the purpose of meeting the individual minimum dollar amounts of such subsection.

(c)    Except as disclosed in the Continuous Disclosure Documents, the Company is not a guarantor or indemnitor of any material indebtedness of any other Person.

4.11    Certain Transactions.

(a)    Other than (i) customary employee benefits generally made available to all employees and standard employee offer letters, (ii) customary director and officer indemnification agreements approved by the Board, (iii) the purchase by Persons of Common Shares and the issuance by the Company of share based awards entitling the holder thereof to purchase or redeem Common Shares, in each instance, approved by the Board, (iv) the Loan Documents, and (v) as disclosed in Section 4.11(a) of the Disclosure Schedule, there are no material agreements, understandings or proposed transactions between the Company and any of its officers, directors, consultants or employees, or any Affiliate thereof.  For purposes of this Agreement, "*Affiliate*" shall mean a Person that directly, or indirectly through one or more intermediaries, controls or is controlled by, or is under common control with, the Person specified.  For the purposes of this definition, "*control*" when used with respect to any Person, means the possession, direct or

indirect, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract, or otherwise.

(b)    The Company is not indebted, directly or indirectly, to any of its directors, officers or employees or to their respective spouses or children, other than in connection with expenses or advances of expenses incurred in the ordinary course of business or employee relocation expenses and for other customary employee benefits made generally available to all employees.  None of the Company's directors or officers are, directly or indirectly, indebted to the Company or, to the Company's knowledge, have any financial interest in any material contract with the Company.

4.12    Rights of Registration and Voting Rights.  Except as provided in the Investor Rights Agreement, the Company is not under any obligation to register or qualify under applicable securities laws any of its currently outstanding securities or any securities issuable upon exercise or conversion of its currently outstanding securities.  To the Company's knowledge, no shareholder of the Company has entered into any pooling agreements, voting trusts or other similar agreements with respect to the ownership or voting of any of the securities of the Company.

4.13    Property.  The property and assets that the Company owns are free and clear of all mortgages, deeds of trust, liens, loans and encumbrances, except for statutory liens for the payment of current taxes that are not yet delinquent and encumbrances and liens that arise in the ordinary course of business and do not materially impair the Company's ownership or use of such property or assets.  With respect to the property and assets it leases, the Company is in compliance in all material respects with such leases and holds a valid leasehold interest free of any liens, claims or encumbrances other than those of the lessors of such property or assets.  The Company does not own any real property.

4.14    Financial Statements.  The Company has delivered to the Purchaser its audited financial statements (including the notes thereto) as of March 31, 2021 and for the fiscal year ended March 31, 2021 (the "***Financial Statements***").  The Financial Statements have been prepared in accordance with International Financial Reporting Standards ("***IFRS***") applied on a consistent basis throughout the periods indicated.  The Financial Statements fairly present in all material respects the financial condition and operating results of the Company as of the dates, and for the periods, indicated therein.  Except as set forth in the Financial Statements and except as disclosed in Section 4.14 of the Disclosure Schedule, the Company has no material liabilities or obligations, contingent or otherwise, other than (i) liabilities incurred in the ordinary course of business subsequent to March 31, 2021; (ii) obligations under contracts and commitments incurred in the ordinary course of business; and (iii) liabilities and obligations of a type or nature not required under IFRS to be reflected in the Financial Statements, which, in all such cases, individually and in the aggregate would not have a Material Adverse Effect.  The Company maintains and will continue to maintain a standard system of accounting established and administered in accordance with IFRS.

4.15    Changes.  Since March 31, 2021 and except as disclosed in Section 4.15 of the Disclosure Schedule, there has not been:

(a)  any change in the assets, liabilities, financial condition or operating results of the Company from that reflected in the Financial Statements, except changes in the ordinary course of business that have not caused, in the aggregate, a Material Adverse Effect;

(b)  any damage, destruction or loss, whether or not covered by insurance, that would have a Material Adverse Effect;

(c)  any waiver or compromise by the Company of a material right or of a material debt owed to it;

(d)  any satisfaction or discharge of any lien, claim, or encumbrance or payment of any obligation by the Company, except in the ordinary course of business and the satisfaction or discharge of which would not have a Material Adverse Effect;

(e)  any material change to a material contract or agreement by which the Company or any of its assets is bound or subject;

(f)  any material change in any compensation arrangement or agreement with any employee, officer, director or shareholder;

(g)  any resignation or termination of employment of any officer of the Company;

(h)  any mortgage, pledge, transfer of a security interest in, or lien, created by the Company, with respect to any of its material properties or assets, except liens for taxes not yet due or payable and liens that arise in the ordinary course of business and do not materially impair the Company's ownership or use of such property or assets;

(i)  any loans or guarantees made by the Company to or for the benefit of its employees, officers or directors, or any members of their immediate families, other than travel advances and other advances made in the ordinary course of its business;

(j)  any declaration, setting aside or payment or other distribution in respect of any of the Company's capital stock, or any direct or indirect redemption, purchase, or other acquisition of any of such stock by the Company, other than in the ordinary course in connection with the administration of the Equity Incentive Plans; or

(k)  any arrangement or commitment by the Company to do any of the things described in this Section 4.15.

4.16  <u>Employee Matters</u>.

(a)  The Company (i) is not delinquent, in any material respect, in payments to any of its employees, consultants, or independent contractors for any wages, salaries, commissions, bonuses, or other direct compensation for any service performed for it to the date hereof or amounts required to be reimbursed to such employees, consultants or independent contractors and (ii) except as disclosed in Section 4.16 of the Disclosure Schedule, will not be required to make any payments to any of its employees, consultants, or independent contractors for any commissions,

bonuses, or other direct compensation as a result of the transactions contemplated hereby. The Company has complied in all material respects with all applicable equal employment opportunity laws and with other laws related to employment, including those related to wages, hours, worker classification and collective bargaining. The Company has withheld and paid to the appropriate Governmental Authority or is holding for payment not yet due to such Governmental Authority all amounts required to be withheld from employees of the Company and is not liable for any arrears of wages, taxes, penalties or other sums for failure to comply with any of the foregoing.

(b)     Other than as set forth in the Equity Incentive Plans or any award agreement or award documentation issued thereunder, the Company has not made any representations regarding equity incentives to any officer, employee, director or consultant that are inconsistent with the share amounts and terms set forth in the minutes of meetings or written resolutions of the Board.

(c)     The Company and each of its Subsidiaries is in compliance in all material respects with the provisions of applicable federal, provincial, state, local and foreign laws and regulations respecting employment.  There is no material labour dispute with the employees of the Company or any of its Subsidiaries and, to the knowledge of the Company, (i) no such dispute is pending or threatened, and (ii) there is no existing or threatened labour disturbance by the employees of the Company or any of its Subsidiaries which, in either case, would result, individually or in the aggregate, in a Material Adverse Effect.

(d)     There are no material outstanding assessments, penalties, fines, liens, charges, surcharges, or other amounts due or owing pursuant to any workplace safety and insurance laws, and neither the Company nor any of its Subsidiaries has been reassessed in any material respect under such law during the past three years and, to the knowledge of the Company, no audit of the Company is currently being performed pursuant to any workplace safety and insurance laws.  There are no claims or potential claims which would result in a Material Adverse Effect regarding the Company's or any of its Subsidiaries' accident cost experience.

4.17    <u>Tax Returns and Payments</u>.  There are no material federal, provincial, state, county, local or foreign taxes due and payable by the Company which have not been timely paid, other than those which are being disputed in good faith by the Company.  There are no material accrued and unpaid federal, provincial, state, country, local or foreign taxes of the Company which are due, whether or not assessed or disputed.  There have been no examinations or audits of any tax returns or reports by any applicable federal, provincial, state, local or foreign governmental agency.  The Company has duly and timely filed all federal, provincial, state, county, local and foreign tax returns required to have been filed by it, and there are in effect no waivers of applicable statutes of limitations with respect to taxes for any year.

4.18    <u>Insurance</u>.  Except as disclosed in Section 4.18 of the Disclosure Schedule, the Company has in full force and effect insurance policies concerning such casualties as would be reasonable and customary for companies like the Company.

4.19    <u>Permits</u>.  The Company has all franchises, permits, licenses and any similar authority necessary for the conduct of its business as currently conducted, the lack of which would

reasonably be expected to have a Material Adverse Effect.  The Company is not in default in any material respect under any of such franchises, permits, licenses or other similar authority.

4.20    Cannabis Act. The Company has not received any correspondence or notice from Health Canada or any other Governmental Authority alleging or asserting any material noncompliance with applicable laws, including the *Cannabis Act* (Canada) (the "***Cannabis Act***"), any and all laws prescribed by and in respect of the Cannabis Act and its regulations and all other laws relating to Cannabis (as defined in the Cannabis Act) which are applicable to the Company's, or any authorization, nor, has Health Canada or any other government authority alleged or asserted any such issue that has not been resolved to the written satisfaction of Health Canada or such other government authority.

4.21    Corporate Documents.  The Articles and By-laws of the Company are in the form provided to the Purchaser.  Copies of the corporate records provided to the Purchaser contain all material minutes of all meetings of directors and shareholders and all actions by written consent without a meeting by the directors and shareholders since the date of incorporation and accurately reflects in all material respects all actions by the directors (and any committee of directors) and shareholders with respect to all transactions referred to in such minutes.

4.22    Environmental and Safety Laws.  Except as would not reasonably be expected to have a Material Adverse Effect: (a) the Company is and has been in compliance with all Environmental Laws; (b) there has been no release or, to the Company's knowledge, threatened release of any pollutant, contaminant or toxic or hazardous material, substance or waste or petroleum or any fraction thereof (each a "***Hazardous Substance***"), on, upon, into or from any site currently or heretofore owned, leased or otherwise used by the Company; (c) there have been no Hazardous Substances generated by the Company that have been disposed of or come to rest at any site that would be in non-compliance or violation of any applicable Environmental Law or Hazardous Substance law; and (d) there are no underground storage tanks located on, no polychlorinated biphenyls ("***PCB*s**") or PCB-containing equipment used or stored on, and no hazardous waste as defined by the Resource Conservation and Recovery Act, as amended, stored on, any site owned or operated by the Company, except for the storage of hazardous waste in compliance with Environmental Laws. The Company has made available to the Purchaser true and complete copies of any material environmental records, reports, notifications, certificates of need, permits, pending permit applications, correspondence, engineering studies and environmental studies or assessments in its possession. For purposes of this Section 4.22, "***Environmental Laws***" means any law, regulation, or other applicable requirement relating to (i) releases or threatened release of Hazardous Substance; (ii) pollution or protection of employee health or safety, public health or the environment; or (iii) the manufacture, handling, transport, use, treatment, storage, or disposal of Hazardous Substances.

4.23    Foreign Corrupt Practices Act.  Neither the Company nor any of its Subsidiaries nor, to the Company's knowledge, any of their respective directors, officers, employees or agents (a) have, directly or indirectly, made, offered, promised or authorized any payment or gift of any money or anything of value to or for the benefit of any "foreign official" (as such term is defined in the U.S. Foreign Corrupt Practices Act of 1977, as amended (the "***FCPA***")), foreign political party or official thereof or candidate for foreign political office for the purpose of (i) influencing any official act or decision of such official, party or candidate, (ii) inducing such official, party or

candidate to use his, her or its influence to affect any act or decision of a foreign governmental authority, or (iii) securing any improper advantage, in the case of (i), (ii) and (iii) above in order to assist the Company or any of its Affiliates in obtaining or retaining business for or with, or directing business to, any person, or (b) has violated the *Corruption of Foreign Public Officials Act* (Canada) (the "**CFPOA**") or other applicable anti-corruption laws.  Neither the Company nor any of its Subsidiaries nor, to the Company's knowledge, any of their respective directors, officers, employees or agents have made or authorized any bribe, rebate, payoff, influence payment, kickback or other unlawful payment of funds or received or retained any funds in violation of any law, rule or regulation.  The Company further represents that it maintains a written policy to promote compliance with the FCPA, CFPOA or any other applicable anti-bribery or anti-corruption law (a true copy of which have been made available to the Purchaser) and such other commercially reasonable measures intended to provide assurance that all books and records of the Company and its Subsidiaries accurately and fairly reflect, in reasonable detail, all transactions and dispositions of funds and assets.  Neither the Company nor, to the knowledge of the Company, any of its officers, directors or employees are the subject of any allegation, voluntary disclosure, investigation, prosecution or other enforcement action related to the FCPA, CFPOA or any other applicable anti-bribery or anti-corruption law.

4.24    Money Laundering.  The Company and its Subsidiaries are and have been conducted at all times in compliance in all material respects with any applicable financial recordkeeping and reporting requirements of the *Proceeds of Crime (Money Laundering) and Terrorist Financing Act* (Canada).  No action, suit or proceeding by or before any court or Governmental Authority, authority or body or any arbitrator involving the Company or any of its Subsidiaries, with respect to the Money Laundering Laws is pending, or, to the knowledge of the Company, threatened. The term "***Money Laundering Laws***" means, collectively, (i) the *Proceeds of Crime (Money Laundering) and Terrorist Financing Act* (Canada), and (ii) 31 U.S.C. §§ 5311-5330 and 12 U.S.C. §§ 1818(s), 1820(b), and 1951-1959.

4.25    Data Privacy.  In connection with its collection, storage, transfer (including, without limitation, any transfer across national borders) and/or use of any personally identifiable information from any individuals, including, without limitation, any employees and/or other third parties (collectively "***Personal Information***"), the Company is and has been, to the Company's knowledge, in material compliance with all applicable laws in all relevant jurisdictions, the Company's privacy policies and the requirements of any contract or codes of conduct to which the Company is a party.  The Company further represents that it maintains a written policy to promote compliance with applicable laws relating to personal information (a true copy of which have been made available to the Purchaser) and such other commercially reasonable measures intended to protect Personal Information. The Company is and has been, to the Company's knowledge, in compliance in all material respects with all applicable laws relating to data loss, theft and breach of security notification obligations.

4.26    Regulatory Matters.  The Company is a "reporting issuer" in each of the provinces of Canada, other than Québec, and is not included in a list of defaulting reporting issuers maintained by the securities commissions or similar securities regulatory authorities in such provinces.  The Company has not taken any action to cease to be a "reporting issuer" in any jurisdiction in which it is a reporting issuer and has not received any notification from a securities commission or similar securities regulatory authorities seeking to revoke the Company's reporting

issuer status. The Company has filed with the securities commissions or similar securities regulatory authorities, on a timely basis, all required financial statements, annual information forms, proxy solicitation materials, material change reports and other documents required to be filed by it pursuant to National Instrument 51-102 – *Continuous Disclosure Obligations* ("***NI 51-102***"), applicable stock exchange rules and policies and all other applicable securities laws (the "***Continuous Disclosure Documents***"). As of their respective filing dates, each of the Continuous Disclosure Documents complied with the requirements of applicable securities laws in all material respects and none of the Continuous Disclosure Documents contained any untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements made therein, in light of the circumstances in which they were made, not misleading. No Order having the effect of suspending the sale or ceasing the trading in any securities of the Company has been issued by any regulatory authority and is continuing in effect and no proceedings for that purpose have been instituted or, to the knowledge of the Company, are pending, contemplated or threatened by any Governmental Authority.

4.27    Transfer Agent. The Company's transfer agent has been duly appointed as the registrar and transfer agent of the Company with respect to the Common Shares.

4.28    Material Change Reports. The Company has not filed a confidential material change report with any of a securities commissions or similar securities regulatory authority which remains confidential.

4.29    Listing of Common Shares. On the Closing Date, the Common Shares will be listed and posted for trading on the CSE, and no Order ceasing or suspending trading in the Common Shares or prohibiting the sale or issuance of the Common Shares or the trading of any of the Common Shares issued securities has been issued and no (formal or informal) proceedings for such purpose are pending or contemplated by the Company or, to the knowledge of the Company, have been threatened. On the Closing Date, the Company will be in compliance in all material respects with the rules and regulations of the CSE, including the applicable listing requirements of the CSE.

4.30    Auditor. KPMG LLP is the auditor of the Company and is independent with respect to the Company as required under applicable securities laws, and since its engagement there has not been a "reportable event" (as such term is defined in NI 51-102) with respect to the Company. Since the most recent Financial Statements, neither the Company nor any of its Subsidiaries has (a) made, or agreed to make, any material change in any method of accounting or auditing practice or (b) amended or approved any amendment to its Articles, By-laws or capital structure. The Company maintains a system of internal accounting controls intended to provide reasonable assurance that: (i) transactions are executed in accordance with management's general or specific authorization; and (ii) transactions are recorded as necessary to permit preparation of financial statements in conformity with IFRS and to maintain accountability for assets.

4.31    No Bankruptcy. Neither the Company nor any of its Subsidiaries is insolvent within the meaning of the *Bankruptcy and Insolvency Act* (Canada) or other applicable bankruptcy or insolvency laws and neither the Company nor any of its Subsidiaries has made an assignment in favour of its creditors or a proposal in bankruptcy to its creditors or any class thereof nor had any petition for a receiving order presented in respect of it. Neither the Company nor any of its

Subsidiaries has initiated proceedings with respect to a compromise or arrangement with its creditors or for its winding up, liquidation or dissolution. No receiver has been appointed in respect of the Company or any of its Subsidiaries.

4.32    No Brokers.  Except as disclosed in Section 4.32 of the Disclosure Schedule, the Company is not party to any contract with any Person that would give rise to any liability of the Purchaser to pay a brokerage commission, finder's fee, financial advisor fee or like payment, fee or commission, or the reimbursement of expenses in connection therewith, in connection with the issuance and sale of the Note or the transactions contemplated by the Loan Documents.

**5.    Representations and Warranties of the Purchaser.**  The Purchaser hereby represents and warrants to the Company that the following representations are true and complete as of the date of this Agreement.  As used in this Article 5, the term "*knowledge*" (including the phrase "*to the Purchaser's knowledge*") shall mean the actual knowledge, after reasonable investigation of such Person's direct reports, of Michael Lukemire and Cory Miller.

5.1    Organization, Good Standing and Corporate Power.  The Purchaser is a corporation duly organized, validly existing and in good standing under the laws of its jurisdiction of incorporation with all requisite power (corporate or other) and authority to own or to hold the Note and to complete the transactions contemplated by the Loan Documents.

5.2    Authorization.  All corporate action required to be taken by the Purchaser to authorize its entry into the Loan Documents to which it is a party, to execute and deliver the Loan Documents to which it is a party and the performance of its obligations thereunder, has been taken or will be taken prior to the Closing.  The Loan Documents to which the Purchaser is a party, when executed and delivered by the Purchaser, shall constitute valid and legally binding obligations of the Purchaser, enforceable against the Purchaser in accordance with their respective terms except (i) as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, or other laws of general application relating to or affecting the enforcement of creditors' rights generally or (ii) as limited by laws relating to the availability of specific performance, injunctive relief, or other equitable remedies.

5.3    No Violation.  The execution, delivery and performance of the Loan Documents to which the Purchaser is a party and the consummation of the transactions contemplated by the Loan Documents does not and will not result in any such violation, conflict or default of the (i) provisions of its constating documents, or (ii) the provisions of any law or Order applicable to it, except, in the case of clause (ii), as would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on the ability of the Purchaser to consummate the transactions contemplated by the Loan Documents and to perform its obligations under the Loan Documents to which it is a party.

5.4    Governmental Consents and Filings.  Subject to the terms and conditions of the Note, assuming the accuracy of the representations made by the Company in Article 4, no consent, approval, Order or authorization of, or registration, qualification, designation, declaration or filing with, any Governmental Authority is required on the part of the Purchaser in connection with the consummation of the transactions contemplated by this Agreement to be completed at the Closing,

except for filings pursuant to applicable securities laws, which have been made or will be made in a timely manner.

5.5    <u>Litigation</u>.  There is no claim, action, suit, proceeding, arbitration, complaint, charge or investigation pending or, to the Purchaser's knowledge, currently threatened that questions the validity of the Loan Documents or the right of the Purchaser to enter into them (to the extent a party thereto), or to consummate the transactions contemplated by the Loan Documents.

5.6    <u>Purchase for Own Account</u>.  The Purchaser represents that it is acquiring the Note and the Conversion Shares (collectively, the "***Securities***") solely for its own account and beneficial interest for investment and not for sale or with a view to distribution of the Securities or any part thereof, has no present intention of selling (in connection with a distribution or otherwise), granting any participation in, or otherwise distributing the same, and does not presently have reason to anticipate a change in such intention.

5.7    <u>Information and Sophistication</u>.  Without lessening or obviating the representations and warranties of the Company set forth in <u>Article 4</u>, the Purchaser hereby: (a) acknowledges that it has received all the information it has requested from the Company and it considers necessary or appropriate for deciding whether to acquire the Securities, (b) represents that it has had an opportunity to ask questions and receive answers from the Company regarding the terms and conditions of the offering of the Securities and to obtain any additional information necessary to verify the accuracy of the information given the Purchaser, (c) further represents that it has such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risk of this investment, (d) acknowledges that, except as otherwise expressly set forth in the Loan Documents, the Purchaser is not relying on any statements or representations of the Company or its agents for legal, financial and tax advice with respect to this investment or the transactions contemplated by the Loan Documents, and (e) further acknowledges that it has not received any offering document or disclosure document relating to the Securities, the Company or its Subsidiaries.

5.8    <u>Collection of Information</u>.  The Purchaser acknowledges that its name and other specified information, including the number of Securities subscribed for hereunder, may be disclosed to authorities pursuant to applicable Money Laundering Laws and applicable securities laws.  The Purchaser consents to the disclosure of all such information.

5.9    <u>Ability to Bear Economic Risk</u>.  The Purchaser acknowledges that investment in the Securities involves a high degree of risk, and represents that it is able, without materially impairing its financial condition, to hold the Securities for an indefinite period of time and to suffer a complete loss of its investment.

5.10    <u>Residence</u>.  The office or offices of the Purchaser in which its principal place of business is identified in the address or addresses of the Purchaser set forth on the signature pages hereto.  The Purchaser is resident in the United States.

5.11    <u>Representation by Counsel and Advisors</u>.  The Purchaser (a) has been represented by, had the opportunity to be represented by, and/or consult with, independent counsel and

financial/tax advisors of the Purchaser's own choosing, (b) has carefully read and fully understands this Agreement and the other Loan Documents in their entirety, (c) has had this Agreement and the other Loan Documents fully explained to them by such counsel and advisors, and (d) is fully aware of the contents hereof and its meaning, intent and legal, financial and tax effect.

5.12    <u>Securities Not Registered</u>.  The Purchaser acknowledges that the Note and the Conversion Shares have not been registered under the U.S. Securities Act of 1933, as amended (the "***Securities Act***") or any state securities laws and, therefore, cannot be resold unless they are registered under the Securities Act and applicable state securities laws or unless an exemption from such registration requirements is available.

5.13    <u>Private Placement</u>.  The Purchaser is an "accredited investor" as such term is defined in Rule 501 under the Securities Act and is purchasing the Note as principal, solely for its own account for investment purposes and not with a view to, or for offer or sale in connection with, any distribution or other disposition thereof.  The Purchaser further represents that:

(a)    it understands that the Securities are being offered on a "private placement" basis (i) exempt from registration under the Securities Act, and, therefore, may not be transferred or sold except pursuant to the registration requirements of the Securities Act and any applicable state securities laws, or in compliance with the requirements of an exemption from such registration requirements, and (ii) exempt from or not subject to prospectus requirements under Canadian securities laws;

(b)    it understands that no securities regulator in Canada or the United States has reviewed or passed on the merits of the Securities;

(c)    it understands that there is no government or other insurance covering the Securities;

(d)    it is not purchasing the Note and the Conversion Shares as a result of any "general solicitation or general advertising" (as those terms are used in Rule 501 under the Securities Act), including any advertisements, articles, notices or other communications published in any newspaper, magazine or similar media or on the internet or broadcast over radio, television or the internet, or any seminar or meeting whose attendees have been invited by general solicitation or general advertising; and

(e)    it understands that there may be restrictions on its ability to resell the Securities under applicable laws, it is its own responsibility to find out what those restrictions are and to comply with them before selling the Securities and, except as otherwise set out in the Loan Documents, the Company has not agreed to take any action to facilitate such resale in accordance with applicable laws.

5.14    <u>Restrictive Legends</u>.  The Purchaser acknowledges that the Note (including any Additional Notes) and the Conversion Shares will bear such legend or legends as may, in the opinion of counsel to the Company, be reasonably necessary in order to avoid a violation of any applicable securities laws or to comply with the requirements of the CSE.

5.15   <u>Sufficient Funds</u>.  The Purchaser will, at Closing, have sufficient funds available to pay the Loan.

5.16   <u>No Broker's Fees</u>. The Purchaser is not party to any contract with any Person that would give rise to any liability of the Company or any Subsidiary to pay a brokerage commission, finder's fee, financial advisor fee or like payment, fee or commission, or the reimbursement of expenses in connection therewith, in connection with the issuance and sale of the Note or the transactions contemplated by the Loan Documents.

**6.**   **Survival.**  The representations and warranties of a party herein shall survive until the date that is 24 months from the Closing Date, if any, unless bona fide notice of a claim shall have been made in writing before such date, in which case the representation and warranty to which such notice applies shall survive in respect of that claim until the final determination or settlement of the claim; provided that the representations and warranties of the Company set out in Sections 4.1, 4.4, 4.5 and 4.32 (collectively, the "***Company Fundamental Representations***") and the representations and warranties of the Purchaser set out in Sections 5.1, 5.2 and 5.16 (collectively, the "***Purchaser Fundamental Representations***") shall continue in full force and effect for a period of six years following the Closing Date. Notwithstanding the foregoing, a claim for any breach of any of the representations and warranties contained in this Agreement involving fraud or fraudulent misrepresentation may be made at any time following the date of this Agreement, subject only to applicable limitation periods imposed by applicable law.

**7.**   **Covenants.**

7.1   <u>Further Assurances</u>. Subject to the terms and conditions hereof, each of the parties shall perform all obligations required to be performed by it under this Agreement, reasonably co-operate with the other parties in connection therewith, and do all such other commercially reasonable acts and things as may be necessary or desirable in order to consummate and make effective, as soon as reasonably practicable, the transactions contemplated in this Agreement, including using commercially reasonable efforts to (a) effect all necessary registrations, filings and submissions of information in connection with obtaining applicable stock exchange approval, provided that nothing in this Agreement shall require the Company to obtain any shareholder approvals, (b) obtain all Company Required Approvals, and (c) execute and deliver any additional instruments reasonably necessary to consummate the transactions contemplated by this Agreement.

7.2   <u>Confidentiality</u>. Each party acknowledges and agrees that the Confidentiality Agreement remains in full force and effect. If this Agreement is, for any reason, terminated before the Closing, the Confidentiality Agreement and the provisions of this Section 7.2 shall nonetheless continue in full force and effect. For the purposes of this Section 7.2, "***Confidentiality Agreement***") means the mutual confidentiality agreement entered into on July 30, 2020 between Hawthorne Hydroponics LLC and the Company (formerly, Canopy Rivers Inc.).

**8.**   **Loan Covenants.**  For so long as the Purchaser holds the Note, the Company covenants and agrees with the Purchaser that, unless the Purchaser provides its prior written consent (not to be unreasonably withheld, conditioned or delayed):

8.1     Amendment to Constating Documents.  The Company will not amend, modify or waive any of its rights under its articles of incorporation and bylaws, or other organizational or governing documents, in a manner which materially adversely affects the rights, preferences or privileges of the Conversion Shares, including amending its articles to create any class of shares that has voting rights superior to the Common Shares.

8.2     Good Standing and Government Compliance.  The Company shall maintain its and each of the Subsidiaries' organizational existence and good standing in each jurisdiction in which the failure to so maintain would reasonably be expected to have a Material Adverse Effect.  The Company shall, and shall cause its Subsidiaries to, comply in all material respects with all applicable laws and all contracts material to the business to which it is subject, and maintain all material permits, licenses and approvals required thereunder where the failure to so comply or maintain would reasonably be expected to have a Material Adverse Effect; provided, however, that the Company shall not (and shall not be deemed to be) in violation or breach of this Section 8.2 if such violation or breach is attributable to the Company's non-compliance with U.S. Cannabis Laws.

8.3     Board of Directors.  The Company will not increase or decrease the size of the Company's Board, other than as contemplated in the Investor Rights Agreement.

8.4     Indebtedness.    The Company will not incur any indebtedness in excess of $100,000,000 in the aggregate, pursuant to which the Company creates, incurs, assumes or permits to exist any lien on any property or asset now owned or hereafter acquired by it, or assigns or sells any income or revenues (including accounts) or rights in respect of any thereof.

8.5     Issuance of Securities.  The Company will not create, issue, transfer or distribute in any way any securities of any kind to any person or entity that would result in the Purchaser beneficially owning less than twenty percent (20%) of the issued and outstanding voting and equity securities of the Company, on a partially-diluted basis (accounting for the conversion of the Note and any Additional Notes pursuant to the terms thereof).

8.6     Domicile of Company.  The Company will not change its domicile or place of incorporation.

8.7     Stock Exchange.  The Company will not (i) change its stock exchange listing to an exchange other than the Canadian Securities Exchange or (ii) voluntarily delist its securities entirely.

8.8     Insurance.      The Company will use commercially reasonable efforts to maintain at all times public liability insurance and other insurance as may be required by law.  All personal property and hazard insurance policies, real property insurance policies, director and officer insurance policies and general liability insurance policies shall be in amount, form and content as may be maintained by a reasonably prudent operator in similar circumstances (including industry) to the Company.

8.9     Fundamental Changes.  The Company will not merge into or amalgamate or consolidate with any other Person (other than with a wholly-owned Subsidiary), or permit any other Person to merge into or amalgamate or consolidate with it (other than a wholly-owned

Subsidiary), or liquidate, dissolve, reorganize, amalgamate, windup or permit any Major Transaction. "*Major Transaction*" has the meaning ascribed to "Approved Change of Control Transaction" in the Investor Rights Agreement.

8.10     Taxes and Financial Reporting.  Except as provided in the Loan Documents, the Company will (a) timely file and pay all federal, provincial, state, county, local or foreign taxes as such filings and payments become due and payable by the Company (except those which are being contested in good faith and for which adequate reserve has been or will be made in the Company's financial statements) and (b) comply, in all material respects, with all financial reporting obligations applicable to the Company under law and provide the Purchaser with any information reasonably requested by the Purchaser for purposes of the Purchaser's or its Affiliates' compliance with financial reporting obligations applicable to the Purchaser or its Affiliates.  Notwithstanding the foregoing, the Company shall not be obligated to provide the Purchaser with such financial information if the Company determines, in its reasonable judgment, that doing so would reasonably be expected to (i) violate applicable law, (ii) jeopardize the protection of any solicitor-client privilege, solicitor work product protection or other legal privilege, or (iii) expose the Company to liability for disclosure of personal information; provided that, in the case of each of clauses (i) through (iii), the Company shall use commercially reasonable efforts to disclose such information in a manner that does not give rise to the circumstances contemplated thereby.

8.11     Restriction on Use of Proceeds.  The Company shall not use the proceeds of the Loan to directly or indirectly engage in any activities that are illegal in any jurisdiction in which such activities occur or in any jurisdiction in which the Company is domiciled or qualified to do business or are otherwise prohibited by the U.S. Controlled Substances Act of 1970, 21 U.S.C. 801 et seq.

**9.     Further Agreements.**

9.1     Top-Up Option.  At any time while the Note is outstanding, for so long as the Purchaser has not sold or otherwise transferred the Note (other than transfers to Affiliates permitted pursuant to the terms of the Note), the Purchaser shall have the right to purchase one or more additional notes (each, an "*Additional Note*") in order to increase its pro rata ownership of the Company, on a partially-diluted basis (accounting for the conversion of the Note and the Additional Notes pursuant to the terms thereof), to up to forty-nine percent (49%) (the "*Top-Up Option*"). The Purchaser shall provide written notice to the Company of its election to exercise the Top-Up Option. The purchase of any such Additional Notes shall be subject to the parties entering into a purchase agreement (each, an "*Additional Purchase Agreement*") containing representations, warranties, covenants, terms and conditions substantially similar to those contained herein; provided, however,  that such Additional Purchase Agreement shall not include any additional Top-Up Option and the provisions of Article 8 (*Loan Covenants*) shall terminate on the Maturity Date (as defined in the Note). Any such Additional Notes shall be on substantially the same terms and conditions, and in substantially the same form, as the Note, subject to the following:

(a)     Conversion Price. The conversion price for such Additional Notes (the "*Additional Notes Conversion Price*") shall equal the greater of: (i) the price of the Common Shares on the principal stock exchange on which such Common Shares are listed as of the close

of trading on the date immediately prior to the Purchaser providing notice of its election to exercise the Top-Up Option, and (ii) the lowest conversion price for such Additional Notes, without the requirement for the Company to obtain security holder approval, permitted by the rules of the CSE or such other principal stock exchange on which such Common Shares are listed. The Additional Notes Conversion Price shall be expressed in Canadian dollars, but the amount paid for the Additional Notes shall be in U.S. dollars, calculated using the daily average exchange rate published by the Bank of Canada as of the Business Day immediately prior to the date of the purchase agreement in respect of such Additional Note.

(b)     Purchase Price. The purchase price for any Additional Notes shall be equal to the indicative number of Common Shares multiplied by the Additional Note Conversion Price applicable to such Additional Note; provided that, in determining the maximum number of Conversion Shares available to be issued pursuant to such Additional Note, the parties shall consider interest that has accrued, and is expect to be accrued, on the Note and any such Additional Notes previously purchased, up to and including the Maturity Date, such that the conversion of the outstanding principal and accrued but unpaid interest on the Note and all outstanding Additional Notes would not result in the Purchaser, at any time, having an ownership interest in the Company that is greater than 49% on a partially-diluted basis.

(c)     Maturity Date. The maturity date for any such Additional Note shall be the later of (i) the Maturity Date (as defined in the Note), and (ii) the date that is five years plus one day from the issuance thereof.

(d)     Interest.  The interest rate for any such Additional Note shall be equal to the effective rate of interest of the Note based on the full term on the Note.

(e)     Conversion. Any such Additional Note shall be convertible into Conversion Shares on the same terms provided for in the Note; provided that (i) the Additional Notes shall only be convertible up to and including the Maturity Date (as defined in the Note), notwithstanding the maturity date of such Additional Note, and (ii) the Company may force the conversion of any Additional Notes at any time after the Forced Conversion Date (as defined in the Note) and up to and including the Maturity Date (as defined in the Note).

9.2     Conversion of Note. The Company and the Purchaser shall use reasonable best efforts to take, or cause to be taken, all actions, and to do, or cause to be done, and to assist and cooperate with the other party hereto in doing, all things necessary, proper or advisable to permit the issuance of Conversion Shares, including actions to obtain any consents, approvals, authorizations or waivers required to be obtained from any applicable Governmental Authority (including, for certainty, all consents, approvals, authorizations or waivers that may be required to be obtained under the *Investment Canada Act* (Canada) (the "***Investment Canada Act***"), *Competition Act* (Canada) (the "***Competition Act***") and/or the Hart-Scott-Rodino Antitrust Improvements Act of 1976 (the "***HSR Act***")) including, by making any necessary filings, applications and submissions with any applicable Governmental Authority in a timely manner. For greater certainty, in connection with obtaining any clearance required under the Competition Act for the issuance of Conversion Shares: (i) the Purchaser shall file with the Commissioner of Competition appointed pursuant to the Competition Act (or any other Person authorized to exercise the powers thereof) (the "***Commissioner of Competition***") a letter requesting an advance ruling

certificate or, in the alternative, a no action letter, and (ii) unless otherwise agreed between the Purchaser and the Company, each of the Purchaser and the Company shall file a notification under section 114 of the Competition Act.  The Company and the Purchaser shall provide each other with a reasonable opportunity to review and comment on any filings, applications and submissions with any applicable Governmental Authority (except in connection with any review that may be required under the Investment Canada Act, in respect of which the Purchaser shall provide the Company with a reasonable opportunity to review and comment on such portions of the filings as is customary) and use reasonable best efforts to cooperate with and assist each other in good faith in the preparation and making of any such filings, applications and submissions and the obtaining of any consents, approvals, authorizations or waivers required to be obtained.  Except in connection with any review that may be required under the Investment Canada Act (in respect of which the Purchaser shall keep the Company reasonably apprised of its progress towards obtaining approval), the Company and the Purchaser shall (i) promptly notify each other of any material communication from any Governmental Authority in respect of the conversion of the Note, (ii) furnish each other with copies of all correspondence, filings and written communications between them or their Subsidiaries or Affiliates, on the one hand, and any Governmental Authority or its respective staff, on the other hand, with respect to the issuance of Conversion Shares and (iii) provide each other with a reasonable opportunity to review and comment on any proposed written material communication to any such Governmental Authority.  Except in connection with any review that may be required under the Investment Canada Act, the Purchaser and the Company shall consult with the other prior to participating in any substantive meeting or discussion with any Governmental Authority in respect of the conversion of the Note and give each other the opportunity to attend and participate at any such meetings or discussions.  The Purchaser and the Company will use their commercially reasonable efforts to resolve any objections and challenges, including by contest through litigation on the merits, negotiation or other action, suit or proceeding, that may be asserted by any Governmental Authority under the HSR Act or the Competition Act with respect to the issuance of the Conversion Shares. Notwithstanding anything in this Agreement to the contrary, it is expressly understood and agreed that: (i) neither the Purchaser nor any of its Affiliates, nor the Company nor any of its Affiliates, shall have any obligation to litigate or contest any administrative or judicial action or proceeding or any decree, judgment, decision, injunction or other order, whether temporary, preliminary or permanent; and (ii) neither the Purchaser nor any of its Affiliates shall be under any obligation to make proposals, execute or carry out agreements, enter into consent decrees or submit to orders providing for (A) the sale, divestiture, license or other disposition or holding separate (through the establishment of a trust or otherwise) of any assets or categories of assets of the Purchaser or any of its Affiliates, (B) the imposition of any limitation or regulation on the ability of the Purchaser or any of its Affiliates to freely conduct their business or own such assets, or (C) the holding separate of the Conversion Shares or any limitation or regulation on the ability of the Purchaser or any of its Affiliates to exercise full rights of ownership of the Conversion Shares. The parties shall be jointly responsible (on a 50-50 basis) for and pay all fees payable to the applicable Governmental Authorities in connection with the transactions contemplated by this Agreement. Each party shall bear its own legal or advisor fees in connection with any filings, actions or litigation under this Section 9.2.

## 10.   **Termination**.

10.1   <u>Termination Events</u>. This Agreement may be terminated at any time before the Closing:

(a)      automatically on the conversion of the Note;

(b)      automatically if the Note is no longer outstanding;

(c)      by the mutual written consent of the Company and the Purchaser;

(d)      by the Purchaser by written notice to the Company if any of the conditions set forth in Section 3.3(a) shall not have been satisfied by October 29, 2021 (the "***Outside Date***"), unless such failure shall be due to the failure of the Purchaser to perform or comply with any of the covenants, agreements or conditions hereof to be performed or complied with by it before the Closing; or

(e)      by the Company by written notice if any of the conditions set forth in Section 3.3(b) shall not have been satisfied by the Outside Date, unless such failure shall be due to the failure of the Company to perform or comply with any of the covenants, agreements or conditions hereof to be performed or complied with by it before the Closing.

10.2    <u>Effect of Termination</u>. In the event of the termination of this Agreement in accordance with Section 10.1, this Agreement shall forthwith become terminated and of no further force and effect and there shall be no liability on the part of any party hereto except:

(a)      as set forth in Section 7.2, <u>Article 11</u> and this <u>Article 10</u>; and

(b)      that nothing herein shall relieve any party hereto from liability for any intentional breach of any provision hereof.

**11.    <u>Miscellaneous</u>.**

11.1    <u>Successors and Assigns</u>. This Agreement shall inure to the benefit of and shall be binding on and enforceable by and against the parties and their respective successors or heirs, executors, administrators and other legal personal representatives, and permitted assigns.

11.2    <u>Press Releases and Public Notices</u>.  Neither party shall: (i) issue any press release or otherwise make public announcements with respect to the Loan Documents, the Investor Rights Agreement or the transactions contemplated hereby or thereby, without the prior written consent of the other party (which consent shall not be unreasonably withheld, conditioned or delayed); or (ii) make any regulatory filing with any Governmental Authority with respect thereto without prior consultation with the other party; provided, that, the parties' obligations under this section shall be subject to each party's overriding obligation to make any disclosure or regulatory filing required by law or the rules and regulations of any applicable stock exchange, and the party making such requisite disclosure or regulatory filing shall use all commercially reasonable efforts to give prior oral and written notice to the other party and a reasonable opportunity to review and comment on the requisite disclosure or regulatory filing before it is made and consider, in good faith, any comments by the other party on all such public announcements prior to the release or regulatory filing thereof. The Purchaser hereby acknowledges that the Company will file each of the Loan Documents on the Company's SEDAR profile, with such redactions as the Company deems appropriate; provided that the Company will allow the Purchaser reasonable opportunity to propose redactions on such Loan Documents in advance of their public filing and will consider,

acting reasonably and in good faith, any request by the Purchaser for redactions to the such Loan Documents to the extent permitted under applicable securities laws.

11.3    Counterparts. This Agreement and all documents contemplated by or delivered under or in connection with this Agreement may be executed and delivered in any number of counterparts (including by email or scanned pages), with the same effect as if all parties had signed and delivered the same document, and all counterparts shall be construed together to be an original and will constitute one and the same agreement. Electronic signatures and electronic pdf signatures (including by email or scanned pages) shall be acceptable as a means of executing such documents.

11.4    Titles and Subtitles.  The titles and subtitles used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement.

11.5    Notices.  All notices required or permitted hereunder shall be in writing and shall be deemed effectively given: (a) upon personal delivery to the party to be notified, (b) when sent by confirmed electronic mail or facsimile if sent during normal business hours of the recipient, if not, then on the next Business Day, (c) five (5) days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (d) one (1) day after deposit with a nationally recognized overnight courier, specifying next day delivery, with written verification of receipt. All communications shall be sent to the Company at its principal executive offices, and to the Purchaser at the addresses set forth on the signature pages hereto or at such other addresses as the Company or any Purchaser may designate to the other parties hereto in accordance with this Section 11.5.

11.6    Amendments and Waiver. No amendment or waiver of any provision of this Agreement shall be binding on any party unless consented to in writing by such party. No waiver of any provision of this Agreement shall constitute a waiver of any other provision, nor shall any waiver of any provision of this Agreement constitute a continuing waiver unless otherwise expressly provided.

11.7    Expenses. Each of the Company and each Purchaser shall be solely responsible for its own expenses and legal fees incurred with respect to this Agreement and the transactions contemplated herein; provided that the Company shall pay the reasonable and documented legal fees incurred by the Purchaser up to Closing in connection with the transactions contemplated by this Agreement, up to an aggregate amount of $75,000.

11.8    Time of the Essence. Time is of the essence in this Agreement.

11.9    Delays or Omissions.  It is agreed that no delay or omission to exercise any right, power or remedy accruing to each Purchaser, upon any breach or default of the Company under this Agreement, the Note or any other Loan Documents shall impair any such right, power or remedy, nor shall it be construed to be a waiver of any such breach or default, or any acquiescence therein, or of or in any similar breach or default thereafter occurring; nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring.  It is further agreed that any waiver, permit, consent or approval of any kind or character by any Purchaser of any breach or default under this Agreement, or any waiver by any Purchaser of any provisions or conditions of this Agreement must be in writing and shall be effective only to

the extent specifically set forth in writing and that all remedies, either under this Agreement, or by law or otherwise afforded to the Purchaser, shall be cumulative and not alternative.

11.10   <u>Entire Agreement</u>.  This Agreement (including schedules and the exhibits attached hereto), the Investor Rights Agreement and the other Loan Documents constitute the full and entire understanding and agreement between the parties with regard to the subjects hereof and no party shall be liable or bound to any other party in any manner by any representations, warranties, covenants and agreements except as specifically set forth herein.

11.11   <u>Mutual Indemnification</u>.

(a)   The Company agrees to indemnify and hold harmless the Purchaser from any and all losses, claims, costs, expenses, damages or liabilities directly or indirectly caused by, or resulting or arising from, (i) any inaccuracy or breach of any of the representations and warranties of the Company in this Agreement or (ii) any breach by the Company of any covenant in this Agreement.

(b)   The Purchaser agrees to indemnify and hold harmless the Company from any and all losses, claims, costs, expenses, damages or liabilities directly or indirectly caused by, or resulting or arising from, (i) any inaccuracy or breach of any of the representations and warranties of the Purchaser in this Agreement or (ii) any breach by the Purchaser of any covenant in this Agreement.

*(Signatures Pages Follow)*

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first written above.

**COMPANY:**

**RIV CAPITAL INC.**

By: _____

Name:  Narbé Alexandrian

Title:   President and Chief Executive Officer

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first written above.

**PURCHASER:**

**THE HAWTHORNE COLLECTIVE, INC.**

By: _____

Name:  Albert Messina

Title:   Treasurer

## **EXHIBIT A**

**Investor Rights Agreement**

*(See attached)*

**INVESTOR RIGHTS AND
STRATEGIC OPPORTUNITIES AGREEMENT**

THIS AGREEMENT made the ■ day of ■, 2021,

B E T W E E N :

> **THE HAWTHORNE COLLECTIVE, INC.**, a corporation existing under the laws of the State of Ohio,
>
> (hereinafter referred to as the "**Investor**"),
>
> - and -
>
> **RIV CAPITAL INC.**, a corporation existing under the laws of the Province of Ontario,
>
> (hereinafter referred to as the "**Company**"),
>
> - and -
>
> solely for the purposes of <u>Section 6.1</u>, **THE HAWTHORNE GARDENING COMPANY**, a corporation existing under the laws of the State of Delaware,
>
> (hereinafter referred to as the "**Guarantor**"),

WHEREAS the Investor and the Company wish to create a long-term strategic business relationship (the "**Strategic Relationship**") in order to cooperatively source, invest in and develop certain Business Opportunities that the parties have a shared interest in pursuing;

AND WHEREAS pursuant to that certain note purchase agreement dated August 9, 2021 (the "**Note Purchase Agreement**") between the Investor and the Company, the Company has agreed to issue to the Investor a convertible promissory note dated as of the date hereof in the principal amount of C$188,475,000 (the "**Note**"), which aggregate principal amount is convertible in accordance with the terms of the Note into 99,197,368 Class A common shares in the capital of the Company (the "**Common Shares**"), representing approximately 41% of the then issued and outstanding Common Shares of the Company as of the date hereof;

AND WHEREAS in connection with the Note Purchase Agreement and the issuance of the Note thereunder, the Company has agreed to grant certain rights set out herein to the Investor, on the terms and subject to the conditions set out herein;

AND WHEREAS as an inducement to the Company entering into this Agreement, the Guarantor has agreed, pursuant to Section 6.1, to guarantee certain obligations of the Investor hereunder.

NOW THEREFORE THIS AGREEMENT WITNESSES THAT, in consideration of the respective covenants and agreements of the parties herein contained and for other good and

valuable consideration (the receipt and sufficiency of which are acknowledged by each party), the parties agree as follows:

## ARTICLE 1
## INTERPRETATION

**1.1**          **Defined Terms**

For the purposes of this Agreement (including the recitals hereto), unless the context otherwise requires, the following terms shall have the respective meanings set out below and grammatical variations of such terms shall have corresponding meanings:

"**Act**" means the *Business Corporations Act* (Ontario);

"**Affiliate**" means a Person that directly, or indirectly through one or more intermediaries, controls or is controlled by, or is under common control with, the Person specified; provided, however, that the Company and its Subsidiaries shall be deemed not to be Affiliates of the Investor or any of its Affiliates. For the purposes of this definition, "control" when used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract, or otherwise;

"**Agreed Proposed Terms**" has the meaning given to such term in Section 5.3(d)(iv);

"**Approved Change of Control Transaction**" means a proposed Change of Control Transaction which has been approved by a majority of the Independent Directors and, if applicable, publicly recommended for acceptance or approval by shareholders of the Company by the Board of Directors;

"**Beneficial Ownership**" means, with respect to a Person, as at any time, the aggregate interest of such Person and its Affiliates calculated as a percentage, (a) the numerator of which shall be the number of Common Shares beneficially owned or controlled by such Person and its Affiliates at the relevant date (including any Common Shares underlying any Convertible Securities (including Notes) beneficially owned or controlled by such Person and its Affiliates), and (b) the denominator of which shall be the sum of the number of Common Shares issued and outstanding as at such relevant date plus the number of Common Shares underlying any Convertible Securities (including Notes) beneficially owned or controlled by such Person and its Affiliates at the relevant date;

"**Beneficial Ownership Requirement**" means, as at any date, that the Beneficial Ownership of the Investor is equal to or greater than 10%;

"**Board of Directors**" or "**Board**" means the board of directors of the Company;

"**Board Size**" has the meaning given to such term in Section 2.1(k);

"**Business Day**" means any day, other than (a) a Saturday, Sunday or statutory holiday in the Province of Ontario or the State of Ohio, or (b) a day on which banks are generally closed in the Province of Ontario or the State of Ohio;

"**Business Opportunity**" means any direct or indirect investment in (whether by way of debt, equity or otherwise), acquisition (in whole or in part, whether involving equity, debt, assets or otherwise) of, or the entering into of any partnership, joint venture, leasing arrangement, licensing arrangement or other business relationship with or in respect of a Covered Business which has the same or similar economic effect as an investment in or acquisition of a Covered Business, and includes, for certainty, any such investment, acquisition, partnership, joint venture, leasing arrangement, licensing arrangement or other business relationship having the same or similar economic effect as an investment or acquisition with respect to any Covered Business in respect of which the Company, the Investor or any of its Affiliates has a pre-existing interest, whether pursuant to the Strategic Relationship or otherwise; underline(provided), however, that the following shall be deemed not to be a Business Opportunity: (a) transactions in the ordinary course of business of the Investor or any of its Affiliates, including, but not limited to, the purchase, sale or leasing of products or services to any customer or supplier, (b) research and development conducted by the Investor or any of its Affiliates, (c) any transaction with a Covered Business in which the Investor and/or its Affiliates has a pre-existing interest at the relevant time, which interest was acquired as a result of pursuing a Rejected Opportunity pursuant to Section 5.3(f); and (d) transactions with the entities disclosed in writing to the Company by the Investor prior to the execution of this Agreement;

"**Canadian Securities Commissions**" means the securities commissions or similar securities regulatory authorities in each of the provinces and territories of Canada;

"**Canadian Securities Laws**" means the applicable securities legislation of each of the provinces and territories of Canada and all regulations, published policy statements, Orders, rules, instruments, rulings and published interpretation notes issued thereunder or in relation thereto;

"**cannabis**" means (a) all living or dead material, plants, seeds, plant parts or plant cells from any cannabis species or subspecies (including sativa, indica and ruderalis), including wet and dry material, trichomes, oil and extracts from cannabis (including cannabinoid or terpene extracts from the cannabis plant), and (b) cannabinoids and/or analogs of cannabinoids produced through biological or chemical synthesis, and novel substances or compounds specific to the production of cannabinoids and/or analogs of cannabinoids, in the case of each of (a) and (b), including (i) cannabis and marijuana, as defined pursuant to applicable Law, including the Cannabis Act; and (ii) Industrial Hemp as defined in the Industrial Hemp Regulations issued under the Cannabis Act or other applicable Law;

"**Cannabis Act**" means *An Act respecting cannabis and to amend the Controlled Drugs and Substances Act, the Criminal Code and other Acts* (Canada);

"**Cannabis-Related Business**" means: (a) the actual or proposed business of the Company or any of its Subsidiaries or Investees, including the operation of a venture capital, growth equity, or other investment firm that invests, directly or indirectly, in businesses related to, in whole or in part, the cannabis industry; (b) cultivating, processing, branding, licensing, manufacturing, distributing and/or selling cannabis or cannabis-related products by any means, directly or indirectly; and/or (c) any other business operating in the cannabis industry, and includes any Person engaged in or proposing to engage in any of the foregoing alone or together with others, directly or indirectly;

"**Change of Control Transaction**" shall mean the occurrence of any of the following:

(a)    (i) the direct or indirect sale, lease, transfer, conveyance or other disposition, in one or a series of related transactions, of all or substantially all of the assets of the Company and its Subsidiaries, taken as a whole, to any Person (other than to the Company or to any wholly-owned Subsidiary of the Company), or (ii) a plan or scheme of arrangement, merger, amalgamation, consolidation, share sale or other transaction or series of related transactions, in which all or substantially all of the Common Shares are exchanged for, converted into, acquired for, or constitute solely the right to receive, other securities, cash or other property, that would result in the Persons who beneficially own, directly or indirectly, 100% of the issued and outstanding Common Shares (including any Common Shares or other voting shares of the Company that would be beneficially owned by such Persons on an as-converted, as-exercised or as-exchanged basis) as of immediately prior to such transaction ceasing to beneficially own, directly or indirectly, at least a majority of the outstanding Common Shares or outstanding common equity securities of the surviving entity (including any Common Shares, common equity securities or voting shares that would be beneficially owned by such Persons on an as-converted, as-exercised or as-exchanged basis) immediately following the completion of such transaction or series of related transactions; or

(b)    the consummation of any transaction or series of related transactions (including pursuant to a merger, amalgamation or consolidation), the result of which is that any Person, including any Persons acting jointly or in concert with such Person, becomes the beneficial owner, directly or indirectly, of shares of the Company's common equity representing more than 50% of the voting power of all of the Company's then-outstanding common equity (including any common equity beneficially owned by such Person on an as-converted, as-exercised or as-exchanged basis);

"**Closing**" means the closing of the transactions contemplated under the Note Purchase Agreement, including the issuance of the Note thereunder;

"**Common Shares**" has the meaning given to such term in the recitals hereto;

"**Company**" has the meaning given to such term on the first page of this Agreement;

"**Company Indemnified Parties**" has the meaning given to such term in Section 4.6(b);

"**Company Nominees**" has the meaning given to such term in Section 2.1(d);

"**Competitor**" means a Person (other than the Investor or any of its Affiliates) engaged, directly or indirectly (including through any other Person), in the cultivation of cannabis (other than solely non-THC cannabis), the manufacture of cannabis-related products (other than solely non-THC cannabis-related products), or the operation of cannabis dispensaries, but excludes any financial investment firm and its Affiliates (provided no such Affiliate otherwise meets the definition of "Competitor"); provided that, for purposes of this definition, "cannabis-related products" shall exclude lighting, nutrients, growing media, growing environments, growing inputs and hardware products, technology or other products or services, in each case, used in connection with indoor and hydroponic gardening;

"**Confidential Information**" means, subject to Section 5.7(d), any and all information, in any form or medium, written or oral, whether concerning or relating to the Company, its Subsidiaries, Investees, or its and their respective officers and employees (whether prepared by or on behalf of the Company or otherwise, and irrespective of the form or means of communication) that is furnished to the Investor or its Representatives by or on behalf of the Company at any time, whether before, upon or after the execution of this Agreement, including all oral and written information relating to financial statements, projections, evaluations, plans, strategy, programs, customers, suppliers, facilities, equipment and other assets, products, processes, manufacturing, marketing, research and development, trade secrets, know-how, patent applications that have not been published, technology and intellectual property of the Company and its Subsidiaries or Investees. "**Confidential Information**" shall be deemed to include the portion of all notes, analyses, studies, interpretations, memoranda and other documents, material or reports (in any form or medium) prepared by the Investor and its Representatives that contain, reflect or are based upon, in whole or part, the information furnished to or on behalf of the Company;

"**Confidentiality Agreement**" means the confidentiality agreement dated July 30, 2020 between the Company and the Investor;

"**Conversion Common Shares**" means the Common Shares issuable to the Investor upon conversion of the Notes;

"**Conversion Date**" means the date that the Notes are converted into Common Shares pursuant to the Note Purchase Agreement;

"**Conversion Price**" has the meaning set out in the Note;

"**Convertible Securities**" means securities which are exercisable for, convertible into or exchangeable for Common Shares;

"**Covered Business**" means a Cannabis-Related Business that is not an Excluded Business;

"**CSE**" means the Canadian Securities Exchange or any successor thereto;

"**Demand Registration**" has the meaning given to such term in Section 4.1;

"**Demand Registration Request**" has the meaning given to such term in Section 4.1;

"**Distribution Expenses**" means any and all fees and expenses incidental to the Company's performance of, or compliance with, the terms of a Registration hereunder, including: (a) the Canadian Securities Commissions and Canadian stock exchange listing and filing fees, (b) fees and expenses of compliance with Securities Laws, (c) printing, copying, messenger, delivery and translation expenses, (d) expenses incurred in connection with any "road show" and marketing activities, (e) reasonable fees, expenses and disbursements of legal counsel to the Company in all relevant jurisdictions, (f) reasonable fees, expenses and disbursements of the Company's auditors in connection with a Registration, including the expenses of any special audits or "comfort" letters, (g) all rating agency fees, (h) all transfer agents', depositaries' and registrars' fees, (i) reasonable legal fees and disbursements of legal counsel for the Investor in all relevant jurisdictions,

up to $50,000 in the aggregate per distribution contemplated hereby; (j) translation fees, and (l) any other fees, expenses and/or commissions payable to an underwriter, investment banker, manager or agent customarily paid by issuers or sellers of securities, other than Selling Expenses;

"**Excluded Business**" means any Cannabis-Related Business in which substantially all of such business relates to (a) the manufacturing, marketing, and distribution of lighting, nutrients, growing media, growing environments, growing inputs and hardware products, technology and technology-enabled services (including data and data services) or other products or services used in connection with indoor and hydroponic gardening, or (b) non-THC cannabis or non-THC cannabis-related products or services;

"**Exempt Issuance**" means the issuance by the Company of Common Shares or Convertible Securities: (a) as full or partial consideration in connection with any merger, business combination or similar transaction, tender offer, exchange offer, formal take-over bid, statutory amalgamation, statutory arrangement or other statutory procedure, or purchase of the securities or assets of a corporation or other entity; (b) pursuant to a rights offering by the Company to all of its holders of Common Shares for which an adjustment to the Conversion Price is required to be made pursuant to Section 8 of the Note; (c) upon the exercise, exchange or conversion of any Convertible Securities (i) that are outstanding as of the date of the Note Purchase Agreement as described in Section 4.2(b) of the Note Purchase Agreement, provided such exercise, exchange or conversion is effected pursuant to the terms of such securities as in effect on the date of the Note Purchase Agreement; or (ii) that were issued as part of a Subsequent Offering that was offered to the Investor in accordance with Section 3.1, to the extent required by Section 3.1; (d) pursuant to employee, advisor, director or advisory board compensation arrangements, including stock option or other equity based compensation plans, in each case, that have been approved by the Board of Directors after the date hereof; (e) as a result of the consolidation or subdivision of any securities of the Company or its Subsidiaries, or as special distributions, stock dividends or payments in kind or similar transactions for which an adjustment to the Conversion Price is required to be made pursuant to Section 8 of the Note; (f) as a bona fide commission or finder's fee paid to a third party on arm's length terms approved by a majority of the disinterested members of the Board of Directors; (g) pursuant to any shareholder rights plan approved by a majority of the Independent Directors; (h) to the Investor or its Affiliates; or (i) pursuant to the Note Purchase Agreement;

"**Exercise Notice**" has the meaning given to such term in Section 3.1(c);

"**Exercise Notice Period**" has the meaning given to such term in Section 3.1(c);

"**Extraordinary Transaction**" has the meaning given to such term in Section 5.1(a)(iii);

"**Governmental Entity**" means any domestic or foreign federal, provincial, regional, state, municipal, local or other government, governmental department, agency, arbitrator, authority or body (whether administrative, legislative, executive or otherwise), court, tribunal, commission or commissioner, bureau, minister or ministry, board or agency, or other regulatory or self-regulatory authority, including any securities regulatory authorities and stock exchange including the CSE and any other exchange on which the securities of the Company are listed or posted for trading;

"**Guaranteed Obligations**" has the meaning given to such term in <u>Section 6.1(a)</u>;

"**Independent Directors**" means the members of the Board of Directors other than any directors that are Investor Nominees or members of the Company's management team;

"**Ineligible Consideration**" has the meaning given to such term in <u>Section 5.9</u>;

"**Investee**" means, as to any Person, any other Person in which the Person has made a direct or indirect investment in, other than a Subsidiary of such Person;

"**Investor**" has the meaning given to such term on the first page of this Agreement;

"**Investor Indemnified Parties**" has the meaning given to such term in <u>Section 4.6(a)</u>;

"**Investor Nominee**" has the meaning given to such term in <u>Section 2.1(a)</u>;

"**Laws**" means any and all federal, state, provincial, regional, national, foreign, local, municipal or other laws, statutes, acts, treaties, constitutions, principles of common law, resolutions, ordinances, proclamations, directives, codes, edicts, Orders, rules, regulations, rulings or requirements or other legally binding directives or guidance issued, enacted, adopted, promulgated, implemented or otherwise put into effect by or under the authority of any Governmental Entity and includes Securities Laws;

"**Maximum Offering Size**" has the meaning given to such term in <u>Section 4.1(b)</u>;

"**Nomination Right Ownership Requirement**" means, as at any date, that the Investor and its Affiliates beneficially own or control (a) if prior to the Conversion Date, Notes representing at least 60% of the principal amount of the Note originally purchased by the Investor pursuant to the Note Purchase Agreement, or (b) if after the Conversion Date, Common Shares (including any Common Shares underlying any Convertible Securities beneficially owned or controlled by the Investor and its Affiliates) representing at least 60% of the Conversion Common Shares into which the original principal amount of the Note was convertible;

"**Note**" has the meaning given to such term in the recitals hereto, and "**Notes**" refers to the Note and any other convertible promissory notes issued to the Investor pursuant to Section 9.1 of the Note Purchase Agreement, in each case, having the rights set forth in the Note Purchase Agreement;

"**Note Purchase Agreement**" has the meaning given to such term in the recitals hereto;

"**Ontario Securities Act**" means the *Securities Act* (Ontario);

"**Order**" means any judgment, decision, decree, injunction, ruling, writ, assessment or order of any Governmental Entity that is binding on a Person or its property under applicable Law;

"**Ownership Certificate**" has the meaning given to such term in <u>Section 5.6</u>;

"**Participation Right**" has the meaning given to such term in <u>Section 3.1(b)</u>;

"**Person**" means and includes any individual, corporation, limited partnership, general partnership, joint stock company, limited liability company, joint venture, association, company, trust, bank, trust company, pension fund, business trust or other organization, whether or not a legal entity and any Governmental Entity;

"**Piggyback Notice**" has the meaning given to such term in Section 4.3(a);

"**Piggyback Registration**" has the meaning given to such term in Section 4.3(a);

"**Piggyback Request**" has the meaning given to such term in Section 4.3(a);

"**Prospectus**" means, as the context requires, a "preliminary prospectus," "amended and restated preliminary prospectus" and a "final prospectus", as those terms are used in National Instrument 41-101 – *General Prospectus Requirements*, including all amendments and supplements thereto;

"**Registrable Shares**" means any Common Shares that the Investor beneficially owns or has the right to acquire pursuant to the terms of the Notes or any other Convertible Securities;

"**Registration**" means the qualification under any of the Canadian Securities Laws of the distribution of Registrable Shares, as a secondary offering, to the public in any or all of the provinces and territories of Canada pursuant to a Prospectus;

"**Rejected Opportunity**" has the meaning given to such term in Section 5.3(f);

"**Rejection Date**" has the meaning given to such term in Section 5.3(f);

"**Rejection Notice**" has the meaning given to such term in Section 5.3(f);

"**Representatives**" means, in respect of any Person, the directors, officers, general and current or prospective limited partners, managers, members, employees, advisors, agents, insurers (including brokers and re-insurers), equityholders, actual or potential sources of debt or equity financing and other representatives (including lawyers, accountants, consultants and financial advisors) of such Person, and in the case of the Investor and its Affiliates, includes any Investor Nominee;

"**Revised Terms** has the meaning given to such term in Section 5.3(g);

"**Securities Laws**" means the Canadian Securities Laws and the U.S. Securities Laws;

"**Selling Expenses**" means any and all underwriters' discounts and commissions;

"**Standstill**" has the meaning given to such term in Section 5.1(b);

"**Strategic Relationship**" has the meaning given to such term in the recitals hereto;

"**Subsequent Offering**" has the meaning given to such term in Section 3.1(a);

"**Subsequent Offering Notice**" has the meaning given to such term in Section 3.1(a);

- 9 -

"**Subsidiary**" means, as to any Person (in this definition, the "first Person"), any other Person (in this definition, the "second Person"): (a) in respect of which the first Person or a Subsidiary of the first Person is a general partner or, in the case of a limited liability company, the managing member or manager thereof; (b) of which at least a majority of the outstanding equity interests having by the terms thereof ordinary voting power to elect a majority of the board of directors or similar governing body of the second Person (irrespective of whether or not at the time any equity interests of any other class or classes of the second Person shall have or might have voting power by reason of the happening of any contingency) is at the time directly or indirectly owned or controlled by the first Person or one or more of its Subsidiaries; or (c) as to which the first Person consolidates for accounting purposes;

"**Suspension Period**" has the meaning given to it in Section 4.1(d);

"**THC**" means tetrahydrocannabinol, a chemical compound in cannabis;

"**Transaction Agreements**" means this Agreement, the Note Purchase Agreement and the Note;

"**Transaction Proposal**" has the meaning given to it in Section 5.3(a);

"**Transfer**" includes any direct or indirect transfer, sale, assignment, gift, pledge, encumbrance, hypothecation, mortgage, granting of any option, right or warrant to purchase (including any short sale, put option or call option) or other disposition;

"**United States**" means the United States of America, its territories and possessions, any State of the United States, and the District of Columbia;

"**U.S. Exchange Act**" means the United States *Securities Exchange Act of 1934*;

"**U.S. Securities Act**" means the United States *Securities Act of 1933*;

"**U.S. Securities Laws**" means the U.S. Exchange Act and the U.S. Securities Act; and

"**Valid Business Reason**" has the meaning given to it in Section 4.1(d).

**1.2**     **Rules of Construction**

Except as may be otherwise specifically provided in this Agreement and unless the context otherwise requires, in this Agreement:

(a)     the terms "Agreement", "this Agreement", "the Agreement", "hereto", "hereof", "herein", "hereby", "hereunder" and similar expressions refer to this Agreement in its entirety and not to any particular provision hereof and include any schedules or exhibits thereto;

(b)     references to an "Article" or "Section" followed by a number or letter refer to the specified Article or Section to this Agreement;

- 10 -

(c)     the division of this Agreement into articles and sections and the insertion of headings are for convenience of reference only and shall not affect the construction or interpretation of this Agreement;

(d)     words importing the singular number only shall include the plural and vice versa and words importing the use of any gender shall include all genders;

(e)     the word "including" is deemed to mean "including without limitation" and the word "includes" is deemed to mean "includes without limitation";

(f)     the terms "party" and "the parties" refer to a party or the parties to this Agreement;

(g)     all terms defined in this Agreement have the defined meanings when used in any certificate or other document made or delivered pursuant hereto, unless otherwise defined therein;

(h)     any reference to any agreement, plan, contract or any other written instrument or document (including this Agreement) means such agreement, plan, contract, or written instrument or document as amended, modified, replaced or supplemented from time to time;

(i)     any reference to a statute, regulation or rule shall be construed to be a reference thereto as the same may from time to time be amended, re-enacted or replaced, and any reference to a statute shall include any regulations or rules made thereunder;

(j)     unless otherwise stated, all dollar amounts refer to United States dollars;

(k)     the word "day" means calendar day unless Business Day is expressly specified;

(l)     any time period within which a payment is to be made or any other action is to be taken hereunder shall be calculated excluding the day on which the period commences and including the day on which the period ends;

(m)     the parties agree that they have been represented by counsel during the negotiation and execution of this Agreement and, therefore, waive the application of any law, regulation, holding or rule of construction providing that ambiguities in any agreement or other document will be construed against the party drafting such agreement or document; and

(n)     whenever any payment is required to be made, action is required to be taken or period of time is to expire on a day other than a Business Day, such payment shall be made, action shall be taken or period shall expire on the next following Business Day.

## 1.3     Entire Agreement

The Transaction Agreements constitute the entire agreement between the parties with respect to the subject matter hereof and thereof and supersede all prior agreements, understandings, negotiations and discussions, whether written or oral, including the Confidentiality Agreement (which is being concurrently terminated with the execution of this

Agreement and will be of no further force and effect). There are no conditions, covenants, agreements, representations, warranties or other provisions, express or implied, collateral, statutory or otherwise, relating to the subject matter hereof except as provided in the Transaction Agreements.

**1.4      Time of Essence**

Time shall be of the essence of this Agreement.

**1.5      Governing Law and Submission to Jurisdiction**

(a)      This Agreement and all matters, claims or actions (whether at law, in equity, in contract, in tort or otherwise) based upon, arising out of or relating to this Agreement or the negotiation, execution or performance of this Agreement, shall be interpreted and enforced in accordance with, and the respective rights and obligations of the parties shall be governed by, the laws of the Province of Ontario and the federal laws of Canada applicable in that province, regardless of the Laws that might otherwise govern under any applicable conflict of Laws principles.

(b)      Each of the parties irrevocably and unconditionally (i) submits to the exclusive jurisdiction of the courts of the Province of Ontario over any action or proceeding arising out of or relating to this Agreement, (ii) agrees to commence such an action or proceeding in Toronto, Ontario, and to cooperate and use its commercially reasonable efforts to bring the action or proceeding before the Ontario Superior Court of Justice (Commercial List), (iii) waives any objection that it might otherwise be entitled to assert to the jurisdiction of such courts and (iv) agrees not to assert that such courts are not a convenient forum for the determination of any such action or proceeding.

(c)      Each of the Investor and the Guarantor, being organized under the laws of a foreign jurisdiction and residing outside of Canada, hereby appoint Blake, Cassels & Graydon LLP, 199 Bay St, Suite 4000, Toronto, Ontario, M5L 1A9, as their agent for service of process in the Province of Ontario.

**1.6      Severability**

If any provision of this Agreement is determined by a court of competent jurisdiction to be invalid, illegal or unenforceable in any respect, all other provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party hereto. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties hereto as closely as possible in an acceptable manner to the end that transactions contemplated hereby are fulfilled to the extent possible.

**1.7      Certain Terminology**

For the purposes of this Agreement, the terms and phrases "acting jointly or in concert", "beneficial ownership", "take-over bid" and "issuer bid" (or grammatical variations thereof) shall have the meanings given to them under applicable Canadian Securities Laws and

"take-over bid" shall include a tender offer or exchange offer conducted pursuant to applicable U.S. Securities Laws.

1.8     **Schedules**

The following Schedules are attached to and form an integral part of this Agreement:

Schedule A              –         Registration Procedures

**ARTICLE 2**
**BOARD NOMINATION RIGHTS**

2.1     **Board of Directors Nominees**

(a)     Effective at Closing, the Board of Directors shall consist of seven directors. Subject to Section 2.3, and provided that the Beneficial Ownership of the Investor is 33% or greater, the Investor shall be entitled to designate three nominees (each an "**Investor Nominee**") for election to the Board of Directors; provided, however, that the number of Investor Nominees will be reduced: (i) to two if the Beneficial Ownership of the Investor is at least 20% but less than 33%; or (ii) to one if (A) the Beneficial Ownership of the Investor is less than 20% and (B) the Investor satisfies the Nomination Right Ownership Requirement.

(b)     Each Investor Nominee must be an individual that meets the qualification requirements to act as a director in accordance with Section 2.2. The parties acknowledge that the initial Investor Nominees shall be Christopher Hagedorn, Mark Sims and Gary Vaynerchuk, who have been determined by the Board of Directors to satisfy the requirements set forth in Section 2.2(a) and have been appointed to the Board of Directors as of the date hereof.

(c)     Where the number of Investor Nominees that the Investor is entitled to designate is reduced pursuant to Section 2.1(a), the Investor shall advise the Company as soon as reasonably practicable, but in any event within 5 Business Days, which of the Investor Nominees will resign from the Board of Directors. Any such resignation by an Investor Nominee will occur as soon as practicable, but in any event within 5 days following the date that the Investor delivers notice to the Company of the Investor Nominees that will resign from the Board of Directors.

(d)     The Company shall (i) recommend and reflect such recommendation in any management information circular relating to any meeting where directors of the Company are elected (or submit to shareholders by written consent, if applicable) that the shareholders of the Company vote to elect each Investor Nominee to the Board of Directors for a term of office expiring at the closing of the subsequent annual meeting of the shareholders of the Company; and (ii) solicit proxies in favour of and otherwise support his or her election, each in a manner no less favourable than the manner in which the Company supports its other nominees selected by the Independent Directors (the "**Company Nominees**") for election to the Board of Directors. For any meeting of the Company's shareholders (or written consent in lieu of a meeting) for the election of members to the Board of Directors,

the Company shall not nominate, in the aggregate, a number of nominees greater than the number of members of the Board of Directors.

(e)     At least 10 Business Days prior to designating an individual as an Investor Nominee, the Investor will discuss the identity of each proposed Investor Nominee with the Company. Following such discussion, but prior to the later of (i) 45 days prior to any meeting of shareholders at which directors of the Company are to be elected and (ii) 10 days after being notified of the record date for such a meeting, the Investor shall advise the Company of the identity of each Investor Nominee that satisfies the requirements of Section 2.2. If the Investor does not advise the Company of the identity of each Investor Nominee prior to such deadline, then the Investor will be deemed to have nominated each incumbent Investor Nominee unless the Investor notifies the Company in writing that it does not wish to nominate any Investor Nominees for such election.

(f)     In the event that an Investor Nominee is not duly elected to the Board of Directors or shall cease to serve as a director of the Company, whether due to such Investor Nominee's death, disability, resignation or removal (including failure to be elected by the Company's shareholders or being required to resign in accordance with any applicable majority voting policy), the Company shall cause the Board of Directors to appoint an Investor Nominee designated by the Investor to fill the vacancy so created, provided that the Investor remains eligible to designate an Investor Nominee in accordance with Section 2.1(a) and that the replacement Investor Nominee meets the qualification requirements in Section 2.2.

(g)     Each Investor Nominee shall be compensated for the Investor Nominee's service on the Board of Directors and any committee thereof consistent with the Company's policies for director compensation, provided that any full-time employee of the Investor or any of its Affiliates who serves as an Investor Nominee shall not be entitled to any salary or compensation from the Company for the Investor Nominee's services. Each Investor Nominee shall be reimbursed for all reasonable expenses related to such service on the Board of Directors consistent with the Company's policies for director reimbursement.

(h)     It is acknowledged by the Investor that each Investor Nominee will be required to comply with all policies of the Company that are applicable to members of the Board of Directors.

(i)     The Company shall enter into an indemnification agreement with each Investor Nominee in a form substantially similar to the Company's form of director indemnification agreement and provide each Investor Nominee with director and officer insurance to the same extent it indemnifies and provides insurance for the other members of the Board of Directors pursuant to the constating documents of the Company, applicable Laws or otherwise.

(j)     Upon the death, disability, resignation or removal (including failure to be elected by the Company's shareholders or being required to resign in accordance with any applicable majority voting policy) of any director that is not an Investor Nominee, or if any such director determines not to stand for re-election for any reason, the Independent Directors shall be entitled to designate a replacement Company

Nominee to fill the vacancy created by such death, disability, resignation or removal or determination not to stand for re-election.

(k)     The number of directors constituting the full Board (the "**Board Size**") shall be seven directors, unless the Investor otherwise agrees, and the Board shall not (i) propose or resolve to increase or decrease the Board Size except with the prior written consent of the Investor (except where the Investor has provided notice to the Company in accordance with Section 2.1(e) that it does not wish to nominate any Investor Nominee for election at any meeting where directors of the Company are elected, in which case the Board may resolve to decrease the Board Size to remove any such Investor Nominee in respect of which the Investor provides such notice) or (ii) except with the prior written consent of the Investor, and subject to the obligations of the directors of the Company to comply with their fiduciary duties under applicable Law, fail to recommend against any proposal by the Company's shareholders to increase or decrease the Board Size.

(l)     For greater certainty, the selection of the Company Nominees shall rest with the Independent Directors.

(m)     Notwithstanding anything herein to the contrary, a failure by the Investor to designate any or all of the Investor Nominees that it is entitled to designate pursuant to this Section 2.1 at any time shall not restrict the ability of the Investor to designate such Investor Nominees at any time in the future.  In the event that the Investor has designated fewer Investor Nominees than the total number of Investor Nominees that the Investor is entitled to designate pursuant to this Section 2.1, then the Investor shall have the right, at any time and from time to time, to designate such additional Investor Nominee(s) to which it is entitled hereunder, in which case, the Company and the Board shall take all necessary corporate action, to the fullest extent permitted by Law, to promptly: (i) enable the Investor to designate and effect the election or appointment of such additional Investor Nominee(s) (including increasing the Board Size if it has been reduced pursuant Section 2.1(k)); and (ii) appoint such Investor Nominee(s) to fill any available vacancies or, to the extent not so permitted, nominate any such Investor Nominee for election to the Board at the next meeting of shareholders.

(n)     Subject to applicable Law, for so long as the Investor has the right to designate one or more Investor Nominees, at least one Investor Nominee shall be appointed to each committee established by the Board, including, for certainty, any *ad hoc* special committee, strategic advisory committee or other similarly constituted committee of the Board formed for the purposes of, among other things, reviewing, considering or evaluating regulatory issues, strategic initiatives or material transactions involving the Company and/or its Subsidiaries, unless (i) the committee in question has been formed to consider (A) a Business Opportunity or (B) a transaction in which all Investor Nominees or the Investor or any of its Affiliates has a material interest (other than solely as a shareholder) or (ii) such appointment would be otherwise inconsistent with the requirements or recommended best practices for the composition of such committees under applicable Securities Laws or the rules of a stock exchange on which the Common Shares are listed.

(o)    The Company will not adopt a majority voting policy with respect to the election of members of the Board of Directors without the unanimous written consent of the Board of Directors, unless required to do so pursuant to applicable Securities Laws or the rules of a stock exchange on which the Common Shares are listed.

(p)    Subject to <u>Section 5.3(k)</u> and <u>Section 5.7</u> and applicable Law, each Investor Nominee shall be permitted to disclose non-privileged information about the Company and its Subsidiaries that the Investor Nominee receives as a result of being a director of the Company to the Investor, its Affiliates and their respective Representatives solely for the purposes of monitoring, administering or managing the Investor's investment in the Company and advising the Investor Nominee in the Investor Nominee's capacity as a director of the Company and for no other purpose; <u>provided</u> that the recipient of such disclosure is directed (i) to keep confidential and not disclose any Confidential Information, in each case, in accordance with <u>Section 5.7</u>, and (ii) to be comply with all of the covenants applicable to the Investor and its Affiliates contained in <u>Section 5.1</u>. The Investor shall be liable to the Company for any breach of this <u>Section 2.1(p)</u> by any of the foregoing Persons as if such Person were an original party hereto.

## 2.2    Qualifications of Investor Nominee(s)

(a)    The Investor may appoint any individual as an Investor Nominee <u>provided</u> that such Person:

    (i)    meets the qualification requirements to serve as a director under the Act, the applicable Securities Laws and/or the applicable rules of the CSE or any other exchange on which the Common Shares are listed, and <u>provided</u> further that if the Investor is entitled to designate more than one Investor Nominee, at least one of the Investor Nominees so designated must qualify as an independent director under applicable Securities Laws and/or the applicable rules of the CSE or any other exchange on which the Common Shares are listed; and

    (ii)    is not an employee of, is not involved in the day-to-day operations of, and/or does not have a fiduciary responsibility to a Competitor.

(b)    If at any time an Investor Nominee fails to satisfy the requirements provided in <u>Section 2.2(a)</u>, then the Investor shall use commercially reasonable efforts to procure the immediate resignation of such Investor Nominee and/or remove such Investor Nominee following which the Investor may designate a replacement Investor Nominee in accordance with <u>Section 2.1</u>.

(c)    Notwithstanding <u>Section 2.2(b)</u>, if the Investor Nominee fails to satisfy the requirements in <u>Section 2.2(a)(ii)</u>, the majority of the Independent Directors may waive such requirements on such terms as such Independent Directors may approve.

## 2.3    Expiry of Board Nomination Rights

    The provisions of this <u>Article 2</u> (other than this <u>Section 2.3</u>) shall terminate and be of no further force or effect on the first day following the date on which the Beneficial Ownership

of the Investor is less than 20% and the Nomination Right Ownership Requirement is no longer satisfied.

**ARTICLE 3**
**PARTICIPATION RIGHT**

3.1        **Participation Right**

(a)        For so long as the Beneficial Ownership Requirement is satisfied, if the Company proposes to issue any Common Shares or Convertible Securities, other than pursuant to an Exempt Issuance (any such issuance, a "**Subsequent Offering**"), then the Company shall promptly following the announcement of such Subsequent Offering, provide a written notice (the "**Subsequent Offering Notice**") to the Investor setting out: (i) the number of Common Shares or Convertible Securities issued or to be issued; (ii) the material terms and conditions of any Convertible Securities issued or to be issued and any other terms and conditions of such Subsequent Offering; (iii) the subscription price per Common Share or Convertible Security issued or to be issued by the Company under such Subsequent Offering, as applicable (and, in the case of a Subsequent Offering for consideration in whole or in part other than cash, the fair market value thereof as reasonably determined by the Independent Directors); and (iv) the proposed closing date for the issuance of a Note, Common Shares or Convertible Securities to the Investor, assuming exercise of the Participation Right by the Investor, which closing date shall be at least 10 Business Days following the date of such notice, or such other date as the Company and the Investor may agree.

(b)        Subject to Section 3.1(c) and the receipt of all required regulatory approvals and compliance with applicable Laws, the Company agrees that the Investor has the right (the "**Participation Right**"), upon receipt of a Subsequent Offering Notice, to purchase, on substantially similar terms and conditions of such Subsequent Offering (but in any event at the same price per security received by the Company in such Subsequent Offering):

    (i)        in the case of a Subsequent Offering of Common Shares that occurs:

        (A)        prior to the Conversion Date, a Note in a principal amount equal to the amount required to convert the Note into such number of Common Shares that will allow the Investor to maintain its Beneficial Ownership immediately prior to completion of the Subsequent Offering;

        (B)        following the Conversion Date, Common Shares that will allow the Investor to maintain its Beneficial Ownership immediately prior to the completion of the Subsequent Offering; and

    (ii)        in the case of a Subsequent Offering of Convertible Securities that occurs:

        (A)        prior to the Conversion Date, a Note in a principal amount equal to the amount required to convert such Note into such number of Common Shares that will (assuming conversion or exchange of all of the Convertible Securities issued in connection with the

Subsequent Offering and the Notes issuable pursuant to this Section 3.1) allow the Investor to maintain its Beneficial Ownership immediately prior to completion of the Subsequent Offering;

(B)     following the Conversion Date, such number of Convertible Securities that will (assuming conversion or exchange of all of the Convertible Securities issued in connection with the Subsequent Offering and the Convertible Securities issuable pursuant to this Section 3.1) allow the Investor to maintain its Beneficial Ownership immediately prior to the completion of the Subsequent Offering,

in each case, for certainty, after giving effect to any Common Shares or Convertible Securities acquired by the Investor as part of the Subsequent Offering, other than pursuant to the exercise of the Participation Right.

(c)     If the Investor wishes to exercise the Participation Right in respect of a particular Subsequent Offering, the Investor shall give written notice to the Company (the "**Exercise Notice**") of the exercise of such right and the principal amount of the Note or the number of Common Shares or Convertible Securities, as applicable, that the Investor wishes to purchase (subject to the limits prescribed by Section 3.1(b)), within 10 Business Days (or, in the case of a Subsequent Offering that is a public offering in a "bought deal", three Business Days) after the date of receipt of the Subsequent Offering Notice (the "**Exercise Notice Period**"), provided that if the Investor does not so provide such Exercise Notice prior to the expiration of the Exercise Notice Period, the Investor will not be entitled to exercise the Participation Right in respect of such Subsequent Offering. Each Exercise Notice delivered by the Investor shall set forth the aggregate number of each class of securities of the Company beneficially owned or controlled by the Investor as of the date of such Exercise Notice.

(d)     If the Company receives a valid Exercise Notice from the Investor within the Exercise Notice Period, then the Company shall issue to the Investor against payment of the purchase price or subscription price payable in respect thereof set forth in the Subsequent Offering Notice, a Note in the principal amount, or that number of Common Shares or Convertible Securities, as applicable, set forth in the Exercise Notice, subject to the receipt of all required regulatory and other approvals on terms and conditions satisfactory to the Company, acting reasonably, which approvals the Company shall use commercially reasonable efforts to obtain (including any required shareholder approvals), and subject to compliance with applicable Laws and to the limits prescribed by Section 3.1(b). The Investor acknowledges and agrees that such Note, Common Shares or Convertible Securities may be subject to restrictions on transfer pursuant to applicable Securities Laws. Accordingly, the Investor acknowledges and agrees that prior to the expiry of any applicable hold period under applicable Securities Laws, the Note or certificates (if any) representing such Common Shares or Convertible Securities will bear such legend or legends as may, in the reasonable opinion of counsel to the Company, be necessary in order to comply with applicable Securities Laws or the requirements of, as applicable, the CSE or any other exchange where the Common Shares are listed.

- 18 -

(e)     If the Company is required to seek shareholder approval for the issuance of securities to the Investor, then the Company shall call and hold a meeting of its shareholders to consider the issuance of such securities to the Investor as soon as reasonably practicable, and in any event such meeting shall be held within 75 days after the date that the Company is advised that it will require shareholder approval, and shall recommend approval of the issuance of such securities and shall solicit proxies in support thereof.

(f)     The closing of the exercise of the Participation Right of the Investor will take place on the closing date set out in the Subsequent Offering Notice, which shall be, to the extent practicable, concurrent with the related issuance pursuant to the Subsequent Offering and, if not practicable, as soon as practicable thereafter. If the closing of the exercise of the Participation Right has not been completed by the 90th day following the receipt of the Subsequent Offering Notice (or such earlier or later date as the parties may agree), provided that the Company has used its commercially reasonable efforts to obtain all required regulatory and other approvals (including any required shareholder approvals), then the Exercise Notice will be deemed to have been irrevocably withdrawn and the Company will have no obligation to issue any Note, Common Shares or Convertible Securities, as applicable, to the Investor pursuant to such exercise of the Participation Right. If the Investor does not timely elect to exercise its Participation Right in full, then the Company shall be free for a period of 120 days following the expiration of the Exercise Notice Period to sell the Common Shares or Convertible Securities that are the subject of the Subsequent Offering Notice on terms and conditions not materially more favorable to the purchasers thereof (but in any event with a price no less than those offered to the Investor in the Subsequent Offering Notice). Any Common Shares or Convertible Securities offered or sold by the Company pursuant to such Subsequent Offering after such 120-day period, must be reoffered to the Investor pursuant to this Section 3.1.

(g)     The election by the Investor not to exercise its Participation Right under this Section 3.1 in any one instance shall not affect its right as to any subsequent proposed issuance.

(h)     In the case of an issuance subject to this Section 3.1 for consideration in whole or in part other than cash, including securities acquired in exchange therefor (other than securities by their terms so exchangeable), the consideration other than cash shall be deemed to be the fair market value thereof as reasonably determined in good faith by the Independent Directors.

**3.2        Filing of Form 72-503F**

The Company shall file a Form 72-503F – *Report of Distributions Outside Canada*, within the time frame and form required by OSC Rule 72-503, in each case where securities are issued to the Investor pursuant to the Participation Right if such issuance is (i) not qualified by a Prospectus and (ii) the Investor is, at the time of that issuance, outside Canada.

3.3        **Expiry of Participation Right**

The provisions of this Article 3 (other than this Section 3.3) shall terminate and be of no further force or effect on the first day following the date on which the Beneficial Ownership Requirement is no longer satisfied.

**ARTICLE 4
REGISTRATION RIGHTS**

4.1        **Demand Registrations**

(a)    Subject to Section 4.8, at any time and from time to time following the Conversion Date, the Investor may request the Company to use commercially reasonable efforts to effect a Registration of all or part of its Registrable Shares (such Registration being hereinafter referred to as a "**Demand Registration**") by filing a Prospectus under the Canadian Securities Laws of the jurisdictions selected by the Investor. Any such request shall be made by notice in writing (a "**Demand Registration Request**") to the Company. Subject to Section 4.1(b), the Company shall be entitled to include for sale in any Prospectus filed pursuant to a Demand Registration any securities of the Company to be sold by the Company for its own account. The Company shall as soon as reasonably practical, and in any event within 30 days of receipt of a Demand Registration Request, file a Prospectus under the Canadian Securities Laws of the jurisdictions selected by the Investor covering all of the Registrable Shares that the Investor requested to be registered and, as applicable, any securities offered by the Company for its own account, and use its commercially reasonable efforts to cause a receipt to be issued for such Prospectus as soon as reasonably practicable. The Company and the Investor shall cooperate in a timely manner in connection with any such distribution and the procedures in Schedule A shall apply.

(b)    If the lead underwriter or underwriters in any underwritten Demand Registration advise the Company in writing that the inclusion of all the securities requested to be included in a Demand Registration, including securities offered by the Company for its own account, as applicable, may have an adverse effect on the distribution or sales price of the securities being offered unless the number of such securities is reduced (such reduced offering size, the "**Maximum Offering Size**"), the Company will include in such Registration, in the following priority, in the aggregate up to the Maximum Offering Size: (i) first, all Registrable Shares requested to be registered in the Demand Registration by the Investor, and (ii) second, securities offered by the Company for its own account.

(c)    The Company shall not be obliged to effect:

(i)    more than two Demand Registrations in any one 12 month period; provided however, that a Registration shall not be deemed "effected" for purposes of this Section 4.1 until such time as a receipt has been issued by, or deemed to be issued by, the applicable Canadian Securities Commission for a final Prospectus pursuant to which all of the Registrable Shares included in the Demand Registration are to be distributed; provided however, that if the Investor withdraws, or does not pursue a request for a Demand Registration after (A) filing a preliminary Prospectus pursuant to

which the Registrable Shares are to be distributed, or (B) the entering into of an enforceable bought deal letter or an underwriting or agency agreement in connection with the Demand Registration, then such Demand Registration shall be deemed to be effected and <u>provided</u> further that if the Investor withdraws its request for inclusion of its Registrable Shares at any time after having learned of a material adverse change in the condition or business of the Company, or if the Investor withdraws its request during the Suspension Period, the Investor shall not be deemed to have participated in or requested such Demand Registration;

(ii)    a Demand Registration in respect of (A) a number of Registrable Shares that is expected to result in gross proceeds of less than C$50 million to the Investor or (B) all of the Registrable Shares owned by the Investor at such time; or

(iii)    a Demand Registration before the 90th day following the date on which a receipt was issued to the Company with respect to any final Prospectus filed by the Company in connection with another Demand Registration.

(d)    The Company may postpone the filing of a Prospectus to effect a Demand Registration for the later of (i) a period of not more than 90 days or (ii) the duration of the period that the Company is, in good faith, pursuing a Business Opportunity presented to the Company by the Investor in accordance with Section 5.3 that would constitute a "significant acquisition" for the Company pursuant to Part 8 of National Instrument 51-102 – *Continuous Disclosure Obligations* (each, a "**Suspension Period**"), upon written notice to the Investor, in the event the Independent Directors reasonably determine in good faith that either: (A) the filing of that Prospectus for the Demand Registration would materially impede the ability of the Company to consummate a *bona fide* transaction (including a financing, an acquisition, a disposition, a restructuring or a merger) or proceed with negotiations or discussions in relation thereto; or (B) there exists at the time material non-public information relating to the Company or its Subsidiaries or Investees, the disclosure of which the Company believes would be materially adverse to the Company and its Subsidiaries and Investees, taken as a whole, and which the Company or its Subsidiaries or Investees are not otherwise required by applicable Law or regulations to disclose; (each of (A) and (B), a "**Valid Business Reason**") provided, however, that (i) the Company shall give written notice to the Investor of the time at which it determines the Valid Business Reason to no longer exist; and (ii) the Company shall not qualify or register any securities offered by the Company for its own account during the Suspension Period.

(e)    If the Investor provides notice to the Company that the Investor has been advised by outside counsel that holding an investment in the Company would reasonably be expected to trigger a violation of, or any significant liability (other than any liability arising from obligations required to be performed by the Investor hereunder or the Note Purchase Agreement) to the Investor and/or its Affiliates under, applicable Law (which, for greater certainty, shall include any Laws applicable in the United States), which notice outlines the basis upon which the Investor has reached the above-referenced determination, then the Investor shall be entitled to exercise a Demand Registration and to sell all of its Registrable Shares without any of the limitations or constraints on the Investor set forth in Section 4.1(d).

(f)     The lead underwriter or underwriters for any offering in connection with a Demand Registration shall be selected by the Investor and shall be acceptable to the Company, acting reasonably, and the plan of distribution for such offering in connection with a Demand Registration shall be selected by the Investor in consultation with the Company.

**4.2        Demand Registration Request**

Any Demand Registration Request delivered by the Investor pursuant to Section 4.1 hereof shall:

(a)     specify the number of Registrable Shares which the Investor intends to offer and sell;

(b)     express the intention of the Investor to offer or cause the offering of such Registrable Shares;

(c)     describe the nature or methods of the proposed offer and sale thereof and the jurisdictions of Canada in which such offer shall be made;

(d)     contain the undertaking of the Investor participating in such offering to provide all such information regarding their Common Share holdings and the proposed manner of distribution thereof, as may be reasonably required in order to permit the Company to comply with all Securities Laws; and

(e)     specify whether such offer and sale shall be made by an underwritten public offering.

**4.3        Piggyback Registration**

(a)     Subject to Section 4.8, if the Company intends to prepare and file a Prospectus in Canada (or in any other jurisdiction in which the Common Shares are listed at the time a Piggyback Notice is provided) in connection with a proposed distribution by the Company of Common Shares for its own account, or for the account of any other securityholder whether pursuant to the exercise of registration rights by such other securityholder or otherwise, the Company shall give written notice thereof (including details of the number of Common Shares to be distributed, the minimum offering price per Common Share that the Company, acting reasonably, would be willing to accept in such distribution and the proposed timing and means of distribution) to the Investor as soon as practicable (and in any event no less than 15 Business Days if such distribution is not to be effected as a "bought deal" or two Business Days if such distribution is to be effected as a "bought deal") before the anticipated filing date of such Prospectus (or in the case of a "bought deal", the launch thereof) (the "**Piggyback Notice**"). In such event, the Investor shall be entitled, by notice (the "**Piggyback Request**") in writing given to the Company within five Business Days after the receipt of the Piggyback Notice (provided that, if such distribution is to be effected as a "bought deal", the Investor shall respond consistent with the time periods typical for transactions of that nature), to request that the Company cause any or all of the Registrable Shares held by the Investor to be included in such Prospectus (such Registration being hereinafter referred to as a "**Piggyback Registration**"). The Investor shall specify in the Piggyback

Request the number of Registrable Shares which the Investor intends to offer and sell and include the undertaking of the Investor and any applicable Affiliate thereof to provide all such information regarding their Common Share holdings and the proposed manner of distribution of the Registrable Shares, as may be reasonably required in order to permit the Company to comply with all applicable Securities Laws.

(b)     The Company shall include in each such Piggyback Registration all such Registrable Shares as directed by the Investor. Notwithstanding the foregoing, the Company shall not be required to include all such Registrable Shares in any such distribution:

(i)     initiated by the Company for its own account if the Company is advised in writing by its lead underwriter or underwriters that the inclusion of all Common Shares proposed to be distributed for the Company's account, all such Registrable Shares and all Common Shares of any other securityholder may have an adverse effect on the distribution or sales price of the securities being offered by the Company, in which case, the number of Common Shares and other Registrable Shares to be included in such Prospectus will be limited to the Maximum Offering Size and the Company will include in such Registration, in the following priority, in the aggregate up to the Maximum Offering Size: (A) first, the number of Common Shares proposed to be distributed for the account of the Company that represents up to 75% of the Common Shares to be included in such Prospectus; (B) second, all additional Common Shares proposed to be distributed for the account of the Company, all Registrable Shares requested to be qualified in the Piggyback Notice and all Common Shares of any other securityholder to be included in such Prospectus, on a *pro rata* basis based on the amount of Registrable Shares and other Common Shares requested to be included in such Prospectus; and (C) third, all additional Registrable Shares requested to be qualified in the Piggyback Notice and all additional Common Shares of any other securityholder to be included in such Prospectus, on a *pro rata* basis based on the amount of additional Registrable Shares and additional Common Shares requested to be included in such Prospectus; or

(ii)     initiated by any other securityholders, if the other securityholders are advised by their lead underwriter or underwriters that the inclusion of all such Registrable Shares and the Common Shares proposed to be distributed for the Company's account or Common Shares of such other securityholder may have a material adverse effect on the distribution or sales price of the securities being offered by such other securityholders, in which case, the number of Registrable Shares, Common Shares for the account of the Company and the Common Shares of any other securityholder will be limited to the Maximum Offering Size and the Company will include in such Registration, in the following order of priority, in the aggregate up to the Maximum Offering Size: (A) first, all Common Shares proposed to be distributed for the account of the other securityholder, and (B) second, all Registrable Shares and Common Shares proposed to be distributed for the account of the Company on a *pro rata* basis based on the amount of Registrable Shares and Common

Shares proposed to be distributed for the account of the Company requested to be included in such Prospectus .

(c)     The Company may, at any time prior to the issuance of a receipt for a final Prospectus in connection with a Piggyback Registration, at its sole discretion and without the consent of the Investor, withdraw such Prospectus and abandon the proposed distribution in which the Investor has requested to participate pursuant to the Piggyback Request.

**4.4     Registration Expenses**

(a)     In the case of a Demand Registration, all Distribution Expenses shall be paid by the Company; <u>provided</u>, however, that the Investor shall be required to reimburse the Company for any reasonable out-of-pocket expenses incurred by the Company in connection with a Demand Registration if the Demand Registration is subsequently withdrawn at the request of the Investor, unless the Investor withdraws such request after having learned of a material adverse change in the condition or business of the Company which is unknown to the Investor at the time of its request for a Demand Registration.

(b)     In the case of a Piggyback Registration, all Distribution Expenses shall be paid by the Company.

(c)     The Investor will pay all of its own Selling Expenses, the Company will pay all Selling Expenses of the Company and any other securityholder will pay all Selling Expenses of such securityholder, if any, in connection with any Demand Registration or Piggyback Registration, as the case may be.

**4.5     Preparation; Reasonable Investigation**

In connection with the preparation and filing of any Prospectus in connection with a Demand Registration or Piggyback Registration as herein contemplated:

(a)     the Company will give the Investor, the underwriter or underwriters of such distribution, if any, and their respective counsel, auditors and other representatives, the opportunity to participate in the preparation of such documents and each amendment thereof or supplement thereto, and shall insert therein such material furnished to the Company in writing, which in the reasonable judgment of the Company and its counsel should be included, and will give each of them such reasonable and customary access to the Company's books and records and such reasonable and customary opportunity to discuss the business of the Company with its officers and auditors, and to conduct all reasonable and customary due diligence which the Investor and the underwriters or underwriter, if any, and their respective counsel may reasonably require in order to conduct a reasonable investigation for purposes of establishing a due diligence defence as contemplated by Canadian Securities Laws (and any other applicable securities Laws) and in order to enable such underwriters to execute any certificate required to be executed by them in Canada for inclusion in such documents, provided that the Investor and the underwriters agree to maintain the confidentiality of such information.

(b)      the Investor shall furnish to the Company in writing such information as the Company reasonably requests for use in connection with any such Prospectus.

**4.6**        **Indemnification**

(a)      _By the Company._ The Company agrees to indemnify and hold harmless, to the maximum extent permitted by Law, each holder of Registrable Shares, such holder's officers, directors, partners, members, managers, employees, advisors, sub-advisors, attorneys, agents and Representatives, and each Person who controls such holder (within the meaning of the Ontario Securities Act) (collectively, the "**Investor Indemnified Parties**") against all losses (other than indirect or consequential damages, including loss of profit in connection with the distribution of the Registrable Shares), claims, actions, damages, liabilities and expenses (including with respect to actions or proceedings, whether commenced or threatened, and including reasonable attorney fees and expenses) caused by, resulting from, arising out of, based upon or related to any of the following statements, omissions or violations by the Company or any of its Representatives acting on its behalf: (i) any untrue or alleged untrue statement of material fact contained in any Prospectus or any amendment thereof or supplement thereto, in respect of a Demand Registration or Piggyback Registration, or any omission or alleged omission of a material fact required to be stated therein or necessary to make the statements therein not misleading; or (ii) any violation or alleged violation by the Company or any of its Representatives of the Securities Laws or any rule or regulation promulgated thereunder applicable to the Company and relating to action or inaction required of the Company in connection with any such registration, qualification or compliance. In addition, the Company will reimburse such Investor Indemnified Party for any legal or any other expenses reasonably incurred by it in connection with investigating or defending any such losses. Notwithstanding the foregoing, the Company shall not be liable in any such case to the extent that any such losses result from, arise out of, are based upon, or relate to an untrue statement or alleged untrue statement, or omission or alleged omission, made in any such Prospectus, or in any application, in reliance upon, and in conformity with, written information prepared and furnished in writing to the Company by such Investor Indemnified Party expressly for use therein or by such Investor Indemnified Party's failure to deliver a copy of the Prospectus or any amendments or supplements thereto after the Company has furnished such Investor Indemnified Party with a sufficient number of copies of the same.

(b)      _By the Investor._ The Investor agrees to indemnify and hold harmless, to the maximum extent permitted by Law, the Company, its directors and officers, directors, parents, members, managers, employees, advisors, sub-advisors, attorneys, agents and representatives and each Person who controls the Company (within the meaning of the Ontario Securities Act) (collectively, the "**Company Indemnified Parties**") against all losses (other than indirect or consequential damages, including loss of profit in connection with the distribution of the Common Shares), claims, actions, damages, liabilities and expenses (including with respect to actions or proceedings, whether commenced or threatened, and including reasonable attorney fees and expenses) caused by, resulting from, arising out of, based upon or related to any of the following statements, omissions or violations by the Investor or any of its Representatives acting on its behalf: (i) any untrue or alleged untrue statement of material fact contained in any Prospectus or any

amendment thereof or supplement thereto, or any omission or alleged omission of a material fact required to be stated therein or necessary to make the statements therein not misleading, but only to the extent that such untrue statement or omission is contained in any information furnished in writing by the Investor expressly for inclusion in such Prospectus; or (ii) any violation or alleged violation by the Investor or its Representatives of the Securities Laws or any rule or regulation promulgated thereunder applicable to the Investor and relating to action or inaction required of the Investor in connection with any such registration, qualification or compliance. In addition, the Investor will reimburse such Company Indemnified Party for any legal or any other expenses reasonably incurred by it in connection with investigating or defending any such losses. Notwithstanding the foregoing, in no event shall any indemnity under this Section 4.6(b), inclusive of any reimbursement of expenses payable by the Investor, exceed an amount equal to the net proceeds received by the Investor (after deducting any discounts and commissions) in respect of the Registrable Shares sold pursuant to a Registration.

(c)     *Claim Procedure.* Any Person entitled to indemnification hereunder shall: (i) give prompt written notice to the indemnifying party of any claim with respect to which it seeks indemnification (provided that the failure to give prompt notice shall not impair any Person's right to indemnification hereunder only to the extent such failure has not prejudiced the indemnifying party); and (ii) unless in such indemnified party's reasonable judgment a conflict of interest between such indemnified and indemnifying parties may exist with respect to such claim, permit such indemnifying party to assume the defense of such claim with counsel satisfactory to the indemnified party, acting reasonably. If such defense is assumed, the indemnifying party shall not be subject to any liability for any settlement made by the indemnified party without its consent (but such consent shall not be unreasonably withheld, conditioned or delayed). An indemnifying party who is not entitled to, or elects not to, assume the defense of a claim shall not be obligated to pay the fees and expenses of more than one counsel in each jurisdiction for all parties indemnified by such indemnifying party with respect to such claim, unless in the opinion of outside counsel to any indemnified party a conflict of interest may exist between such indemnified party and any other of such indemnified parties with respect to such claim. In such instance, the conflicted indemnified parties shall have a right to retain one separate counsel, chosen by the holders of a majority of the Registrable Shares included in the Registration if such holders are indemnified parties, at the expense of the indemnifying party.

(d)     *Non-Exclusive Remedy; Survival.* The indemnification and contribution provided for under this Agreement shall be in addition to any other rights to indemnification or contribution that any indemnified party may have pursuant to Law or contract and shall remain in full force and effect regardless of any investigation made by or on behalf of the indemnified party or any officer, director or controlling Person of such indemnified party and shall survive the Transfer of Registrable Shares and the termination or expiration of this Agreement.

(e)     *Contribution.* The Company and the Investor also agree to make such provisions, as are reasonably requested by any indemnified party, for contribution to such party in the event the Company's or the Investor's, as applicable, indemnification is unavailable for any reason (other than, with respect to the Investor, as a result of the last sentence of Section 4.6(b)). Such provisions shall provide that the

liability amongst the various Persons shall be allocated in such proportion as is appropriate to reflect the relative fault of such Persons in connection with the statements or omissions which resulted in losses (the relative fault being determined by reference to, among other things, which Person supplied the information giving rise to the untrue statement or omission and each Person's relative intent, knowledge, access to information and opportunity to correct or prevent such untrue statement or omission) and, only if such allocation is not respected at Law, would other equitable considerations, such as the relative benefit received by each Person from the sale of the securities, be taken into consideration. Notwithstanding the foregoing no Person guilty of fraudulent misrepresentation shall be entitled to contribution from any Person who was not guilty of such fraudulent misrepresentation.

(f)     _Release._ No indemnifying party shall, except with the consent of the indemnified party, consent to the entry of any judgment or enter into any settlement that does not include as an unconditional term thereof giving by the claimant or plaintiff to such indemnified party of a release from all liability in respect to such claim or litigation.

(g)     _The Company is Trustee._ The Investor hereby acknowledges and agrees that, with respect to this Article 4, the Company is contracting on its own behalf and as agent for the Company Indemnified Parties referred to in this Article 4. In this regard, the Company will act as trustee for such Company Indemnified Parties of the covenants of the Investor under this Article 4 with respect to such Company Indemnified Parties and accepts these trusts and will hold and enforce those covenants on behalf of such Company Indemnified Parties.

(h)     _The Investor is Trustee._ The Company hereby acknowledges and agrees that, with respect to this Article 4, the Investor is contracting on its own behalf and as agent for the Investor Indemnified Parties referred to in this Article 4. In this regard, the Investor will act as trustee for such Investor Indemnified Parties of the covenants of the Company under this Article 4 with respect to such Investor Indemnified Parties and accepts these trusts and will hold and enforce those covenants on behalf of such Investor Indemnified Parties.

**4.7      Limitation on Subsequent Registration Rights**

The Company shall not, without the prior written consent of the Investor, enter into any agreement with any holder or prospective holder of the Company's securities that grants such holder or prospective holder rights to include securities of the Company in any Prospectus under applicable Securities Laws, unless such rights are either _pro rata_ with, or subordinated to, the rights granted to the Investor under this Agreement on terms reasonably satisfactory to the Investor.

**4.8      Termination/Suspension of Registration Rights**

The provisions of this Article 4 (other than Section 4.6 and this Section 4.8) shall terminate and be of no further force or effect on the earlier of (a) the Company having effected five Demand Registrations and (b) the first day following the date on which the Beneficial Ownership Requirement is no longer satisfied.

**4.9**        **U.S. Registration Rights**

The Company covenants and agrees that, in the event the Company proposes to become a U.S. registrant at a time when the Investor is entitled to the rights set out in this Article 4, the Company will, as a condition to so becoming a U.S. registrant, either (i) provide an opinion of recognized U.S. securities law counsel confirming that the Registrable Shares will be freely tradeable in the United States or (ii) enter into a registration rights agreement with the Investor in a form acceptable to the Investor, acting reasonably, upon terms substantially similar to those provided in this Article 4 with respect to Demand Registrations and Piggyback Registrations.

**ARTICLE 5**
**ADDITIONAL COVENANTS OF THE PARTIES**

**5.1**        **Standstill**

(a)    For as long as the Beneficial Ownership of the Investor is at least 10%, the Investor covenants and agrees with the Company that without the prior written consent of the Independent Directors or as permitted by the Transaction Agreements (A) the Investor shall not, and (B) the Investor shall cause its Affiliates not to, in each case directly or indirectly, alone or acting jointly or in concert with any other Person:

    (i)    acquire or agree to acquire or make any proposal or offer to acquire, directly or indirectly in any manner, any Common Shares (or any securities convertible, exercisable or exchangeable into Common Shares) or other securities of the Company (other than Notes) or any material portion of the assets of the Company from any third party other than the Company or one of its Affiliates;

    (ii)    commence a take-over bid for any securities of the Company or its Subsidiaries;

    (iii)    effect, seek, offer or propose any take-over bid, amalgamation, merger, arrangement, business combination, re-organization, restructuring, liquidation, by or with respect to the Company or any of its Subsidiaries, or disposition of more than 50% (by fair market value) of the consolidated assets of the Company and its Subsidiaries, taken as a whole ("**Extraordinary Transaction**");

    (iv)    request, requisition or call a special meeting of shareholders of the Company;

    (v)    propose a shareholder proposal (under the applicable provisions of the Act) with respect to the Company;

    (vi)    seek to obtain representation on the Board of Directors other than pursuant to Article 2;

    (vii)    engage in short sales of any securities of the Company or its Subsidiaries;

    (viii)    solicit proxies from the security holders of the Company, or form, join or act jointly or in concert to so solicit, in relation to a proposed Change of Control

Transaction or, for three years from the date hereof, any of the matters referred to in Section 5.1(b);

(ix) enter into or offer to enter into or otherwise agree to be bound by a lockup, voting, support or other similar agreement with respect to any Common Shares (or any Notes or any other right or option to acquire Common Shares (pursuant to the terms of a convertible, exchangeable or exercisable security or otherwise)) beneficially owned by the Investor or any Affiliate thereof, or over which it exercises control or direction, in connection with any proposed Change of Control Transaction unless such Change of Control Transaction is an Approved Change of Control Transaction;

(x) advise, assist (including by providing direct or indirect financial assistance), contact, encourage, or act jointly or in concert with any other Person to engage in any of the activities from which the Investor is restricted under this Section 5.1(a); or

(xi) make any public disclosure with respect to the foregoing, including, any consideration, intention, plan or arrangement inconsistent with any of the foregoing.

(b) For three years from the date hereof, the Investor shall, in respect of any meeting of the shareholders of the Company held during that period:

(i) not vote any Common Shares held against any Company Nominee, including, if applicable, any such Company Nominee designated pursuant to Section 2.1(j);

(ii) not vote any Common Shares held in favour of any director nominee that is not an Investor Nominee or approved by the Independent Directors;

(iii) not vote any Common Shares held in favour of any proposal or resolution to remove any member of the Board of Directors other than as contemplated in Section 2.1 or if such proposal or resolution is recommended by a majority of the Independent Directors; and

(iv) not vote against the recommendations of the Board of Directors on all regular business matters at each annual meeting of shareholders, including: (A) the appointment or reappointment of the Company's auditors, (B) the ratification of any amendment to the Company's constating documents, where such amendment would not have an adverse effect on the Investor or any of its Affiliates and would not be inconsistent with the terms of the Transaction Agreements, (C) normal course amendments to the Company's incentive compensation plans, and (D) the adoption of an advisory non-binding resolution on the Company's approach to executive compensation.

(collectively, the obligations in Section 5.1(a) and Section 5.1(b), the "**Standstill**").

For certainty, for the purposes of this Section 5.1(b), "vote against" includes submission by the Investor of a proxy or other voting instruction form pursuant to which the Investor specifically directs that its vote be withheld on a matter or otherwise casts a "withhold" vote on a matter but does not include the Investor abstaining from casting a vote on a matter altogether.

(c)     Notwithstanding the foregoing, Section 5.1(a)(ii) shall cease to apply in the event that any Person other than the Investor or one of its Affiliates makes a formal bid (as defined in the *Securities Act* (Ontario)) for any securities of the Company or its Subsidiaries for the duration that any such bid is in effect, following which Section 5.1(a)(ii) shall once again apply in full force and effect.

(d)     Notwithstanding anything to the contrary in Sections 5.1(a) and 5.1(b), the Investor will be entitled to vote any Common Shares in its discretion with respect to any Approved Change of Control Transaction. For certainty, nothing in Sections 5.1(a) and 5.1(b) shall prohibit the Investor or its Affiliates from (i) making one or more confidential proposals to the Board of Directors relating to an Extraordinary Transaction or other transaction, provided that the Board of Directors shall be under no obligation to accept any such proposal, (ii) participating in rights offerings made by the Company to all holders of its Common Shares, or (iii) receiving any dividends or similar distributions with respect to any securities of the Company or any of its Subsidiaries held by the Investor.

**5.2      Limitations on Transfers**

(a)     The Investor shall not, directly or indirectly, Transfer any Common Shares (or any other right or option to acquire Common Shares (pursuant to the terms of a convertible, exchangeable or exercisable security or otherwise)) to or for the benefit of any Person where that other Person (i) would, immediately following such Transfer and based on the written representations to such effect made by such Person, which the Investor reasonably believes are true after reasonable inquiry, either alone or together with other Persons acting jointly or in concert with such Person, beneficially own, or exercise control or direction over, more than 19.99% of the issued and outstanding Common Shares on the date of such Transfer (or, if such information is not publicly available, the number of issued and outstanding Common Shares determined based on the information most recently provided by the Company in a material change report or its management's discussion and analysis immediately preceding the date of such Transfer), or (ii) is a Competitor or an Affiliate of a Competitor, unless such Transfer (A) is approved by a majority of the Independent Directors or (B) is in connection with an Approved Change of Control Transaction.

(b)     Notwithstanding the foregoing, nothing in Section 5.2(a) shall restrict any Transfer into the public market pursuant to a bona fide, broadly distributed underwritten public offering or sales over the facilities of a stock exchange (excluding, for certainty, pre-arranged trades).

**5.3      Business Opportunities**

(a)     Subject to Section 5.3(h), until the termination of this Agreement in accordance with its terms, (i) Investor shall, for itself and on behalf of its Affiliates, in

accordance with this <u>Section 5.3,</u> present exclusively to the Company all Business Opportunities it or its Affiliates identify and wish to pursue, and (ii) neither the Investor nor any of its Affiliates shall (and the Investor shall cause its Affiliates not to), directly or indirectly, pursue, participate in any negotiations regarding, or authorize, engage in, or enter into any letter of intent, agreement (other than a customary non-disclosure agreement), arrangement or understanding (whether or not legally binding) with respect to any Business Opportunity (a "**Transaction Proposal**"), other than as expressly permitted by this <u>Section 5.3</u> or with the prior written consent of the Independent Directors; <u>provided</u> that the Investor, its Affiliates and their respective Representatives shall be permitted to have preliminary discussions with a potential counterparty regarding a Business Opportunity solely for the purpose of understanding the Business Opportunity and assessing whether it is a Business Opportunity that the Investor wishes to pursue.

(b)     Upon identifying any particular Business Opportunity that the Investor or any of its Affiliates wishes to pursue, the Investor shall promptly present such Business Opportunity to the Company by (i) furnishing the Company with all information with respect to such Business Opportunity, including information relating to the applicable Covered Business, that is in the possession of or otherwise reasonably available to the Investor and its Affiliates (including all studies, evaluations or other investigations or reports and other materials prepared by or on behalf of the Investor and/or any of its Affiliates with respect to the Business Opportunity) and (ii) using commercially reasonable efforts to assist the Company in obtaining such additional information as is reasonably required by management of the Company, the Independent Directors and their and the Company's external advisors to evaluate the Business Opportunity (it being understood that the Investor shall not be required to commission any studies, evaluations or other investigations or reports with respect to such Business Opportunity).

(c)     Upon the receipt by the Company of the information contemplated in <u>Section 5.3(b)(i)</u>, management of the Company shall, in consultation with the Independent Directors, as promptly as practicable, and in any event within 15 Business Days of the date on which the information contemplated in <u>Section 5.3(b)(i)</u> was received by the Company, make an initial determination either to proceed to pursue such Business Opportunity or to not so proceed.  If the Company does not provide written notice that it intends to pursue the opportunity within the timeframe provided for in this <u>Section 5.3(c)</u>, it shall be deemed to have provided a Rejection Notice in respect of such Business Opportunity and the provisions of <u>Section 5.3(f)</u> shall apply.

(d)     If, pursuant to <u>Section 5.3(c)</u>, the Company elects to proceed and pursue the Business Opportunity:

(i)     the Company shall undertake due diligence regarding the Covered Business as management of the Company and the Independent Directors determine necessary, and keep the Investor reasonably informed with respect thereto;

(ii)    the Investor shall have the right, at its option, to take part in all or part of such due diligence and shall, upon the reasonable request of the Company, provide assistance with such due diligence;

(iii)   the Company and the Investor shall discuss in good faith the Company's financing needs for such Business Opportunity and, if applicable, whether there are mutually agreeable terms upon which (A) the Investor and/or any of its Affiliates would provide the Company funding for such Business Opportunity and/or (B) the Investor would support any third party financing for such Business Opportunity;

(iv)   the Company and the Investor shall discuss, negotiate and cooperate in good faith in an effort to reach a mutually agreeable structure and terms (including financial terms) in respect of such Business Opportunity, including, if applicable, any external financing supported by the Investor and any financing that the Investor and/or any of its Affiliates is willing to provide in respect thereof (the "**Agreed Proposed Terms**");

(v)   if Agreed Proposed Terms are reached between the Company and the Investor, the Company shall negotiate with the potential counterparties in respect of the Business Opportunity to attempt to reach mutually agreeable terms for a transaction based on such Agreed Proposed Terms and the Company shall keep the Investor reasonably informed with respect thereto;

(vi)   the Investor shall have the right, at its option, to take part in all or part of such negotiations; and

(vii)   if the Company, the Investor and the potential counterparties in respect of the Business Opportunity reach a mutually agreeable structure and terms (including financial terms) for a transaction with respect to such Business Opportunity, (A) the Company and/or one or more of its Subsidiaries shall enter into one or more definitive agreements with such counterparties with respect thereto, (B) if applicable, the Company and/or one or more of its Affiliates and the Investor and/or one or more of its Affiliates shall enter into any documentation in respect of any agreed financing, and (C) each of the Company and the Investor shall and shall cause its respective Affiliates to use commercially reasonable efforts to consummate such Business Opportunity as promptly as practicable.

(e)   Notwithstanding the foregoing, none of the Company, the Investor or any of their respective Affiliates shall be under any obligation to consummate or otherwise participate in any Business Opportunity presented by the Investor to the Company expect pursuant to any definitive agreement in respect thereof entered into by such Person.

(f)   If, at any time prior to entering into a definitive agreement to effect a Business Opportunity, the Company elects not to pursue such Business Opportunity, the Company shall, as soon as reasonably practicable, provide notice of same to the Investor (a "**Rejection Notice**") and thereafter the Investor or any of its Affiliates may (i) pursue, negotiate and enter into one or more definitive agreements with respect to such Business Opportunity (a "**Rejected Opportunity**") within 180 days following the date of the Rejection Notice (the "**Rejection Date**") and (ii) consummate such Rejected Opportunity on the terms of such agreement, failing which the Investor shall again comply with the provisions of this Section 5.3 in respect of such Business Opportunity.

(g)     Notwithstanding anything to the contrary in <u>Section 5.3(f)</u>, neither the Investor nor any of its Affiliates may enter into any definitive agreement in respect of a Rejected Opportunity if the definitive agreement(s) contemplates or provides for (i) an implied valuation for the Covered Business that is at least 15% lower from that contemplated on the Rejection Date; (ii) the level of post-closing equity ownership, directly or indirectly, in the Covered Business, on a fully diluted basis, (A) increases from less than or equal to 50% to more than 50% or (B) decreases from more than 50% to less than or equal to 50%, in each case, from that contemplated on the Rejection Date; or (iii) the amount of the investment or other consideration to be received by the applicable counterparties is at least 15% higher or lower in the aggregate from that contemplated on the Rejection Date (any of the foregoing that is applicable being the "**Revised Terms**"), unless the Investor promptly furnishes the Revised Terms and all other applicable terms to the Company, following which the Company shall, as promptly as reasonably practicable, but in any event within 10 Business Days of receipt of such information, notify the Investor whether it wishes to pursue the Business Opportunity, as amended, by providing written notice of same to the Investor, in which case the parties shall again satisfy their obligations under <u>Section 5.3(d)</u>. If the Company (x) elects not to pursue such Business Opportunity, or (y) fails to make an election prior to the expiry of such 10 Business Day period, then such Business Opportunity shall be deemed to be a Rejected Opportunity for purposes of this Agreement, and the Investor or any of its Affiliates shall be permitted to enter into one or more definitive agreements with respect to such Rejected Opportunity and consummate such Rejected Opportunity in accordance with <u>Section 5.3(f)</u>.

(h)     Notwithstanding anything to the contrary set forth in <u>Section 5.3(a)</u>, the Investor and its Affiliates may beneficially acquire (i) 5% or less of the equity or debt securities of any Person (for the avoidance of doubt, excluding the Company or any of its Subsidiaries, other than pursuant to the terms of this Agreement and the Transaction Agreements) whose securities are traded on any stock exchange, securities exchange, marketplace or trading market so long as (A) such beneficial ownership is in the nature of a portfolio investment undertaken in connection with asset management activities and which is not part of an investment strategy directed at acquiring and holding direct investments in a Covered Business, (B) such beneficial ownership is at all times a passive investment, and (C) neither the Investor nor any of its Affiliates (or any of its or their Representatives) holds any directorship or management position with respect to such Person, has observation rights with respect to the board of directors or similar governing body of any such Person or, pursuant to any contract or other agreement, arrangement or understanding, has other approval, veto or similar rights or (ii) other equity investments in such Persons solely through pension plan investments not directed by the Company or indirect interests through passive investments in broad-based mutual funds and similar investment vehicles.

(i)     The election by the Company not to participate in a Business Opportunity under this <u>Section 5.3</u> in any one instance shall not affect its right as to any subsequent Business Opportunity.

(j)     For the avoidance of doubt, any decision by the Company to pursue, issue a Rejection Notice with respect to, or enter into any definitive agreement in respect

of, a Business Opportunity shall require approval by a majority of the Independent Directors.

(k)     The Investor shall implement or cause to be implemented commercially reasonable policies and procedures, including, if required, implementing firewalls, to restrict access to any Confidential Information by the Investor's Affiliates or any of the Investor's or its Affiliates' Representatives who are directly involved in the operation of any Covered Business that was a Rejected Opportunity. The Investor shall be liable to the Company for any breach of this Section 5.3(k) by any of the foregoing Persons as if such Person were an original party hereto.

(l)      The Investor and the Company will cooperate and use their commercially reasonable efforts to identify and arrange for the Company or its Subsidiaries to hire qualified professionals where necessary to accelerate the operational success of the investees of the Company.

**5.4         Information Rights**

In order to facilitate (i) the Investor's and its Affiliates' compliance with legal and regulatory requirements applicable to the beneficial ownership by the Investor and its Affiliates of equity securities of the Company and (ii) oversight of the Investor's investment in the Company, for so long as the Beneficial Ownership Requirement is met, the Company agrees to provide the Investor with the following, all of which shall be subject to Section 5.7:

(a)     within 120 days after the end of each fiscal year of the Company, (i) an audited, consolidated balance sheet of the Company and its Subsidiaries as of the end of such fiscal year and (ii) audited, consolidated statements of income, comprehensive income, cash flows and changes in shareholders' equity of the Company and its Subsidiaries for such fiscal year; provided that this requirement shall be deemed to have been satisfied if on or prior to such date the Company files its audited annual financial statements with the applicable Canadian Securities Commissions pursuant to National Instrument 51-102 – *Continuous Disclosure Obligations*;

(b)     within 60 days after the end of each of the first three quarters of each fiscal year of the Company, (i) an unaudited, consolidated balance sheet of the Company and its Subsidiaries as of the end of such fiscal quarter and (ii) consolidated statements of income, comprehensive income and cash flows of the Company and its Subsidiaries for such fiscal quarter; provided that this requirement shall be deemed to have been satisfied if on or prior to such date the Company files its interim financial report with the applicable Canadian Securities Commissions pursuant to National Instrument 51-102 – *Continuous Disclosure Obligations*;

(c)     as promptly as practicable, a copy of the proposed annual budget for the Company and its Subsidiaries (as shared with the Board); and

(d)     as promptly as practicable following receipt thereof, a copy of any written notice, letter, correspondence or other written communication from a Governmental Entity or any litigation proceedings or filings involving the Company or any of its Subsidiaries, in each case, in respect of the Company's potential, actual or alleged violation of any and all applicable Laws in any material respect and any written

responses by the Company in respect thereto; provided that the Company shall not be required to furnish such copies or other information, the disclosure of which would reasonably be expected to result in the loss or impairment of solicitor-client privilege.

**5.5        Inspection Rights**

During the term of this Agreement, the Company shall, subject to <u>Section 5.3(k)</u>, provide the Investor and its Representatives with reasonable access upon reasonable notice during normal business hours, to the Company's and its Subsidiaries' books and records so that the Investor may conduct reasonable inspections, investigations and audits relating to the information provided by the Company pursuant to this <u>Article 5</u>, as well as to the internal accounting controls and operations of the Company and its Subsidiaries, in each case, as necessary to fulfill Investor's tax and financial reporting obligations or to monitor, administer or manage the Investor's investment in the Company; provided that (i) any such access shall be conducted in such a manner as not to interfere unreasonably with the operation of the Company and its Subsidiaries and investees (the "**Company Parties**"), (ii) Investor shall be responsible for any damage to any real property owned or leased by the Company Parties or any other assets or property of the Company Parties caused by Investor or any of its Representatives; and (iii) Company shall not be required to confer, afford such access or furnish such copies or other information (A) to the extent that doing so would result in the breach of any confidentiality or similar agreement to which any of the Company Parties is a party or (B) the disclosure of which would reasonably be expected to result in the loss or impairment of solicitor-client privilege; provided that the Company shall identify any such information or materials to which access is not provided and use its reasonable best efforts to allow for such access or disclosure in a manner that does not result in a breach of such agreement or a loss of solicitor-client privilege.

**5.6        Ownership Certificate**

The Investor agrees to deliver to the Company a written certificate signed by an officer of the Investor (the "**Ownership Certificate**"), certifying as to the number of Common Shares and the principal amount of Notes beneficially owned or controlled by the Investor and its Affiliates and any other Persons acting jointly or in concert with the Investor, as at the date of such certificate, such Ownership Certificate to be delivered to the Company as reasonably requested from time to time, together with any supporting documentation reasonably requested by the Company.

**5.7        Confidentiality**

(a)        The Investor will, and will cause its Affiliates and Representatives to, keep confidential and will treat confidentially all Confidential Information. The Investor agrees that it will, and will cause its Affiliates and Representatives to, not disclose any Confidential Information nor use any Confidential Information other than for the purposes of monitoring, administering or managing the Investor's investment in the Company; <u>provided</u> that the Investor may, subject to compliance with the terms hereof, disclose the Confidential Information to its Affiliates or Representatives (including any Investor Nominee).

(b)        As a condition to the furnishing of Confidential Information to an Affiliate or Representative of the Investor, the Investor shall advise such Affiliate or Representative of the confidential nature of and restriction on use of the

information disclosed. The Investor agrees that it will be fully responsible for any breach of this Section 5.7 by such Affiliates or Representatives as if such Affiliates or Representatives are an original party hereto. In addition, the Investor will take all commercially reasonable steps, including the obtaining of suitable undertakings, to ensure that Confidential Information is not disclosed to any other Person or used in a manner contrary to this Agreement, and, to the extent reasonably practicable, promptly notify the Company of any unauthorized disclosure of Confidential Information or breach of this Agreement known to the Investor.

(c)     The Investor hereby acknowledges that Securities Laws impose restrictions on its ability to purchase, sell, trade or otherwise Transfer securities of the Company until such time as material, non-public information received by the Investor becomes publicly available or is no longer material, and the Investor further hereby agrees to comply with all such restrictions and to inform those of its Affiliates and Representatives provided with any Confidential Information of such restrictions.

(d)     The term Confidential Information shall exclude any information that: (i)  was generally available to the public prior to the date hereof; (ii)  becomes generally available to the public (through no violation hereof by the Investor or its Affiliates or Representatives); (iii) was within the Investor's or its Representatives' possession prior to it being furnished to the Investor or its Affiliates or Representatives by or on behalf of the Company, provided that such information is not, to the Investor's knowledge, subject to any contractual, legal or fiduciary obligations of confidentiality to the Company that would prevent its use or disclosure; (iv) is obtained by the Investor or its Affiliates or Representatives from a third party who, to the Investor's knowledge, at the time of disclosure, is not prohibited by an obligation to the Company from disclosing such information on a non-confidential basis to the Investor or its Affiliates or Representatives; (v) was independently developed by the Investor or its Affiliates or Representatives, or on the Investor's behalf, without use of or reference to the Confidential Information, and which can be substantiated by written evidence; or (vi) is expressly permitted in writing by the Company to be disclosed to third parties on a non-confidential basis.

(e)     Nothing in this Section 5.7 grants or is to be construed as granting the Investor any title, ownership, license or other right of interest with respect to the Confidential Information. The Company retains all right, title and interest in and to the Confidential Information.

(f)     If the Investor or any of its Affiliates or Representatives is requested or required to disclose any Confidential Information in connection with any legal or administrative proceeding or investigation (including pursuant to the terms of a subpoena or order issued by a court of competent jurisdiction or a regulatory or self-regulatory body), or is requested or required by Law to disclose any Confidential Information, the Investor or such Affiliate or Representative, as applicable, will provide the Company with prompt written notice of any such request or requirement, to the extent reasonably practicable and not prohibited by Law, so that the Company has an opportunity to seek a protective Order or other appropriate remedy or waive compliance with the provisions of this Section 5.7, in each case, at the Company's cost and expense. If the Company waives compliance with the provisions of this

Section 5.7 with respect to a specific request or requirement, the Investor or such Affiliate or Representative, as applicable, shall disclose only that portion of the Confidential Information that is covered by such waiver and which is necessary to disclose in order to comply with such request or requirement. If (in the absence of a waiver by the Company) the Company has not secured a protective Order or other appropriate remedy, and the Investor or such Affiliate or Representative is nonetheless required by Law to disclose any Confidential Information, the Investor or such Affiliate or Representative, as applicable, may, without liability hereunder, disclose only that portion of the Confidential Information that is necessary to be disclosed.

(g)     At any time following the Beneficial Ownership Requirement no longer being satisfied, upon written request by the Company, the Investor shall, and shall direct its Affiliates and Representatives to, at the option of the Investor, promptly return to the Company or promptly destroy, at the option of the Investor, all Confidential Information (including, electronic copies) supplied by the Company to and in the possession of the Investor or its Affiliates or Representatives, as applicable, without retaining any copy thereof. Notwithstanding the foregoing, (i) the Investor and its Affiliates and Representatives may retain Confidential Information as required to comply with applicable Laws or their respective corporate governance and/or record keeping policies, and (ii) neither the Investor nor its Affiliates or Representatives shall be required to purge their respective computer or electronic archives (including routine computer system backup tapes, disks or other backup storage devices).

(h)     Notwithstanding the return or destruction of the Confidential Information as contemplated hereby or the termination of this Agreement, the Investor will continue to be bound by the terms of this Section 5.7 with respect thereto, including all obligations of confidentiality and restrictions on use.

## 5.8     Privilege

The provision of any information pursuant to this Agreement shall not be (and shall be deemed not to be) a waiver of any privilege, including privileges arising under or related to the attorney- or solicitor-client privilege or any other applicable privileges.

## 5.9     Certain Transactions

In the event of any stock split, reverse stock split, stock dividend or distribution, subdivision, or any change in the Common Shares or the Notes by reason of any recapitalization, combination, reclassification, exchange of shares, merger, consolidation, partial or complete liquidation, share dividend, split-up, sale of assets, distribution to equityholders or similar transactions or change in the Company's capital structure, (i) the terms "Common Shares" used herein shall, as applicable, be deemed to refer to and include all such dividends and distributions and any other securities into which or for which any or all of such securities may be changed or exchanged or which are received in such transaction and (ii) the Company agrees that appropriate adjustments shall be made to this Agreement to ensure that the Investor has, immediately after consummation of such transaction, substantially the same rights with respect to the Company or another issuer of securities, as applicable, as they have immediately prior to the consummation of such transaction under this Agreement. Notwithstanding anything herein to the contrary, if, prior to the date that is five years plus one day from the date of issuance of a Note, the Investor would

otherwise be entitled to receive, upon conversion of a Note, any property (including cash) or securities that would not constitute "prescribed securities" for the purposes of clause 212(1)(b)(vii)(E) of the *Income Tax Act* (Canada) as it applied for the 2007 taxation year (referred to herein as "**Ineligible Consideration**"), the Investor shall not be entitled to receive such Ineligible Consideration but the Company or its successor or acquiror, as the case may be, shall have the right (at the sole option of the Company or the successor or acquiror, as the case may be) to deliver either such Ineligible Consideration or "prescribed securities," for the purposes of clause 212(1)(b)(vii)(E) of the *Income Tax Act* (Canada) as it applied for the 2007 taxation year, with a market value equal to the market value of such Ineligible Consideration. The Company shall notify the Investor in writing as promptly as practicable following the date the Company publicly announces such transaction but in no event less than 25 days prior to the effective date of such transaction. Such notice will also state the consideration into which the Note will be convertible after the effective date of such transaction. After such notice, the Company or the successor or acquirer, as the case may be, may not change the consideration to be delivered upon conversion of the Note except in accordance with any other provision hereof.

### ARTICLE 6
### MISCELLANEOUS

6.1     **Guarantee**

(a)     Guarantor hereby absolutely, unconditionally and irrevocably guarantees, as a direct obligation, in favour of the Company, the full and timely performance, observance and payment by the Investor of (i) each and every covenant, agreement, undertaking, representation, warranty, indemnity and obligation of the Investor contained in Sections 5.1 and 5.3 (the "**Guaranteed Obligations**"), and (ii) all reasonable costs and expenses incurred by the Company in successfully enforcing its rights hereunder. Guarantor covenants and agrees to cause the Investor to perform the Guaranteed Obligations.

(b)     The liability of Guarantor under this Section 6.1 shall be absolute and unconditional and shall be in effect irrespective of: (i) any failure, neglect or omission on the part of the Company or any other Person to realize upon any obligations or liabilities of the Investor, (ii) any merger, amalgamation or reorganization of the Investor in which event the guarantee of Guarantor shall apply to the entity resulting therefrom, (iii) any change in the name, share capital or organizational documents of the Investor, (iv) any merger, amalgamation or reorganization of Guarantor, (v) any sale, lease or transfer of the assets of the Investor or Guarantor, (vi) any change in the ownership of any shares in the capital of the Investor or Guarantor, (vii) any amendment or modification of this Agreement or any Transaction Agreement to which the Investor is a party, (viii) any other occurrence or circumstances whatsoever similar to the foregoing, or (ix) to the extent permitted by applicable Law, any other circumstances which might otherwise constitute a defense available to, or a discharge of, Guarantor in respect of its guarantee and which do not constitute a defense available to, or a discharge of, the Investor in respect of the Guaranteed Obligations.

(c)     Guarantor waives (i) any notice of the creation, renewal, extension or accrual of the guarantee, (ii) notice of or proof of reliance by the Company on the guarantee or acceptance of the guarantee, and (iii) diligence, presentment, protest, demand for payment and notice of default or nonpayment. The obligations and liabilities of

Guarantor under this <u>Section 6.1</u> shall be binding upon and enforceable against Guarantor without regard to the validity or enforceability of any other provision of this Agreement.

(d)     The obligations and liabilities of Guarantor hereunder shall not be impaired, diminished, abated or otherwise affected by the commencement by or against the Investor or Guarantor of any proceedings under any bankruptcy or insolvency Law or Laws relating to the relief of debtors, re-adjustment of indebtedness, reorganization, arrangements, compositions or extensions or other similar Laws.

(e)     This <u>Section 6.1</u> is a continuing guarantee and shall remain in full force and effect and be binding in accordance with and to the extent of its terms upon Guarantor and its successors and assigns thereof, until all the obligations contemplated by this <u>Section 6.1</u> have been performed or satisfied by payment in full, as applicable, and shall inure to the benefit of the Company.

(f)     Guarantor, as the indirect parent of the Investor, anticipates that it will receive substantial economic benefit as a result of the transactions contemplated by this Agreement. Guarantor providing the guarantee set forth in this <u>Section 6.1</u> is a material inducement and condition to the Company agreeing to enter into this Agreement and complete the transactions contemplated hereby, and the Company would not agree to enter into this Agreement without such guarantee.

**6.2     Termination**

The term of this Agreement shall commence on the date of this Agreement and shall continue in force until the earlier of (i) such time that the Beneficial Ownership of the Investor is less than 10% and the Investor no longer satisfies the Nomination Right Ownership Requirement and (ii) the full repayment in cash of the Note in accordance with its terms.

**6.3     Survival**

Notwithstanding <u>Section 6.2</u>, <u>Article 1</u> (Interpretation), <u>Section 2.1(i)</u> (Director Indemnification and Insurance), <u>Section 2.1(p)</u> (Information Sharing), <u>Section 4.4</u> (Registration Expenses), <u>Section 4.6</u> (Indemnification), <u>Section 5.7</u> (Confidentiality) and this <u>Article 6</u> (Miscellaneous) shall survive the termination of this Agreement and shall remain in full force and effect (<u>provided</u> that <u>Section 2.1(i)</u> will only survive for six years from termination). No termination of this Agreement shall constitute a termination or a waiver of any rights of either party against the other party accruing at or prior to the time of such termination.

**6.4     Notices**

(a)     Any notice or other communication required or permitted to be given hereunder shall be in writing and shall be delivered in Person, transmitted by e-mail or similar means of recorded electronic communication or sent by registered mail, charges prepaid, addressed as follows:

(i)     in the case of the Investor or the Guarantor:

The Hawthorne Collective, Inc.
14111 Scottslawn Rd
Marysville, OH 43041

Attention:     Katy Wiles
Email:         kwiles@hawthornegc.com

with a copy (which shall not constitute notice) to:

Paul Hastings LLP
200 Park Avenue
New York, NY 10166

Attention:     Samuel Waxman
E-mail:        samuelwaxman@paulhastings.com

and

Blake, Cassels & Graydon LLP
199 Bay Street, Suite 4000
Toronto, ON M5L 1A9

Attention:     Jeff Glass and Richard Turner
E-mail:        jeff.glass@blakes.com and richard.turner@blakes.com

(ii)    in the case of the Company:

RIV Capital Inc.
40 King Street West, Suite 2504
Toronto, Ontario
M5H 3Y2

Attention:     Matt Mundy
E-mail:        matt@rivcapital.com

with a copy (which shall not constitute notice) to:

Davies Ward Phillips & Vineberg LLP
155 Wellington Street West
Toronto, ON M5V 3J7

Attention:     Aaron Atkinson and Zain Rizvi
E-mail:        aatkinson@dwpv.com and zrizvi@dwpv.com

(b)    Any such notice or other communication shall be deemed to have been given and received on the day on which it was delivered or transmitted by email or personally by hand (or, if such day is not a Business Day or if delivery or transmission is made on a Business Day after 5:00 p.m. (Toronto time) at the place of receipt, then on the next following Business Day) or, if mailed by internationally recognized overnight courier, on the Business Day following the date of mailing; provided, however, that if at the time of mailing or within two Business Days thereafter there

is or occurs a labour dispute or other event which might reasonably be expected to disrupt the delivery of documents by mail, any notice or other communication hereunder shall be delivered or transmitted by means of recorded electronic communication as aforesaid.

(c)     Any party may at any time change its address for service from time to time by giving notice to the other parties in accordance with this Section 6.4.

**6.5        Amendments and Waiver**

No amendment or waiver of any provision of this Agreement shall be binding on any party unless consented to in writing by such party. No waiver of any provision of this Agreement shall constitute a waiver of any other provision, nor shall any waiver of any provision of this Agreement constitute a continuing waiver unless otherwise expressly provided.

**6.6        Assignment; Transfer of Rights**

(a)     No party may assign any of its rights or benefits under this Agreement, or delegate any of its duties or obligations, except with the prior written consent of the other party which consent may be withheld in its sole discretion except as otherwise provided herein.

(b)     Notwithstanding the foregoing, (i) the Investor may assign and transfer its rights, benefits, duties and obligations under this Agreement, in whole or in part, without the consent of the Company, to any Affiliate of the Investor, provided that: (A) any such Affiliate shall, prior to any such assignment, agree to be bound by all of the covenants of the Investor contained herein and comply with the provisions of this Agreement that were applicable to the Investor, and shall deliver to the Company a duly executed undertaking to such effect in form and substance satisfactory to the Company, acting reasonably; and (B) except as otherwise provided herein, where any rights of the Investor under this Agreement have been assigned, such rights shall only be exercised by the Investor and its Affiliates, acting together.

(c)     For certainty, no assignment by the Investor or any assignee (each, an "**Assignee**") of its rights hereunder shall relieve such Assignee of its obligations hereunder.

**6.7        Successors and Assigns**

This Agreement shall enure to the benefit of and shall be binding on and enforceable by and against the parties and their respective successors and permitted assigns.

**6.8        No Partnership**

Nothing in this Agreement shall be deemed in any way or for any purpose to constitute any party hereto as a partner of any other party hereto in the conduct of any business.

**6.9        Further Assurances**

Each of the parties hereto shall, from time to time hereafter and upon any reasonable request of the other, promptly do, execute, deliver or cause to be done, executed and

delivered all further acts, documents and things as may be required or necessary for the purposes of giving effect to this Agreement.

## 6.10      Right to Injunctive Relief

Each of the parties hereby acknowledges and agrees that in the event of a breach or threatened breach of any of its covenants hereunder, the harm suffered would not be compensable by monetary damages alone and, accordingly, in addition to other available legal or equitable remedies available to such party, the Investor (in respect of any breach of this Agreement by the Company) and the Company (in respect of any breach of this Agreement by the Investor) shall be entitled to apply for an injunction or specific performance with respect to such breach or threatened breach, without proof of actual damages (and without the requirement of posting a bond, undertaking or other security in connection with such action), and each of the parties hereby agrees not to plead sufficiency of damages as a defence in such circumstances.

## 6.11      LIMITATION ON DAMAGES

NOTWITHSTANDING ANYTHING IN THIS AGREEMENT OR OTHERWISE, NEITHER PARTY, NOR THEIR RESPECTIVE DIRECTORS, OFFICERS, EMPLOYEES OR AGENTS, SHALL BE LIABLE TO THE OTHER PARTY WITH RESPECT TO ANY SUBJECT MATTER OF THIS AGREEMENT FOR ANY INDIRECT, PUNITIVE, SPECIAL OR CONSEQUENTIAL DAMAGES, INCLUDING INCIDENTAL DAMAGES, ECONOMIC DAMAGES OR INJURY TO PROPERTY AND LOST PROFITS, EVEN IF SUCH PARTY HAS BEEN INFORMED, SHOULD HAVE KNOWN OR IN FACT KNEW OF THE POSSIBILITY OF SUCH DAMAGE.

## 6.12      Counterparts

This Agreement and all documents contemplated by or delivered under or in connection with this Agreement may be executed and delivered in any number of counterparts (including by email or scanned pages), with the same effect as if all parties had signed and delivered the same document, and all counterparts shall be construed together to be an original and will constitute one and the same agreement. Electronic signatures and electronic pdf signatures (including by email or scanned pages) shall be acceptable as a means of executing such documents.

(The remainder of this page is intentionally left blank; signature page follows.)

**IN WITNESS WHEREOF**, this Agreement has been executed by the parties on the date first written above.

**THE HAWTHORNE COLLECTIVE, INC.**

by  _____
     Name: Albert Messina
     Title:   Treasurer

**RIV CAPITAL INC.**

by  _____
     Name: Narbé Alexandrian
     Title:    President and Chief Executive
            Officer

**THE HAWTHORNE GARDENING COMPANY**, solely for the purposes of Section 6.1

by  _____
     Name: Albert Messina
     Title:   Vice President and Treasurer

**SCHEDULE A**
**REGISTRATION PROCEDURES**

1.        **Registration Procedures**

In connection with the Demand Registration and Piggyback Registration obligations pursuant to the Agreement, the Company will use commercially reasonable efforts in accordance with the Agreement to effect the qualification for the offer and sale or other disposition or distribution of Registrable Shares in one or more Canadian jurisdictions, as directed by the Investor in the case of a Demand Registration, and in pursuance thereof, the Company will as expeditiously as reasonably possible:

(a)        prepare and file, in the English language and, if an offering is contemplated in Quebec, the French language, with the applicable Canadian Securities Commissions a Prospectus under and in compliance with the applicable Securities Laws, relating to the applicable Demand Registration or Piggyback Registration, including all exhibits, financial statements and such other related documents required by the applicable Canadian Securities Commissions to be filed therewith, and use its commercially reasonable efforts to cause the applicable Canadian Securities Commissions to issue a receipt for such Prospectus (unless such Prospectus is a prospectus supplement); and the Company will furnish to the Investor and the lead underwriters or underwriters, if any, copies of such Prospectus and any amendments or supplements in the form filed with the Canadian Securities Commission, promptly after the filing of such Prospectus, amendments or supplements;

(b)        prepare and file with the Canadian Securities Commissions such amendments and supplements to the Prospectus as may be necessary to complete the distribution of all such Registrable Shares and as required under applicable Securities Laws;

(c)        notify the Investor and the lead underwriter or underwriters, if any, and (if requested) confirm such advice in writing, as soon as practicable after notice thereof is received by the Company: (i) when the Prospectus or any amendment thereto has been filed or a receipt has been issued, and furnish to the Investor and lead underwriters or underwriters, if any, with copies thereof; (ii) of any request by the Canadian Securities Commissions for amendments to the Prospectus or for additional information; (iii) of the issuance by the Canadian Securities Commissions of any stop order or cease trade order relating to the Prospectus or any order preventing or suspending the use of any Prospectus or the initiation or threatening of any proceedings for such purposes; and (iv) of the receipt by the Company of any notification with respect to the suspension of the qualification of the Registrable Shares for offering or sale in jurisdiction or the initiation or threatening of any proceeding for such purpose;

(d)        promptly notify the Investor and the lead underwriter or underwriters, if any, when the Company becomes aware of the happening of any event as a result of which the Prospectus contains any untrue statement of a material fact or omits to state a material fact necessary to make the statement therein (in the case of the Prospectus in light of the circumstances under which they were made) when such Prospectus was delivered not misleading, fails to constitute full, true and plain disclosure of all material facts regarding the Registrable Shares when such

- A2 -

Prospectus was delivered or if for any other reason it will be necessary during such time period to amend or supplement the Prospectus in order to comply with Securities Laws and, in either case as promptly as practicable, prepare and file with the Canadian Securities Commissions, and furnish to the Investor and the lead underwriters or underwriters, if any, a supplement or amendment to such Prospectus which will correct such statement or omission or effect such compliance;

(e)     use commercially reasonable efforts to obtain the withdrawal of any stop order, cease trade order or other order against the Company or affecting the securities of the Company suspending the use of any Prospectus or suspending the qualification of any Registrable Shares covered by the Prospectus, or the initiation or the threatening of any proceedings for such purposes;

(f)     provide the Investor and its counsel with a reasonable opportunity to review and provide comments to the Company on the Prospectus, which shall be considered for inclusion therein in good faith by the Company;

(g)     deliver to the Investor and the underwriters, if any, without charge, as many commercial copies of the Prospectus and any amendment or supplement thereto as such Persons may reasonably request (it being understood that the Company consents to the use of the Prospectus or any amendment or supplement thereto by the Investor and the underwriters, if any, in connection with the offering and sale of the Registrable Shares covered by the Prospectus or any amendment or supplement thereto);

(h)     in connection with any underwritten offering enter into customary agreements, including an underwriting agreement with the underwriter or underwriters, such agreements to contain such representations and warranties by the Company and such other terms and provisions as are consistent with those contained in underwriting agreements previously entered into by the Company or customarily contained in underwriting agreements with respect to secondary distributions and indemnification provisions and/or agreements substantially consistent with those contained in underwriting agreements previously entered into by the Company and with the Agreement or customarily contained in underwriting agreements with respect to secondary distributions, but in any event, which agreements will contain provisions for the indemnification by the underwriter or underwriters in favour of the Company with respect to untrue statements or omissions, or alleged untrue statements or omissions, made in the Prospectus included in reliance upon and in conformity with written information furnished to the Company by any underwriter;

(i)     as promptly as practicable after filing with the applicable Canadian Securities Commissions any document which is incorporated by reference into the Prospectus, provide copies of such document to the Investor and its counsel and to the lead underwriters or underwriters, if any;

(j)     use its commercially reasonable efforts to obtain a customary legal opinion, in the form and substance as is customarily given by external company counsel in securities offerings, addressed to the Investor and the underwriters, if any, and such other Persons as the underwriting agreement may reasonably specify, and a

- A3 -

customary "comfort letter" from the Company's auditor and/or the auditors of any financial statements included or incorporated by reference in a Prospectus;

(k)     furnish to the Investor and the lead underwriter or underwriters, if any, and such other Persons as the Investor may reasonably specify, such corporate certificates, satisfactory to the Investor, acting reasonably, as are customarily furnished in securities offerings, and, in each case, covering substantially the same matters as are customarily covered in such documents in the relevant jurisdictions and such other matters as the Investor may reasonably request; and

(l)     provide and cause to be maintained a transfer agent and registrar for such Common Shares not later than the date a receipt is issued for a final Prospectus by the applicable Canadian Securities Commissions and use its best efforts to cause all Common Shares covered by the Prospectus to be listed on each securities exchange or automated quotation system on which similar securities issued by the Company are then listed.

**2.        Investor Obligations**

The Investor will furnish to the Company such information and execute such documents regarding the Registrable Shares and the intended method of disposition thereof as the Company may reasonably require in order to effect the requested qualification for sale or other disposition. The Investor will promptly notify the Company if the Investor becomes aware of the happening of any event (insofar as it relates to the Investor or information furnished by it in writing for inclusion in the applicable Prospectus) as a result of which the Prospectus contains any untrue statement of a material fact or omits to state a material fact necessary to make the statement therein not misleading in light of the circumstances under which they are made. In addition, the Investor shall, if required under applicable Securities Laws, execute any certificate forming part of a Prospectus to be filed with the applicable Canadian Securities Commissions.

**<u>EXHIBIT B</u>**

**NOTE**

*(See attached)*

**THIS CONVERTIBLE PROMISSORY NOTE AND THE SECURITIES INTO WHICH IT MAY BE CONVERTED HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR APPLICABLE STATE SECURITIES LAWS AND MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR SUCH LAWS COVERING THE TRANSFER OR AN OPINION OF COUNSEL SATISFACTORY TO THE COMPANY THAT SUCH TRANSFER IS EXEMPT FROM SUCH REGISTRATION.**

## RIV CAPITAL INC.

## CONVERTIBLE PROMISSORY NOTE

**AMOUNT: $188,475,000**                    **DATE: [■], 2021[1]**

FOR VALUE RECEIVED, the undersigned, RIV Capital Inc., a corporation formed under the laws of the Province of Ontario (the "***Company***"), promises to pay to the order of The Hawthorne Collective, Inc., or its successors or permitted assigns (the "***Holder***"), the principal amount set forth above plus simple interest on the outstanding principal amount at a fixed rate equal to the Applicable Rate for the period prescribed below, until this Convertible Promissory Note (this "***Note***") is paid in full. Interest shall be calculated on the basis of the actual number of days elapsed over a year of 365 days and shall accrue from the date of this Note until the second (2nd) anniversary of the date hereof. Thereafter, no interest will accrue on this Note. All payments received by the Holder hereunder will be applied first to costs of collection, if any, then to interest and the balance to principal.

Unless converted pursuant to the provisions hereof, payments of principal, interest and other amounts due hereunder will be made by check in immediately available Canadian funds sent to the Holder at the address furnished to the Company for that purpose.

This Note is issued pursuant to that certain Convertible Promissory Note Purchase Agreement (the "***Purchase Agreement***"), dated August 9, 2021, by and among the Company and the Holder. Capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Purchase Agreement.

The following is a statement of the rights of the Holder of this Note and the conditions to which this Note is subject to and to which the Holder hereof, by the acceptance of this Note, agrees:

---

[1]      Note to Draft: To be dated the date of closing.

1.      **Interpretation.**

1.1.   <u>Defined Terms</u>. As used in this Note, the following terms shall have the meanings set forth below:

"***Applicable Rate***" means two and three one-hundredths of a percent (2.03%).

"***Common Shares***" means the Class A common shares in the capital of the Company.

"***Competition Act Approval***" means the occurrence of one or more of the following: (i) the Holder has received an advance ruling certificate under subsection 102(1) of the Competition Act in respect of the conversion of the Note into Conversion Shares; or (ii) both (A) the applicable waiting period under subsection 123(1) of the Competition Act has expired or been waived under subsection 123(2) of the Competition Act, or the obligation to notify the Commissioner of Competition in respect of the conversion of the Note into Conversion Shares under Part IX of the Competition Act has been waived pursuant to paragraph 113(c) of the Competition Act, and (B) the Holder has received a letter from the Commissioner of Competition indicating that the Commissioner of Competition does not, at that time, intend to make an application under section 92 of the Competition Act in respect of the conversion of the Note into Conversion Shares and such letter remains in full force and effect.

"***Conversion Price***" means $1.90.

"***Conversion Shares***" means the Common Shares into which this Note converts.

"***Federal Legalization***" means the first date on which the federal laws in the United States are amended (including the final promulgation of any enabling regulations) to permit the general cultivation, distribution and possession of marijuana (as defined in 21 U.S.C. §802) or to remove the prohibition of such activities from the federal laws of the United States.

"***Indemnified Taxes***" means Withholding Tax that may be imposed on any amount paid or credited, or deemed to be paid or credited for purposes of Part XIII of the ITA, by the Company to the Holder under this Note as interest on and as a result of the conversion of this Note into Conversion Shares under Article 3 hereof, because this Note is not an "excluded obligation" within the meaning of paragraph 214(8)(a) of the ITA; provided, for clarity, that "Indemnified Taxes" shall not include Withholding Tax in respect of Thin Capitalization Dividends.

"***ITA***" means the *Income Tax Act* (Canada), as amended together with rules and regulations thereunder.

"***Senior Indebtedness***" means any secured indebtedness of the Company that ranks or purports to rank in priority to this Note.

"***Senior Lenders***" means any financial institutions or syndicate of financial institutions that are lenders to, or bondholders of, the Company under any Senior Indebtedness.

2

"***Thin Capitalization Dividends***" means any amount paid or credited, or deemed to be paid or credited for purposes of Part XIII of the ITA, as interest by the Company to the Holder under this Note or any Loan Document, that is deemed to be a dividend paid by the Company to the Holder pursuant to subsections 214(16) and/or 214(17) of the ITA.

"***Total Loan Amount***" means, as of a particular time, the entire outstanding principal amount on this Note, together with accrued unpaid interest and any fees, expenses or other amounts payable under this Note.

"***Treaty***" means the *Convention between Canada and the United States of America with Respect to Taxes on Income and on Capital.*

"***Withholding Tax***" means any tax imposed under Part XIII of the ITA in respect of amounts paid or credited, or deemed to be paid or credited for purposes of Part XIII of the ITA, by the Company to the Holder under this Note and any amounts required to be withheld and remitted to the Receiver General for Canada on account thereof.

1.2.    <u>Rules of Construction</u>. Except as may be otherwise specifically provided in this Note and unless the context otherwise requires, in this Note:

(a)    the terms "Note", "this Note", "the Note", "hereto", "hereof", "herein", "hereby", "hereunder" and similar expressions refer to this Note in its entirety and not to any particular provision hereof;

(b)    references to an "Article" or "Section" followed by a number or letter refer to the specified Article or Section to this Note;

(c)    the division of this Note into sections and the insertion of headings are for convenience of reference only and shall not affect the construction or interpretation of this Note;

(d)    words importing the singular number only shall include the plural and vice versa and words importing the use of any gender shall include all genders;

(e)    the word "including" is deemed to mean "including without limitation" and the word "includes" is deemed to mean "includes without limitation";

(f)    the terms "party" and "the parties" refer to a party or the parties to this Note;

(g)    any reference to any agreement, plan, contract or any other written instrument or document (including this Note) means such agreement, plan, contract, or written instrument or document as amended, modified, replaced or supplemented from time to time;

(h)    any reference to a statute, regulation or rule shall be construed to be a reference thereto as the same may from time to time be amended, re-enacted or replaced, and any reference to a statute shall include any regulations or rules made thereunder;

(i)    unless otherwise stated, all dollar amounts refer to Canadian dollars;

3

(j)      the word "day" means calendar day unless Business Day is expressly specified;

(k)      any time period within which a payment is to be made or any other action is to be taken hereunder shall be calculated excluding the day on which the period commences and including the day on which the period ends;

(l)      the parties agree that they have been represented by counsel during the negotiation and execution of this Note and, therefore, waive the application of any law, regulation, holding or rule of construction providing that ambiguities in any agreement or other document will be construed against the party drafting such agreement or document; and

(m)      whenever any payment is required to be made, action is required to be taken or period of time is to expire on a day other than a Business Day, such payment shall be made, action shall be taken or period shall expire on the next following Business Day.

1.3.    <u>Governing Law and Submission to Jurisdiction</u>.

(a)      This Note and all matters, claims or actions (whether at law, in equity, in contract, in tort or otherwise) based upon, arising out of or relating to this Note or the negotiation, execution or performance of this Note, shall be interpreted and enforced in accordance with, and the respective rights and obligations of the parties shall be governed by, the laws of the Province of Ontario and the federal laws of Canada applicable in that province, regardless of the laws that might otherwise govern under any applicable conflict of laws principles.

(b)      Each of the parties irrevocably and unconditionally (i) submits to the exclusive jurisdiction of the courts of the Province of Ontario over any action or proceeding arising out of or relating to this Note, (ii) agrees to commence such an action or proceeding in Toronto, Ontario, and to cooperate and use its commercially reasonable efforts to bring the action or proceeding before the Ontario Superior Court of Justice (Commercial List), (iii) waives any objection that it might otherwise be entitled to assert to the jurisdiction of such courts and (iv) agrees not to assert that such courts are not a convenient forum for the determination of any such action or proceeding.

(c)      The Holder, being organized under the laws of a foreign jurisdiction and residing outside of Canada, hereby appoints Blake, Cassels & Graydon LLP, 199 Bay St, Suite 4000, Toronto, Ontario, M5L 1A9, as its agent for service of process in the Province of Ontario.

1.4.    <u>Severability</u>. If any provision of this Note is determined by a court of competent jurisdiction to be invalid, illegal or unenforceable in any respect, all other provisions of this Note shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party hereto. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Note so as to effect the original intent of the parties hereto as closely as possible in an acceptable manner to the end that transactions contemplated hereby are fulfilled to the extent possible.

4

**2.      Maturity Date.** Subject to Article 3 below or the occurrence of an Event of Default as provided for in Article 5 below, the principal amount owing under this Note, together with accrued unpaid interest and any fees, expenses or other amounts payable under this Note, shall be due and payable in full on [■], 2027[2] (the "***Maturity Date***"). Any repayment of the Note shall be made in U.S. dollars calculated using the daily average exchange rate published by the Bank of Canada on the Maturity Date.

**3.      Note Conversion.**

3.1.      Holder Conversion Option. Subject to the terms and conditions of this Note, including satisfaction or, where permitted, waiver of the conditions set forth in Section 3.4, the Purchase Agreement and applicable securities laws, the Holder shall have the right and option, exercisable in its sole option at any time prior to and including the close of business on the Maturity Date, on the Holder providing no less than 30 days' written notice, to convert the Total Loan Amount into the number of Conversion Shares equal to the Total Loan Amount divided by the Conversion Price.

3.2.      Company Conversion Option. Subject to the terms and conditions of this Note, including satisfaction or, where permitted, waiver of the conditions set forth in Section 3.4, the Purchase Agreement and applicable securities laws, the Company shall have the right and option, exercisable in its sole option at any time after the later of (i) the date that Federal Legalization occurs (the "***Forced Conversion Date***") and (ii) [■], 2023,[3] and prior to and including the close of business on the Maturity Date, to cause the Total Loan Amount to be converted into the number of Conversion Shares equal to the Total Loan Amount divided by the Conversion Price (the "***Forced Conversion Right***").

3.3.      Mechanics and Effect of Conversion. No fractional Conversion Shares shall be issued. In lieu of the Company issuing any fractional Conversion Shares to the Holder upon the conversion of this Note, the Company shall pay to the Holder in cash the amount of unconverted Total Loan Amount. Upon the conversion of this Note pursuant to this Article 3, the Holder shall surrender this Note, duly endorsed, at the principal office of the Company, and simultaneously, at its expense, the Company shall, in exchange for such Note, issue and deliver to the Holder at the Holder's address or if no such address appears or is given, at such principal office of the Company, a direct registration system (DRS) advice evidencing the number of Conversion Shares to which the Holder shall be entitled upon such conversion, together with any other securities and property to which the Holder is entitled upon conversion of this Note, including a check payable to the Holder for any cash amounts payable in lieu of fractional shares as described above. Upon conversion of this Note pursuant to this Article 3, the Company shall be released from all its obligations and liabilities under this Note.

3.4.      Conditions of Conversion. Notwithstanding any other provisions of this Note, this Note shall not be converted unless and until all consents, approvals, authorizations or waivers (collectively, the "***Approvals***") required to be obtained from any applicable Governmental Authority in respect of any conversion (including, for certainty, the Competition Act Approval, if required, and all Approvals required to be obtained under the Investment Canada Act and the HSR

---

2       Note to Draft: To be the sixth anniversary of closing.
3       Note to Draft: To be the second anniversary of closing.

Act) shall have been obtained in accordance with Section 9.2 of the Purchase Agreement; provided, that if on the Maturity Date any such Approvals are pending before any applicable Governmental Authority, then the Maturity Date shall be automatically extended until 10 Business Days following the end of the applicable waiting periods and the receipt of all applicable Approvals.

4. **Rights Upon A Major Transaction.**

4.1. At least 15 Business Days prior to the consummation of any Major Transaction, the Company shall deliver written notice thereof via electronic mail and overnight courier to the Holder (a "***Major Transaction Notice***"). Such Major Transaction Notice shall specify the nature of, and the anticipated signing date and closing date for, the contemplated Major Transaction.

4.2. At any time during the period beginning after Holder's receipt of a Major Transaction Notice and ending no later than five Business Days prior to the consummation of such Major Transaction, the Holder may at its sole option elect to sell to the acquiring party or parties in such Major Transaction, in which case such party or parties shall purchase from the Holder, this Note, for consideration, payable in preference to any payments to shareholders of the Company, equal to the amount of consideration paid to Company shareholders in connection with such Major Transaction that the Holder would have received had it converted the Total Loan Amount into Conversion Shares immediately prior to the consummation of such Major Transaction (the "***Major Transaction Consideration***"). In connection with the foregoing, Holder shall have the right to elect to have the Major Transaction Consideration set aside in an escrow account for the benefit of Holder upon completion of one Major Transaction.  The Company agrees not to enter into a definitive agreement in respect of a Major Transaction unless such definitive agreement provides for the rights of the Holder set forth in this Article 4.

5. **Events of Default.** Upon the occurrence and during the continuance of an Event of Default, the Holder shall be entitled, by written notice to the Company, to declare all principal and accrued interest under this Note to be, and upon such declaration all principal and accrued interest under this Note shall be and become, immediately due and payable, in addition to any other rights or remedies the Holder may have under applicable law or the provisions of this Note. The Company shall furnish to the Holder prompt written notice of the occurrence of any event, change, circumstance, occurrence, effect or state of facts that constitutes or upon lapse of time or notice or both would constitute an Event of Default. The occurrence of any of the following events shall constitute an "***Event of Default***":

(a)     default in the payment of principal of this Note, accrued interest thereon or any fees, expenses or other amounts payable under this Note when due and the Company's failure to cure such default within 30 days thereof;

(b)     any representation or warranty made by the Company in the Purchase Agreement is false, incorrect or misleading in any material respect when made and would reasonably be expected to have a material adverse effect on the Company's ability to fulfill any of its obligations under the Loan Documents;

6

(c)     the Company (i) fails to observe or perform in any material respect any covenant contained in Article 8 (*Loan Covenants*) of the Purchase Agreement, with such failure being incapable of being cured or such failure continuing for 30 days after the Company's receipt of the Holder's written notice of such failure or (ii) intentionally and willfully breaches any of its obligations under the Investor Rights Agreement;

(d)     any liquidation, dissolution, or winding up of the Company, whether voluntary or involuntary;

(e)     the institution by the Company of proceedings to be adjudicated as bankrupt or insolvent, or the consent by the Company to institution of bankruptcy or insolvency proceedings against the Company under any federal, state, provincial or municipal law, or the consent by the Company to or acquiescence in the filing of any petition relating thereto, or the appointment with the consent or acquiescence of the Company of a receiver, liquidator, assignee, trustee or other similar official of the Company, or of any substantial part of its property, or the making by the Company of an assignment, for the benefit of creditors, or the admission by the Company in writing of its inability to pay its debts generally as such debts become due;

(f)     commencement of proceedings against or affecting the Company seeking any bankruptcy, insolvency, liquidation, dissolution or similar relief under any present or future statute, law or regulations which proceedings shall not have been dismissed or stayed within 30 days of commencement thereof, or the setting aside of any such stay of any such proceedings, or the appointment without the consent or acquiescence of the Company of any trustee, receiver or liquidator of the Company or of all or any substantial portion of the properties of the Company which appointment shall not have been vacated within 60 days thereof;

(g)     a final, non-appealable judgment for the payment of money in excess of US$20,000,000 is outstanding against the Company (which judgment is not covered by insurance policies as to which liability has been accepted by the insurance carrier) and such judgement is not, within thirty (30) days after the entry thereof, discharged or execution thereof stayed or bonded pending appeal, or such judgement is not discharged prior to the expiration of any such stay; or

(h)     the holder of any security interest, hypothec, charge, encumbrance, lien or claim against any of the Company's assets does anything to enforce or realize on such security interest, hypothec, charge, encumbrance, lien or claim, or takes possession of any part of the Company's property, the value of which either alone or in the aggregate is at least US$20,000,000; provided that such enforcement, realization or taking of possession continues in effect and remains undischarged for a period of 45 days.

**6.**     **Security.** The obligations of the Company under this Note shall be unsecured.

**7.**     **No Prepayment.** The Company may not prepay, prior to the Maturity Date, the principal and accrued interest outstanding under this Note (in whole or in part) without the prior written consent of the Holder, in its sole discretion.

**8.**     **Adjustments.** In the event of any stock split, reverse stock split, stock dividend or distribution, subdivision, or any change in the Common Shares or the Note by reason of any

7

recapitalization, combination, reclassification, exchange of shares, merger, consolidation, partial or complete liquidation, share dividend, split-up, sale of assets, distribution to equityholders or similar transactions or changes in the Company's capital structure, the Company agrees that appropriate adjustments shall be made to this Note to ensure that the Holder has, immediately after consummation of such transaction, substantially the same rights with respect to the Company as they have immediately prior to the consummation of such transaction.  Notwithstanding anything herein to the contrary, if, prior to the date that is five years plus one day from the date of issuance of a Note, the Investor would otherwise be entitled to receive, upon conversion of a Note, any property (including cash) or securities that would not constitute "prescribed securities" for the purposes of clause 212(1)(b)(vii)(E) of the *Income Tax Act* (Canada) as it applied for the 2007 taxation year (referred to herein as "***Ineligible Consideration***"), the Investor shall not be entitled to receive such Ineligible Consideration but the Company or its successor or acquiror, as the case may be, shall have the right (at the sole option of the Company or the successor or acquiror, as the case may be) to deliver either such Ineligible Consideration or "prescribed securities," for the purposes of clause 212(1)(b)(vii)(E) of the *Income Tax Act* (Canada) as it applied for the 2007 taxation year, with a market value equal to the market value of such Ineligible Consideration.

9.      **Subordination.**  If requested by the Company, the Holder will enter into a subordination agreement with any Senior Lenders (or one or more agents acting on their behalf), in form and substance satisfactory to such Senior Lenders and the Holder, acting reasonably, pursuant to which, among other things, the Holder will agree in favour of the Senior Lenders that: (a) the obligations of the Company to the Holder under this Note shall be subordinate and rank junior in right of payment to the obligations of the Company under the Senior Indebtedness; and (b) the Holder will not take any steps to accelerate the maturity of the obligations under this Note or take any other enforcement action against the Company so long as the Senior Indebtedness remains outstanding.

10.      **Waiver of Notice.**  The Company hereby waives notice, presentment, protest and notice of dishonor. Other than pursuant to the written notice of the Holder, no failure to exercise any right of the Holder with respect to this Note, nor any delay in, or waiver of, the exercise thereof, shall impair any such right or be deemed to be a waiver thereof.

11.      **Enforcement.**  If the Holder is required to commence legal proceedings, process or incur any other cost to collect amounts due and payable hereunder or to enforce its rights under this Note, the Company shall be liable to pay or reimburse the Holder for all reasonable costs and expenses incurred in connection with the collection of such amounts and any such legal proceedings, including, without limitation, attorneys' fees, and the Company will pay such fees on the demand of the Holder.

12.      **Withholding Tax.**

12.1.      **Payment by Holder; Indemnified Taxes.**  The Holder shall indemnify and save the Company harmless with respect to any Indemnified Taxes and shall timely pay to the Receiver General for Canada or the Company such amount.

12.2.      **Payment by Holder or Company; Thin Capitalization Dividends.**  The Holder shall indemnify and save the Company harmless with respect to 50% of any Withholding

Tax in respect of Thin Capitalization Dividends and shall timely pay to the Receiver General for Canada or the Company an amount equal to 50% of any such Withholding Tax. The Company shall indemnify and save the Holder harmless with respect to 50% of any Withholding Tax in respect of Thin Capitalization Dividends and shall timely pay such amount to the Canada Revenue Agency on the Holder's behalf.

      **12.3.**   <u>**Notice of Withholding Tax.**</u> The Company shall give notice in writing to the Holder (a "***Withholding Notice***") of any Withholding Tax no later than 15 days after receipt of the notice referred to in <u>Section 3.1</u> and in any event reasonably prior to the payment of such Withholding Tax by the Company. The Withholding Notice shall set out the amount of Withholding Tax to be paid by the Company on account of Indemnified Taxes, and Thin Capitalization Dividends, respectively. The Company shall cooperate reasonably with Holder so as to reduce or eliminate the quantum of any Withholding Tax to the extent possible under applicable law.

      **12.4.**   <u>**No Withholding**</u>. The Company agrees that no Withholding Tax would be imposed, under the ITA as it reads on the date hereof, on any amount that will be paid or credited, or deemed to be paid or credited for purposes of Part XIII of the ITA, by the Company to the Holder under this Note or any Loan Document, other than (possibly) Indemnified Taxes and/or Withholding Tax in respect of Thin Capitalization Dividends; and the Company further agrees that it does not intend to withhold any Withholding Tax on any such amount except to the extent that such Withholding Tax is applicable due to an amendment to the ITA or the Treaty after the date hereof. The parties further agree, for clarity, that the Company shall not withhold, fail to issue or sell on the Holder's behalf any Conversion Shares issuable or issued to Holder on the conversion of this Note, whether to fund the payment of Withholding Tax or to satisfy any indemnification obligation of the Holder under this <u>Article 12</u>.

    **13.**   <u>**Miscellaneous.**</u>

      **13.1.**   <u>No Assignment by Company</u>. The Company may not assign its rights or delegate any obligations hereunder without the prior written consent of the Holder.

      **13.2.**   <u>Transfers by Holder</u>. This Note may not be transferred by the Holder other than to an Affiliate of the Holder, without the prior written consent of the Company, not to be unreasonably withheld; <u>provided</u>, that the Company may reasonably withhold its consent to any such transfer if (a) the experience, reputation or financial resources of the proposed transferee is not substantially similar to that of the Holder, or (b) the proposed transferee is a Competitor (as defined in the Investor Rights Agreement) or an Affiliate of a Competitor.

      **13.3.**   <u>Successors and Assigns</u>. This Note shall enure to the benefit of and shall be binding on and enforceable by and against the parties and their respective successors and permitted assigns.

      **13.4.**   <u>Loss or Mutilation of Note</u>. Upon receipt by the Company of evidence satisfactory to the Company of the loss, theft, destruction or mutilation of this Note, together with indemnity reasonably satisfactory to the Company, in the case of loss, theft or destruction, or the

surrender and cancellation of this Note, in the case of mutilation, the Company shall execute and deliver to the Holder a new note of like tenor and denomination as this Note.

13.5. <u>Noteholder Not Shareholder</u>. This Note does not confer upon the Holder any right to vote or to consent to or to receive notice as a shareholder of the Company, as such, in respect of any matters whatsoever, or any other rights or liabilities as a shareholder of the Company, prior to the conversion hereof.

13.6. <u>Notices</u>. Any notice, request or other communication required or permitted hereunder shall be delivered as set forth in the Purchase Agreement.

13.7. <u>Amendments and Waiver</u>. No amendment or waiver of any provision of this Note shall be binding on any party unless consented to in writing by such party. No waiver of any provision of this Note shall constitute a waiver of any other provision, nor shall any waiver of any provision of this Note constitute a continuing waiver unless otherwise expressly provided.

13.8. <u>Usury</u>. It is expressly agreed and provided that the total liability of the Company under this Note for payments in the nature of interest shall not exceed the maximum lawful rate of interest authorized under applicable law, including, without limitation, the *Criminal Code* (Canada) (the "***Maximum Rate***"), and, without limiting the foregoing, in no event shall any rate of interest when aggregated with any other sums in the nature of interest that the Company may be obligated to pay under this Note exceed such Maximum Rate. If under any circumstances whatsoever, interest in excess of the Maximum Rate is paid by the Company to the Holder with respect to indebtedness evidenced by this Note, such excess shall be applied by the Holder to the unpaid principal balance of any such indebtedness or be refunded to the Company, the manner of handling such excess to be at the Holder's election.

13.9. <u>*Interest Act* (Canada)</u>. For the purposes of the *Interest Act* (Canada), where a rate of interest is to be calculated in this Note on the basis of a period of time other than a year of 365 or 366 days, the yearly rate of interest to which the said rate is equivalent is the said rate multiplied by the number of days in the year for which such calculation is made and divided by 365 or 366, as applicable. The principle of deemed reinvestment of interest shall not apply to any interest calculation under this Note, and the rates of interest stipulated in this Note are intended to be nominal rates and not effective rates or yields.

13.10. <u>Further Assurances</u>. Each of the parties hereto shall, from time to time hereafter and upon any reasonable request of the other, promptly do, execute, deliver or cause to be done, executed and delivered all further acts, documents and things as may be required or necessary for the purposes of giving effect to this Note.

13.11. <u>Counterparts</u>. This Note and all documents contemplated by or delivered under or in connection with this Note may be executed and delivered in any number of counterparts (including by email or scanned pages), with the same effect as if all parties had signed and delivered the same document, and all counterparts shall be construed together to be an original and will constitute one and the same agreement. Electronic signatures and electronic pdf signatures (including by email or scanned pages) shall be acceptable as a means of executing such documents.

*(Signature Page Follows)*

IN WITNESS WHEREOF, this Convertible Promissory Note has been signed by the parties as of the date first set forth above.

**RIV CAPITAL INC.**

By: _____
Name: Narbé Alexandrian
Title:  President and Chief Executive Officer


**THE HAWTHORNE COLLECTIVE, INC.**

By: _____
Name: Albert Messina
Title:  Treasurer

[Signature Page to Convertible Promissory Note]