# EXHIBIT 2

**THIS CONVERTIBLE PROMISSORY NOTE AND THE SECURITIES INTO WHICH IT MAY BE CONVERTED HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR APPLICABLE STATE SECURITIES LAWS AND MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR SUCH LAWS COVERING THE TRANSFER OR AN OPINION OF COUNSEL SATISFACTORY TO THE COMPANY THAT SUCH TRANSFER IS EXEMPT FROM SUCH REGISTRATION.**

RIV CAPITAL INC.

CONVERTIBLE PROMISSORY NOTE

**AMOUNT: $188,475,000**                                                                                      **DATE: August 24, 2021**

FOR VALUE RECEIVED, the undersigned, RIV Capital Inc., a corporation formed under the laws of the Province of Ontario (the "*Company*"), promises to pay to the order of The Hawthorne Collective, Inc., or its successors or permitted assigns (the "*Holder*"), the principal amount set forth above plus simple interest on the outstanding principal amount at a fixed rate equal to the Applicable Rate for the period prescribed below, until this Convertible Promissory Note (this "*Note*") is paid in full. Interest shall be calculated on the basis of the actual number of days elapsed over a year of 365 days and shall accrue from the date of this Note until the second (2nd) anniversary of the date hereof. Thereafter, no interest will accrue on this Note. All payments received by the Holder hereunder will be applied first to costs of collection, if any, then to interest and the balance to principal.

Unless converted pursuant to the provisions hereof, payments of principal, interest and other amounts due hereunder will be made by check in immediately available Canadian funds sent to the Holder at the address furnished to the Company for that purpose.

This Note is issued pursuant to that certain Convertible Promissory Note Purchase Agreement (the "*Purchase Agreement*"), dated August 9, 2021, by and among the Company and the Holder. Capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Purchase Agreement.

The following is a statement of the rights of the Holder of this Note and the conditions to which this Note is subject to and to which the Holder hereof, by the acceptance of this Note, agrees:

**1.    Interpretation.**

1.1.    Defined Terms. As used in this Note, the following terms shall have the meanings set forth below:

"*Applicable Rate*" means two and three one-hundredths of a percent (2.03%).

"*Common Shares*" means the Class A common shares in the capital of the Company.

"*Competition Act Approval*" means the occurrence of one or more of the following: (i) the Holder has received an advance ruling certificate under subsection 102(1) of the Competition Act in respect of the conversion of the Note into Conversion Shares; or (ii) both (A) the applicable waiting period under subsection 123(1) of the Competition Act has expired or been waived under subsection 123(2) of the Competition Act, or the obligation to notify the Commissioner of Competition in respect of the conversion of the Note into Conversion Shares under Part IX of the Competition Act has been waived pursuant to paragraph 113(c) of the Competition Act, and (B) the Holder has received a letter from the Commissioner of Competition indicating that the Commissioner of Competition does not, at that time, intend to make an application under section 92 of the Competition Act in respect of the conversion of the Note into Conversion Shares and such letter remains in full force and effect.

"*Conversion Price*" means $1.90.

"*Conversion Shares*" means the Common Shares into which this Note converts.

"*Federal Legalization*" means the first date on which the federal laws in the United States are amended (including the final promulgation of any enabling regulations) to permit the general cultivation, distribution and possession of marijuana (as defined in 21 U.S.C. §802) or to remove the prohibition of such activities from the federal laws of the United States.

"*Indemnified Taxes*" means Withholding Tax that may be imposed on any amount paid or credited, or deemed to be paid or credited for purposes of Part XIII of the ITA, by the Company to the Holder under this Note as interest on and as a result of the conversion of this Note into Conversion Shares under Article 3 hereof, because this Note is not an "excluded obligation" within the meaning of paragraph 214(8)(a) of the ITA; provided, for clarity, that "Indemnified Taxes" shall not include Withholding Tax in respect of Thin Capitalization Dividends.

"*ITA*" means the *Income Tax Act* (Canada), as amended together with rules and regulations thereunder.

"*Senior Indebtedness*" means any secured indebtedness of the Company that ranks or purports to rank in priority to this Note.

"*Senior Lenders*" means any financial institutions or syndicate of financial institutions that are lenders to, or bondholders of, the Company under any Senior Indebtedness.

"***Thin Capitalization Dividends***" means any amount paid or credited, or deemed to be paid or credited for purposes of Part XIII of the ITA, as interest by the Company to the Holder under this Note or any Loan Document, that is deemed to be a dividend paid by the Company to the Holder pursuant to subsections 214(16) and/or 214(17) of the ITA.

"***Total Loan Amount***" means, as of a particular time, the entire outstanding principal amount on this Note, together with accrued unpaid interest and any fees, expenses or other amounts payable under this Note.

"***Treaty***" means the *Convention between Canada and the United States of America with Respect to Taxes on Income and on Capital*.

"***Withholding Tax***" means any tax imposed under Part XIII of the ITA in respect of amounts paid or credited, or deemed to be paid or credited for purposes of Part XIII of the ITA, by the Company to the Holder under this Note and any amounts required to be withheld and remitted to the Receiver General for Canada on account thereof.

1.2.  <u>Rules of Construction</u>.  Except as may be otherwise specifically provided in this Note and unless the context otherwise requires, in this Note:

(a)  the terms "Note", "this Note", "the Note", "hereto", "hereof", "herein", "hereby", "hereunder" and similar expressions refer to this Note in its entirety and not to any particular provision hereof;

(b)  references to an "Article" or "Section" followed by a number or letter refer to the specified Article or Section to this Note;

(c)  the division of this Note into sections and the insertion of headings are for convenience of reference only and shall not affect the construction or interpretation of this Note;

(d)  words importing the singular number only shall include the plural and vice versa and words importing the use of any gender shall include all genders;

(e)  the word "including" is deemed to mean "including without limitation" and the word "includes" is deemed to mean "includes without limitation";

(f)  the terms "party" and "the parties" refer to a party or the parties to this Note;

(g)  any reference to any agreement, plan, contract or any other written instrument or document (including this Note) means such agreement, plan, contract, or written instrument or document as amended, modified, replaced or supplemented from time to time;

(h)  any reference to a statute, regulation or rule shall be construed to be a reference thereto as the same may from time to time be amended, re-enacted or replaced, and any reference to a statute shall include any regulations or rules made thereunder;

(i)  unless otherwise stated, all dollar amounts refer to Canadian dollars;

3

   (j) the word "day" means calendar day unless Business Day is expressly specified;

   (k) any time period within which a payment is to be made or any other action is to be taken hereunder shall be calculated excluding the day on which the period commences and including the day on which the period ends;

   (l) the parties agree that they have been represented by counsel during the negotiation and execution of this Note and, therefore, waive the application of any law, regulation, holding or rule of construction providing that ambiguities in any agreement or other document will be construed against the party drafting such agreement or document; and

   (m) whenever any payment is required to be made, action is required to be taken or period of time is to expire on a day other than a Business Day, such payment shall be made, action shall be taken or period shall expire on the next following Business Day.

   1.3. <u>Governing Law and Submission to Jurisdiction</u>.

   (a) This Note and all matters, claims or actions (whether at law, in equity, in contract, in tort or otherwise) based upon, arising out of or relating to this Note or the negotiation, execution or performance of this Note, shall be interpreted and enforced in accordance with, and the respective rights and obligations of the parties shall be governed by, the laws of the Province of Ontario and the federal laws of Canada applicable in that province, regardless of the laws that might otherwise govern under any applicable conflict of laws principles.

   (b) Each of the parties irrevocably and unconditionally (i) submits to the exclusive jurisdiction of the courts of the Province of Ontario over any action or proceeding arising out of or relating to this Note, (ii) agrees to commence such an action or proceeding in Toronto, Ontario, and to cooperate and use its commercially reasonable efforts to bring the action or proceeding before the Ontario Superior Court of Justice (Commercial List), (iii) waives any objection that it might otherwise be entitled to assert to the jurisdiction of such courts and (iv) agrees not to assert that such courts are not a convenient forum for the determination of any such action or proceeding.

   (c) The Holder, being organized under the laws of a foreign jurisdiction and residing outside of Canada, hereby appoints Blake, Cassels & Graydon LLP, 199 Bay St, Suite 4000, Toronto, Ontario, M5L 1A9, as its agent for service of process in the Province of Ontario.

   1.4. <u>Severability</u>. If any provision of this Note is determined by a court of competent jurisdiction to be invalid, illegal or unenforceable in any respect, all other provisions of this Note shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party hereto. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Note so as to effect the original intent of the parties hereto as closely as possible in an acceptable manner to the end that transactions contemplated hereby are fulfilled to the extent possible.

**2.    Maturity Date.** Subject to Article 3 below or the occurrence of an Event of Default as provided for in Article 5 below, the principal amount owing under this Note, together with accrued unpaid interest and any fees, expenses or other amounts payable under this Note, shall be due and payable in full on August 24, 2027 (the "***Maturity Date***"). Any repayment of the Note shall be made in U.S. dollars calculated using the daily average exchange rate published by the Bank of Canada on the Maturity Date.

**3.    Note Conversion.**

3.1.    Holder Conversion Option. Subject to the terms and conditions of this Note, including satisfaction or, where permitted, waiver of the conditions set forth in Section 3.4, the Purchase Agreement and applicable securities laws, the Holder shall have the right and option, exercisable in its sole option at any time prior to and including the close of business on the Maturity Date, on the Holder providing no less than 30 days' written notice, to convert the Total Loan Amount into the number of Conversion Shares equal to the Total Loan Amount divided by the Conversion Price.

3.2.    Company Conversion Option. Subject to the terms and conditions of this Note, including satisfaction or, where permitted, waiver of the conditions set forth in Section 3.4, the Purchase Agreement and applicable securities laws, the Company shall have the right and option, exercisable in its sole option at any time after the later of (i) the date that Federal Legalization occurs (the "***Forced Conversion Date***") and (ii) August 24, 2023, and prior to and including the close of business on the Maturity Date, to cause the Total Loan Amount to be converted into the number of Conversion Shares equal to the Total Loan Amount divided by the Conversion Price (the "***Forced Conversion Right***").

3.3.    Mechanics and Effect of Conversion. No fractional Conversion Shares shall be issued. In lieu of the Company issuing any fractional Conversion Shares to the Holder upon the conversion of this Note, the Company shall pay to the Holder in cash the amount of unconverted Total Loan Amount. Upon the conversion of this Note pursuant to this Article 3, the Holder shall surrender this Note, duly endorsed, at the principal office of the Company, and simultaneously, at its expense, the Company shall, in exchange for such Note, issue and deliver to the Holder at the Holder's address or if no such address appears or is given, at such principal office of the Company, a direct registration system (DRS) advice evidencing the number of Conversion Shares to which the Holder shall be entitled upon such conversion, together with any other securities and property to which the Holder is entitled upon conversion of this Note, including a check payable to the Holder for any cash amounts payable in lieu of fractional shares as described above. Upon conversion of this Note pursuant to this Article 3, the Company shall be released from all its obligations and liabilities under this Note.

3.4.    Conditions of Conversion. Notwithstanding any other provisions of this Note, this Note shall not be converted unless and until all consents, approvals, authorizations or waivers (collectively, the "***Approvals***") required to be obtained from any applicable Governmental Authority in respect of any conversion (including, for certainty, the Competition Act Approval, if required, and all Approvals required to be obtained under the Investment Canada Act and the HSR Act) shall have been obtained in accordance with Section 9.2 of the Purchase Agreement; provided, that if on the Maturity Date any such Approvals are pending before any applicable Governmental

5

Authority, then the Maturity Date shall be automatically extended until 10 Business Days following the end of the applicable waiting periods and the receipt of all applicable Approvals.

4. **Rights Upon A Major Transaction.**

4.1. At least 15 Business Days prior to the consummation of any Major Transaction, the Company shall deliver written notice thereof via electronic mail and overnight courier to the Holder (a "***Major Transaction Notice***"). Such Major Transaction Notice shall specify the nature of, and the anticipated signing date and closing date for, the contemplated Major Transaction.

4.2. At any time during the period beginning after Holder's receipt of a Major Transaction Notice and ending no later than five Business Days prior to the consummation of such Major Transaction, the Holder may at its sole option elect to sell to the acquiring party or parties in such Major Transaction, in which case such party or parties shall purchase from the Holder, this Note, for consideration, payable in preference to any payments to shareholders of the Company, equal to the amount of consideration paid to Company shareholders in connection with such Major Transaction that the Holder would have received had it converted the Total Loan Amount into Conversion Shares immediately prior to the consummation of such Major Transaction (the "***Major Transaction Consideration***"). In connection with the foregoing, Holder shall have the right to elect to have the Major Transaction Consideration set aside in an escrow account for the benefit of Holder upon completion of one Major Transaction. The Company agrees not to enter into a definitive agreement in respect of a Major Transaction unless such definitive agreement provides for the rights of the Holder set forth in this Article 4.

5. **Events of Default.** Upon the occurrence and during the continuance of an Event of Default, the Holder shall be entitled, by written notice to the Company, to declare all principal and accrued interest under this Note to be, and upon such declaration all principal and accrued interest under this Note shall be and become, immediately due and payable, in addition to any other rights or remedies the Holder may have under applicable law or the provisions of this Note. The Company shall furnish to the Holder prompt written notice of the occurrence of any event, change, circumstance, occurrence, effect or state of facts that constitutes or upon lapse of time or notice or both would constitute an Event of Default. The occurrence of any of the following events shall constitute an "***Event of Default***":

(a) default in the payment of principal of this Note, accrued interest thereon or any fees, expenses or other amounts payable under this Note when due and the Company's failure to cure such default within 30 days thereof;

(b) any representation or warranty made by the Company in the Purchase Agreement is false, incorrect or misleading in any material respect when made and would reasonably be expected to have a material adverse effect on the Company's ability to fulfill any of its obligations under the Loan Documents;

(c) the Company (i) fails to observe or perform in any material respect any covenant contained in Article 8 (*Loan Covenants*) of the Purchase Agreement, with such failure being incapable of being cured or such failure continuing for 30 days after the Company's receipt

of the Holder's written notice of such failure or (ii) intentionally and willfully breaches any of its obligations under the Investor Rights Agreement;

(d) any liquidation, dissolution, or winding up of the Company, whether voluntary or involuntary;

(e) the institution by the Company of proceedings to be adjudicated as bankrupt or insolvent, or the consent by the Company to institution of bankruptcy or insolvency proceedings against the Company under any federal, state, provincial or municipal law, or the consent by the Company to or acquiescence in the filing of any petition relating thereto, or the appointment with the consent or acquiescence of the Company of a receiver, liquidator, assignee, trustee or other similar official of the Company, or of any substantial part of its property, or the making by the Company of an assignment, for the benefit of creditors, or the admission by the Company in writing of its inability to pay its debts generally as such debts become due;

(f) commencement of proceedings against or affecting the Company seeking any bankruptcy, insolvency, liquidation, dissolution or similar relief under any present or future statute, law or regulations which proceedings shall not have been dismissed or stayed within 30 days of commencement thereof, or the setting aside of any such stay of any such proceedings, or the appointment without the consent or acquiescence of the Company of any trustee, receiver or liquidator of the Company or of all or any substantial portion of the properties of the Company which appointment shall not have been vacated within 60 days thereof;

(g) a final, non-appealable judgment for the payment of money in excess of US$20,000,000 is outstanding against the Company (which judgment is not covered by insurance policies as to which liability has been accepted by the insurance carrier) and such judgement is not, within thirty (30) days after the entry thereof, discharged or execution thereof stayed or bonded pending appeal, or such judgement is not discharged prior to the expiration of any such stay; or

(h) the holder of any security interest, hypothec, charge, encumbrance, lien or claim against any of the Company's assets does anything to enforce or realize on such security interest, hypothec, charge, encumbrance, lien or claim, or takes possession of any part of the Company's property, the value of which either alone or in the aggregate is at least US$20,000,000; provided that such enforcement, realization or taking of possession continues in effect and remains undischarged for a period of 45 days.

6. **Security.** The obligations of the Company under this Note shall be unsecured.

7. **No Prepayment.** The Company may not prepay, prior to the Maturity Date, the principal and accrued interest outstanding under this Note (in whole or in part) without the prior written consent of the Holder, in its sole discretion.

8. **Adjustments.** In the event of any stock split, reverse stock split, stock dividend or distribution, subdivision, or any change in the Common Shares or the Note by reason of any recapitalization, combination, reclassification, exchange of shares, merger, consolidation, partial or complete liquidation, share dividend, split-up, sale of assets, distribution to equityholders or similar transactions or changes in the Company's capital structure, the Company agrees that

appropriate adjustments shall be made to this Note to ensure that the Holder has, immediately after consummation of such transaction, substantially the same rights with respect to the Company as they have immediately prior to the consummation of such transaction. Notwithstanding anything herein to the contrary, if, prior to the date that is five years plus one day from the date of issuance of a Note, the Investor would otherwise be entitled to receive, upon conversion of a Note, any property (including cash) or securities that would not constitute "prescribed securities" for the purposes of clause 212(1)(b)(vii)(E) of the *Income Tax Act* (Canada) as it applied for the 2007 taxation year (referred to herein as "***Ineligible Consideration***"), the Investor shall not be entitled to receive such Ineligible Consideration but the Company or its successor or acquiror, as the case may be, shall have the right (at the sole option of the Company or the successor or acquiror, as the case may be) to deliver either such Ineligible Consideration or "prescribed securities," for the purposes of clause 212(1)(b)(vii)(E) of the *Income Tax Act* (Canada) as it applied for the 2007 taxation year, with a market value equal to the market value of such Ineligible Consideration.

9. **Subordination.** If requested by the Company, the Holder will enter into a subordination agreement with any Senior Lenders (or one or more agents acting on their behalf), in form and substance satisfactory to such Senior Lenders and the Holder, acting reasonably, pursuant to which, among other things, the Holder will agree in favour of the Senior Lenders that: (a) the obligations of the Company to the Holder under this Note shall be subordinate and rank junior in right of payment to the obligations of the Company under the Senior Indebtedness; and (b) the Holder will not take any steps to accelerate the maturity of the obligations under this Note or take any other enforcement action against the Company so long as the Senior Indebtedness remains outstanding.

10. **Waiver of Notice.** The Company hereby waives notice, presentment, protest and notice of dishonor. Other than pursuant to the written notice of the Holder, no failure to exercise any right of the Holder with respect to this Note, nor any delay in, or waiver of, the exercise thereof, shall impair any such right or be deemed to be a waiver thereof.

11. **Enforcement.** If the Holder is required to commence legal proceedings, process or incur any other cost to collect amounts due and payable hereunder or to enforce its rights under this Note, the Company shall be liable to pay or reimburse the Holder for all reasonable costs and expenses incurred in connection with the collection of such amounts and any such legal proceedings, including, without limitation, attorneys' fees, and the Company will pay such fees on the demand of the Holder.

12. **Withholding Tax.**

    12.1. **Payment by Holder; Indemnified Taxes.** The Holder shall indemnify and save the Company harmless with respect to any Indemnified Taxes and shall timely pay to the Receiver General for Canada or the Company such amount.

    12.2. **Payment by Holder or Company; Thin Capitalization Dividends.** The Holder shall indemnify and save the Company harmless with respect to 50% of any Withholding Tax in respect of Thin Capitalization Dividends and shall timely pay to the Receiver General for Canada or the Company an amount equal to 50% of any such Withholding Tax. The Company shall indemnify and save the Holder harmless with respect to 50% of any Withholding Tax in

respect of Thin Capitalization Dividends and shall timely pay such amount to the Canada Revenue Agency on the Holder's behalf.

12.3.   **Notice of Withholding Tax.** The Company shall give notice in writing to the Holder (a "*Withholding Notice*") of any Withholding Tax no later than 15 days after receipt of the notice referred to in Section 3.1 and in any event reasonably prior to the payment of such Withholding Tax by the Company. The Withholding Notice shall set out the amount of Withholding Tax to be paid by the Company on account of Indemnified Taxes, and Thin Capitalization Dividends, respectively. The Company shall cooperate reasonably with Holder so as to reduce or eliminate the quantum of any Withholding Tax to the extent possible under applicable law.

12.4.   **No Withholding**. The Company agrees that no Withholding Tax would be imposed, under the ITA as it reads on the date hereof, on any amount that will be paid or credited, or deemed to be paid or credited for purposes of Part XIII of the ITA, by the Company to the Holder under this Note or any Loan Document, other than (possibly) Indemnified Taxes and/or Withholding Tax in respect of Thin Capitalization Dividends; and the Company further agrees that it does not intend to withhold any Withholding Tax on any such amount except to the extent that such Withholding Tax is applicable due to an amendment to the ITA or the Treaty after the date hereof. The parties further agree, for clarity, that the Company shall not withhold, fail to issue or sell on the Holder's behalf any Conversion Shares issuable or issued to Holder on the conversion of this Note, whether to fund the payment of Withholding Tax or to satisfy any indemnification obligation of the Holder under this Article 12.

13.   **Miscellaneous.**

13.1.   **No Assignment by Company**. The Company may not assign its rights or delegate any obligations hereunder without the prior written consent of the Holder.

13.2.   **Transfers by Holder**. This Note may not be transferred by the Holder other than to an Affiliate of the Holder, without the prior written consent of the Company, not to be unreasonably withheld; provided, that the Company may reasonably withhold its consent to any such transfer if (a) the experience, reputation or financial resources of the proposed transferee is not substantially similar to that of the Holder, or (b) the proposed transferee is a Competitor (as defined in the Investor Rights Agreement) or an Affiliate of a Competitor.

13.3.   **Successors and Assigns**. This Note shall enure to the benefit of and shall be binding on and enforceable by and against the parties and their respective successors and permitted assigns.

13.4.   **Loss or Mutilation of Note**. Upon receipt by the Company of evidence satisfactory to the Company of the loss, theft, destruction or mutilation of this Note, together with indemnity reasonably satisfactory to the Company, in the case of loss, theft or destruction, or the surrender and cancellation of this Note, in the case of mutilation, the Company shall execute and deliver to the Holder a new note of like tenor and denomination as this Note.

13.5.   **Noteholder Not Shareholder**. This Note does not confer upon the Holder any right to vote or to consent to or to receive notice as a shareholder of the Company, as such, in

respect of any matters whatsoever, or any other rights or liabilities as a shareholder of the Company, prior to the conversion hereof.

13.6. Notices. Any notice, request or other communication required or permitted hereunder shall be delivered as set forth in the Purchase Agreement.

13.7. Amendments and Waiver. No amendment or waiver of any provision of this Note shall be binding on any party unless consented to in writing by such party. No waiver of any provision of this Note shall constitute a waiver of any other provision, nor shall any waiver of any provision of this Note constitute a continuing waiver unless otherwise expressly provided.

13.8. Usury. It is expressly agreed and provided that the total liability of the Company under this Note for payments in the nature of interest shall not exceed the maximum lawful rate of interest authorized under applicable law, including, without limitation, the *Criminal Code* (Canada) (the "**Maximum Rate**"), and, without limiting the foregoing, in no event shall any rate of interest when aggregated with any other sums in the nature of interest that the Company may be obligated to pay under this Note exceed such Maximum Rate. If under any circumstances whatsoever, interest in excess of the Maximum Rate is paid by the Company to the Holder with respect to indebtedness evidenced by this Note, such excess shall be applied by the Holder to the unpaid principal balance of any such indebtedness or be refunded to the Company, the manner of handling such excess to be at the Holder's election.

13.9. *Interest Act* (Canada). For the purposes of the *Interest Act* (Canada), where a rate of interest is to be calculated in this Note on the basis of a period of time other than a year of 365 or 366 days, the yearly rate of interest to which the said rate is equivalent is the said rate multiplied by the number of days in the year for which such calculation is made and divided by 365 or 366, as applicable. The principle of deemed reinvestment of interest shall not apply to any interest calculation under this Note, and the rates of interest stipulated in this Note are intended to be nominal rates and not effective rates or yields.

13.10. Further Assurances. Each of the parties hereto shall, from time to time hereafter and upon any reasonable request of the other, promptly do, execute, deliver or cause to be done, executed and delivered all further acts, documents and things as may be required or necessary for the purposes of giving effect to this Note.

13.11. Counterparts. This Note and all documents contemplated by or delivered under or in connection with this Note may be executed and delivered in any number of counterparts (including by email or scanned pages), with the same effect as if all parties had signed and delivered the same document, and all counterparts shall be construed together to be an original and will constitute one and the same agreement. Electronic signatures and electronic pdf signatures (including by email or scanned pages) shall be acceptable as a means of executing such documents.

*(Signature Page Follows)*

IN WITNESS WHEREOF, this Convertible Promissory Note has been signed by the parties as of the date first set forth above.

**RIV CAPITAL INC.**

By: _____
Name: Narbé Alexandrian
Title:   President and Chief Executive Officer

**THE HAWTHORNE COLLECTIVE, INC.**

By: _____
Name: Albert Messina
Title:  Treasurer

[Signature Page to Convertible Promissory Note]

IN WITNESS WHEREOF, this Convertible Promissory Note has been signed by the parties as of the date first set forth above.

**RIV CAPITAL INC.**

By: _____
Name: Narbé Alexandrian
Title:  President and Chief Executive Officer


**THE HAWTHORNE COLLECTIVE, INC.**

By: _____
Name: Albert Messina
Title:  Treasurer

[Signature Page to Convertible Promissory Note]